## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NORTHWESTERN CORPORATION, | Case No. 03-12872 (JLP) |
| Reorganized Debtor. | |
| NORTHWESTERN CORPORATION and CLARK FORK AND BLACKFOOT, LLC, | Adv. No. 05-52525 |
| Plaintiff, | |
| v. | |
| MARGARET A. McGREEVEY, JO ANN BARKELL, and JOSEPH MARTELLI, on behalf of themselves and the class of similarly situated individuals, | |
| Defendants. | |

## MOTION FOR LEAVE TO APPEAL INTERLOCUTORY ORDER

Allan M. McGarvey, Esquire
McGARVEY, HEBERLING, SULLIVAN
  & McGARVEY
745 South Main
Kalispell, MT 59901
(406) 752-5566

Edward R. Murphy, Esquire
DATSOPOULOS, MacDONALD &
  LIND, P.C.
201 W. Main, Suite 201
Missoula, MT  59802
(406) 728-0810

KLEHR, HARRISON, HARVEY
  BRANBURG & ELLERS LLP

Steven K. Kortanek (#3106)
919 North Market Street, Suite 1000
Wilmington, DE 19801
(302) 552-5503

COUNSEL FOR *MCGREEVEY* CLASS ACTION CLAIMANTS

Dated:  November 30, 2005

DEL1 62991-1

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 2

STATEMENT OF FACTS ................................................................................... 3

    1.   McGreevey v. Montana Power Company lawsuit ................................... 3

    2.   Corporate reorganization ........................................................................ 3

    3.   The fraudulent transfer is enjoined ........................................................ 4

    4.   The stipulations and representations to protect the McGreevey Class
        interest in the Montana utility ................................................................ 5

    5.   NorthWestern petitions for bankruptcy .................................................. 5

    6.   The proposed Global Settlement............................................................. 6

    7.   The Plan of Reorganization .................................................................... 6

    8.   Global Settlement unresolved as of date of confirmation....................... 8

    9.   The Disclosure Statement ....................................................................... 9

    10.  The Order of Confirmation ....................................................................10

    11.  The Plan Injunctions ..............................................................................12

STATEMENT OF ISSUES AND RELIEF SOUGHT .......................................12

REASONS THAT RELIEF SHOULD BE GRANTED......................................12

  A.   The fraudulent transfer and similar claims survive the reorganization under the
       terms of the Plan of Reorganization and pass through to NorthWestern
       Corporation as reorganized. ...................................................................12

    1.  State law fraudulent transfer actions are expressly reserved under the Plan of
        Reorganization ........................................................................................13

    2.  The plan had to pass through claims in the nature of fraudulent transfers
        because assets which are subject to the superior pre-petition equitable
        interests are not part of the bankruptcy estate.........................................15

        (i)  McGreevey property interests which arose upon November 15, 2002 in-
            court stipulations of NorthWestern. ...............................................16

        (ii) McGreevey's constructive trust interest which arose upon date of
            fraudulent transfer..........................................................................17

    3.  The merits of the reserved fraudulent transfer claims are not an issue for the
        Bankruptcy Court....................................................................................19

B.   The D&O Trust provisions have no application to the McGreevey claim in the absence of an agreement that the MPC policy proceeds may be handled through the NorthWestern bankruptcy estate..............................................................................21

1. The D&O Trust was not intended to affect the McGreevey class claim in the absence of approval of the McGreevey Global Settlement .......................................22

2. References in the D&O Trust provisions to the McGreevey claim and/or the 'disputed' MPC policies are artifacts of a second potential use of the D&O Trust which have no operative effect because the McGreevey claim does not meet the definition of a 'D&O Proceeding'.............................................................23

CONCLUSION...................................................................................................................26

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NORTHWESTERN CORPORATION, | Case No. 03-12872 (JLP) |
| Reorganized Debtor. | |
| NORTHWESTERN CORPORATION and CLARK FORK AND BLACKFOOT, LLC, | Adv. No. 05-52525 |
| Plaintiff, | |
| v. | |
| MARGARET A. McGREEVEY, JO ANN BARKELL, and JOSEPH MARTELLI, on behalf of themselves and the class of similarly situated individuals, | |
| Defendants. | |

## MOTION FOR LEAVE TO APPEAL INTERLOCUTORY ORDER

Comes now Margaret A. McGreevey, Jo Ann Barkell and Joseph Martelli, and pursuant to 28 U.S.C. § 158 (a)(3) and Bankruptcy Rule 8003(a) move the Court for leave to appeal from an interlocutory order of the Bankruptcy Court entered in this matter on October 26, 2005 as more fully described in the Notice of Appeal filed herewith. In support of this motion moving parties respectfully show as follows:

## INTRODUCTION

On August 11, 2005, following NorthWestern Corporation's Chapter 11 reorganization, the McGreevey defendants filed an action against the reorganized NorthWestern Corporation asserting state law fraudulent transfer and related claims. These claims were expressly preserved under the terms of the plan. Specifically, § 5.13(b) of the Plan of Reorganization provides:

> "Except as otherwise expressly provided in this Plan, effective automatically on the Effective Date, the Released Parties, their respective representatives and the Additional Indemnitees, ***shall not be released from*** any and all Claims and Causes of Action arising under Sections 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or similar Claims or Causes of Action arising under state or any other law, including, if applicable, claims in the nature of ***fraudulent transfer***, successor liability, corporate veil piercing or alter-ego claims, as a consequence of transactions, events, or circumstances involving or affecting the Debtor (or any of its predecessors) or any of their respective businesses or operations that occurred or existed prior to the effective date." (Emphasis added)

The McGreevey defendants initiated the fraudulent transfer action under, and expressly citing, the above-quoted terms of the Plan of Reorganization.

NorthWestern initiated this adversary action asserting 1) that the McGreevey fraudulent transfer action violated the plan injunctions, and 2) that the action violated the D&O Channeling Injunction. Northwestern moved for and obtained a preliminary injunction that prevents the timely prosecution of the fraudulent transfer action. The McGreevey defendants seek leave to appeal this preliminary injunction on the grounds that state law fraudulent transfer actions are expressly reserved under the Plan of Reorganization, and upon the further grounds that the D&O Trust Provisions have no application to the McGreevey claim since, by NorthWestern's admission, the Montana Power Company (MPC) D&O policies are not part of the NorthWestern bankruptcy estate.

Creditors, including the McGreevey defendants, are bound by, and entitled to rely upon, Plan provisions and Disclosure Statement representations that a) the McGreevey fraudulent

2

transfer claim is preserved, and b) that the D&O Trust provisions only apply to claims covered by policies which are part of the bankruptcy estate.

## STATEMENT OF FACTS

### 1.    *McGreevey v. Montana Power Company* lawsuit.

On August 16, 2001, a class action was instituted by Margaret McGreevey, et al. versus the Montana Power Company.  The action claims that the Montana Power Company breached the duties it owed to its shareholders to provide notice, voting and dissenter rights prior to selling all or substantially all of its assets, as required under § 35-1-823, MCA.

By rulings dated August 1, 2002, the Montana District Court certified the class and ruled that the corporation's duties under § 35-1-823, MCA, must be followed "regardless of the number of buyers or number of transactions utilized to accomplish a selling or disposition" of all or substantially all of the corporation's assets.  The Court further found that the action brought by the shareholders against the corporation were direct claims to enforce shareholder's individual rights and not rights derivative of the corporation.  Attached as Exhibit 1 is a copy of the August 1, 2002 Order of Judge McKittrick in the *McGreevey* action.

### 2.    Corporate reorganization.

During the pendency of McGreevey's action against the Montana Power Company, the corporation underwent a reorganization by which Montana Power Company was merged into Montana Power, LLC, a subsidiary of Touch America Holdings, Inc.  Attached as Exhibit 2 is a copy of the Articles of Merger whereby the Montana Power Company was merged into Montana Power, LLC, with Montana Power, LLC, the "surviving entity" of the merger.

In October 2002 the McGreevey Class moved to add Montana Power, LLC, which had then changed its name to NorthWestern Energy, LLC, as the entity succeeding to the liabilities of

the Montana Power Company for the McGreevey claims. Attached as Exhibit 3 is the October

23, 2002 Order of the Montana State District Court wherein the Court ruled as follows:

> 1. NorthWestern Energy, L.L.C., a Montana corporation, is added as additional
>    party defendant in this action as a <u>successor entity answerable to the</u>
>    <u>liabilities, duties and obligations of the former Montana Power Company.</u>

The Court's Order is based on § 35-8-1203, MCA, which provides that "all debts, liabilities and

other obligations of each [merging entity] that are party to the merger become the obligations of

the surviving entity."

After the Montana Power Company was merged into the Montana Power, LLC, the 100%

ownership of the latter entity was sold to NorthWestern Corporation. Montana Power, LLC, was

later renamed NorthWestern Energy, LLC, and is now known as Clark Fork and Blackfoot, LLC.

### 3.    The fraudulent transfer is enjoined.

NorthWestern Corporation announced the intent to upstream the assets of its wholly-

owned subsidiary NorthWestern Energy (now known as Clark Fork and Blackfoot) to the parent

NorthWestern Corporation. Such a transfer would leave the entity with insufficient assets to

meet its daily obligations and certainly leave it without assets to satisfy the claims of the

McGreevey Class. The McGreevey Class therefore moved for and obtained an injunction

prohibiting the upstreaming transaction. This injunction is contained in the same October 23,

2002 Order quoted above and attached as Exhibit 3. The Order expressly provided as follows:

> 2.    NorthWestern Energy, L.L.C. <u>shall not transfer its utility business</u> and
>       other interests acquired from the Montana Power Company until such time
>       as an appropriate entity has appeared to be substituted for NorthWestern
>       Energy, L.L.C. with the approval of this Court.

October 23, 2002 order (exhibit 3) at p. 2.

4.    **The stipulations and representations to protect the McGreevey Class interest in the Montana utility.**

In order to satisfy the Court and the McGreevey Class that the upstreaming transaction would not be done to the detriment of the McGreevey Class position as a creditor, NorthWestern made a judicial stipulation and representation to the McGreevey Class and to the Court in a document dated November 15, 2002, entitled Substitute Motion for Leave to Add NorthWestern Corporation as an Additional Party Defendant. A copy of this document is attached as Exhibit 4. In the document NorthWestern Corporation (NOR) made judicial stipulations and representations regarding the McGreevey Class interest in the Montana utility.[1]

First, NorthWestern stipulated and represented to the Court that "it will not take any action intentionally designed to frustrate the ability of plaintiffs to obtain the utility business assets if there is a judgment entered in this case." *Id.* at ¶ 9. Second, NOR stipulated that the McGreevey plaintiffs "retain all rights and remedies to hereafter challenge the transfer of assets from NWE as a fraudulent transfer." *Id.* at ¶ 10.

The stipulation also provides for notification through Federal Energy Regulatory Commission and Montana Public Service Commission procedures such that there could be no proposed purchaser of the Montana utility assets without notice to the McGreevey Class and the ability of the McGreevey Class to enforce its interests in the utility arising out of the stipulation.

5.    **NorthWestern petitions for bankruptcy.**

On September 14, 2003, NorthWestern filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

---

[1] NorthWestern also stipulated and represented to the Court that it will be responsible for any judgment which might be entered in these proceedings against NWE to the extent that NWE might not have sufficient assets to satisfy such judgment, and that NOR is subject to all forms of pre- and post-judgment relief and execution procedures under applicable Montana law." Substitute Motion (Exhibit 4) at ¶ 7.

6.    **The proposed Global Settlement.**

On or about July 10, 2004, the McGreevey Class, NorthWestern and numerous other parties and insurers entered into a Global Settlement which proposed to settle all claims the McGreevey Class had against NorthWestern and others, including the fraudulent transfer claims. The proposed settlement required the approval of the Northwestern Bankruptcy Court, the Bankruptcy Court in the Touch America Chapter 11 proceeding, and the U.S. District Court in which the McGreevey Class action was then pending.    The Global Settlement Agreement expressly provided that in the event that the settlement did not achieve final approval, all parties would return to their litigation positions as of July 10, 2004. (*See* Adversary Complaint at ¶ 36.)

The Memorandum of Understanding governing the proposed settlement also required that the parties, including McGreevey, to "advise the appropriate courts not to take any action that would adversely affect the settlement process."

Pursuant to the terms of the settlement, the McGreevey Class withheld filing the prosecution of the fraudulent transfer adversary action until such time as the Global Settlement could achieve approval.

As of July 1, 2005, approval of the Global Settlement was deemed denied by the United States District Court for Montana and the parties ordered to return to litigation. (*See* 60 day provision of May 2, 2005 Order.)  Thus, NorthWestern and McGreevey were returned to "their litigation positions on July 10, 2004."  Inasmuch as the automatic stay had ended upon the Order of Confirmation approving the Plan of Reorganization, the McGreevey Class initiated the fraudulent transfer action by filing it in State District Court on August 9, 2005.

7.    **The Plan of Reorganization.**

The Plan of Reorganization has two sections that govern this litigation.  First, is the

DEL1 62991-1

express preservation of actions in the nature of pre-petition fraudulent transfer claims. This explicit reservation is contained in Section 5.13 (b) of the Plan that provides that Northwestern *"shall not be released from"*:

> "claims in the nature of <u>fraudulent transfer,</u> successor liability, corporate veil piercing or alter-ego claims, as a consequence of transactions, events, or circumstances involving or affecting the Debtor (or any of its predecessors) or any of their respective businesses or operations that occurred or existed prior to the effective date."

Second Amended Plan of Reorganization (Exhibit 9) at p.48 (emphasis added).

Second, are the provisions of the D&O Trust. NorthWestern Corporation's initial Plan of Reorganization proposed a D&O Trust. The primary purpose of the D&O Trust was to handle claimants who opted out of South Dakota Securities Litigation (unrelated to the McGreevey claim). Much of the NOR policies proceeds were expended to achieve the class settlement in that case. NorthWestern Corporation's interest in the approximate $37 million balance of insurance proceeds was to be transferred to the D&O Trust to satisfy claims of any individuals opting out of that settlement.

The D&O Trust, however, was also drafted so that it might include the McGreevey litigation and the Montana Power Company Policies- **but only if the MPC D&O Policies were part of the NorthWestern estate.** (A number of parties objected to the utilization of the MPC Policies and handling of claims covered thereby through the D&O Trust. These parties objected that the MPC Policies and their proceeds were not part of the NorthWestern bankruptcy estate.) The objections regarding the MPC Policies and claims related thereto (including the McGreevey Class claim) were addressed, in part, by designating the MPC Policies as "Disputed Policies" in Exhibit C to the Plan. This Plan document is attached hereto as Exhibit 6 and it contained the following key provision:

7

The TA Debtors and the <u>plaintiffs to the McGreevey litigation</u> and the In re Touch America ERISA litigation <u>dispute the Debtor status as an insured</u> under, and its entitlement to any proceeds from the Montana Power Company Policies . . . (the "<u>Disputed Policies</u>").

Under this "disputed" status, the applicability of the D&O Trust Provisions to claims arising under the MPC Policies (including the McGreevey Class claim) <u>became contingent, and turned upon a future determination</u> by way of agreement or adjudication that the proceeds of such policies were part of the NorthWestern bankruptcy estate. This contingent application is functionally created by the definitions in the Plan of Reorganization. Specifically, all claims (including the McGreevey claim) are channeled and enjoined **"D&O Proceedings"** if they are "<u>covered by the D&O Policies</u>". **"D&O Policies"**, in turn, is defined as the listed policies (including the "disputed" MPC D&O Policies) but <u>only "to the extent such policies and the proceeds of such policies are property of the Debtor's estate.</u>" Attached as Exhibit 9 are relevant pages of the Second Amended Plan of Reorganization. (*See* Sections 1.47 and 1.46)

NorthWestern has since acknowledged that the MPC D&O policies are <u>not part of the NorthWestern estate</u>.

### 8.    Global Settlement unresolved as of date of confirmation.

As the final confirmation hearing approached, it became clear that final approval of the McGreevey Class settlement would not be obtained before Plan confirmation. Without such global agreement it would be impossible to administer the disputed MPC Policies through the terms of the D&O Trust without litigating the question of whether the proceeds of the MPC Policies were part of the NorthWestern bankruptcy estate.

In the Second Amended and Restated Plan of Reorganization, the MPC Policies remained listed as "Disputed Policies." However, in the Insurance Assignment Agreement, which is essential to the operation of the D&O Trust, the MPC Policies were omitted. NorthWestern

Corporation not only omitted the MPC Policies from the Insurance Assignment Agreement but it affirmatively represented that the unrelated NOR Policies[2] (identified in Exhibit A thereto) were "all insurance policies that the D&O Insurance Contributors have reason to believe potentially provide insurance coverage for D&O Trust claims." Attached hereto as Exhibit 7 is the Insurance Assignment and Funding Agreement, including the referenced Exhibit A thereto. Northwestern now concedes that the MPC D&O Policies are not part of the Northwestern estate.

By exclusion of the MPC Policies, the D&O Trust Documents and D&O Trust Provisions of the Plan became inoperative with respect to the McGreevey claim because the McGreevey claim is a "D&O Proceeding" only to the extent the MPC policies are part of the NorthWestern estate. (Plan Sections 1.47 and 1.46)

9.    **The Disclosure Statement.**

The provisions of the Second Amended and Restated Disclosure Statement disclose to all creditors that the claims of the McGreevey lawsuit, including the fraudulent transfer claim remained a risk to the reorganized corporation.

First, the continuing dispute over the MPC Policies, the reservations related thereto, and the effect of the ongoing dispute were fully disclosed. The relevant pages of this Second Amended and Restated Disclosure Statement are attached as Exhibit 8. At pages 117 and 118 of this Disclosure Statement the dispute over the MPC Policies is described as follows:

L.    Disputes Under Certain Insurance Policies

Certain parties, . . . dispute the Debtor's status as an insured under, and the Debtor's entitlements to any proceeds from, certain policies, the Disputed Policies, identified on Exhibit C to the Plan, namely the Montana Power Company Policies . . . No provision in the Plan (as filed or thereafter amended)

---

[2] The NOR Policies are those policies listed in Exhibit C to the Second Amended Plan of Reorganization which insured NorthWestern Corporation for events after November 15, 2002. These NOR policies covered the South Dakota Securities Litigation.

nor any confirmation order presented or proposed to, or entered by, the Bankruptcy Court, shall (i) determine whether the Debtor is an insured or otherwise entitled to any of the benefits or proceeds of the Disputed Policies, or (ii) prejudice or in any way impair any parties rights with respect to the Disputed Policies and their proceeds. The dispute regarding the Debtor's interest in the Disputed Policies and their proceeds must be determined either consensually or by a court of competent jurisdiction.

Specifically, with respect to the McGreevey litigation, the Disclosure Statement explains

that coverage of the McGreevey litigation by the D&O Trust is contingent upon the resolution of

the Disputed Policies issues:

In claim no. 691, the plaintiffs claim $3,000,000,000 in connection with the Debtor's agreement to be responsible for any judgment which might be entered in the McGreevey Litigation against NorthWestern Energy, LLC . . . Claim No. 691, to the extent Allowed, shall be treated as a D&O Trust Claim only to the extent that such claim is covered by the D&O Policies.

*Id.* at pp. 40-41(Exhibit 8).

Second, the Disclosure Statement explained the effect of the Plan on the ongoing

fraudulent transfer dispute, the anticipated litigation, and the attendant risks to the reorganized

corporation:

**Fraudulent Conveyance Litigation**

[T]he potential litigation which may be filed by the plaintiffs in the McGreevey Litigation concerning the going flat transaction could take time to resolve. . . [R]esolution of this litigation may take some time and the outcome of such litigation is unknown at this time.
                    * * *
The fraudulent conveyance claims . . . if successful may effect the priorities between the unsecured creditors of the Debtor and the creditors of Clark Fork . . .

*Id.* at 117 (Exhibit 8).

### 10.    The Order of Confirmation.

Pursuant to the above-described documentation, including the modification of the

"Disputed Policies", the exclusion of the MPC Policies from the final Insurance Assignment

10

Agreement, and the explicit reservations concerning the continued dispute over the MPC

Policies, the Bankruptcy Court, in its Confirmation Order, resolved remaining objections to the

D&O Trust with express recognition of the preservation of the disputes relating to the MPC

Policies:

> The Milbank Objection also asserts that the Plan cannot determine whether the
> MPC <u>Policies are part of the Debtor's estate</u>. First, the insurance policies whose
> proceeds are subject to the Insurance Assignment Agreement <u>do not include the</u>
> <u>MPC Policies</u>. *See* Insurance Assignment Agreement, Exh. A. Second, the
> Debtor has acknowledged that its interest in the MPC Policies are disputed. *See*
> Plan, Exh. C. Moreover, to the extent the McGreevey Litigation settlement is
> approved, the Debtor will be transferring and assigning its rights and interest in
> the MPC Policies. <u>Neither the Plan nor this Confirmation Order seek to</u>
> <u>determine whether the MPC Policies are part of the Debtor's estate</u>; therefore,
> Milbank Tweed's objection regarding MPC Policies is overruled.

Order of Confirmation dated October 12, 2004 at p. 25 (pages 1-25 and 74-75 of the Order of

Confirmation are attached as Exhibit 11).

Further, the Order of Confirmation defines the Plan's discharge of "liabilities to holders

of D&O Trust Claims" as the discharge effected by "the transfer to, vesting in, and assumption

by the D&O Trust of the D&O Trust Assets[3] and D&O Trust Insurance Assignment." Order of

Confirmation at pp. 74-75 (Exhibit 11). Thus, by its terms, this Order of discharge is limited to

the claims covered by the Insurance Assignment Agreement which "do not include the MPC

Policies." Order of Confirmation at p. 25.

*In view of a) the Plan's express reservation of the fraudulent transfer claim, b) the*

*Plan's definitions and Confirmation Order, which made the D&O Trust provisions*

*inapplicable to claims under the MPC Policies, and c) the Disclosure Statement explanation*

*that the <u>effect</u> of these provisions was to preserve the McGreevey fraudulent transfer claim as*

---

[3]D&O Trust Assets is defined in Section 1.53 of the Plan as the rights assigned "pursuant to the Insurance
Assignment Agreement."

*a future risk to the reorganized corporation, the McGreevey class had no basis for objecting to the Plan, and stated no further objection to the Plan.*

### 11.    The Plan Injunctions.

Section 10.5(a), (c) of the Plan of Reorganization set forth the terms of the Plan Injunctions. These terms prohibit the prosecution of any claim that is "discharged, released or terminated pursuant to this Plan." The scope of the Plan Injunctions are therefore defined and limited by the definitions of which claims are released and which are reserved. <u>Specifically reserved</u> under § 5.13(b), however, are all "claims in the nature of <u>fraudulent transfer</u>, successor liability, corporate veil piercing or alter-ego claims, as a consequence of transactions, events, or circumstances involving or affecting the Debtor (or any of its predecessors) or any of their respective businesses or operations <u>that occurred or existed prior to the effective date</u>."

### STATEMENT OF ISSUES AND RELIEF SOUGHT

McGreevey defendants seek an order reversing the Bankruptcy Court's grant of preliminary injunction. The relief should be granted upon the resolution of the following legal issues:

1.    Did the Bankruptcy Court err in failing to apply the Plan's explicit reservation of pre-petition fraudulent transfer claims?

2.    Do the D&O Trust provisions apply to the McGreevey claim which is insured under policies which are outside of the NorthWestern estate?

### REASONS THAT RELIEF SHOULD BE GRANTED

**A.    The fraudulent transfer and similar claims survive the reorganization under the terms of the Plan of Reorganization and pass through to NorthWestern Corporation as reorganized.**

12

1. **State law fraudulent transfer actions are expressly reserved under the Plan of Reorganization.**

The McGreevey action, which the appealed order enjoins, asserts state law fraudulent transfer and related claims against NorthWestern, *as that corporation has emerged reorganized from bankruptcy*. Therefore, resolution of the claim does not depend on any substantive bankruptcy law, nor does it affect the bankruptcy estate. Indeed, because NorthWestern Corporation stands in a post-reorganization status, it is impossible for the bankrupt Debtors' estate to be affected by this post confirmation dispute, because the Debtors' estate ceases to exist once the confirmation has occurred. *In re Resorts International, Inc.,* 372 F.3d 154, 164-65 (3rd Cir. 2004) citing *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3rd Cir. 1984).

The Plan of Reorganization[4] itself makes clear that the McGreevey class's fraudulent transfer and related claims, have passed through to their reorganized corporation and therefore, are not subject to the Plan injunctions.[5] The controlling provision is Section 5.13(b):

> "Except as otherwise expressly provided in this Plan, effective automatically on the Effective Date, the Released Parties, their respective representatives and the Additional Indemnitees, ***shall not be released from*** any and all Claims and Causes of Action arising under Sections 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or similar Claims or Causes of Action arising under state or any other law, including, if applicable, Claims in the nature of fraudulent transfer, successor liability, corporate veil piercing, or alter ego-type Claims, as a consequence of transactions, events, or circumstances involving or affecting the Debtor (or any of its predecessors) or any of their respective businesses or operations that occurred or existed prior to the Effective Date."

By reason of this express reservation of state law causes of action in the nature of fraudulent transfer claims, the reorganized Debtor emerged from the bankruptcy subject to such claims, and these claims are therefore to be resolved exclusively on the basis of state law.

---

[4] Attached as Exhibit 9.

[5] The injunctions in Sections 10.5(a)-(c) are expressly limited to enjoining claims that are "discharged, released or terminated pursuant to this Plan."

13

Clearly this is the intent and expectation of NorthWestern and the bankruptcy creditors. Indeed, NorthWestern's Second Amended Disclosure Statement[6] expressly recognizes that the fraudulent conveyance litigation is not resolved by the Plan of Reorganization and remains a risk to the reorganized corporation:

"K.  Fraudulent Conveyance Litigation.

The Magten Adversary and the potential litigation which may be filed by the plaintiffs in the McGreevy Litigation concerning the going flat transaction could take time to resolve.  While the Debtor believes that Magten and the plaintiffs in the McGreevey Litigation do not have standing to pursue a claim for a fraudulent transfer, resolution of this litigation may take some time and the outcome of such litigation is unknown at this time.  The Debtor has filed on or about August 13, 2004 its Motion to Approve a Memorandum of Understanding (the "McGreevey MOU") entered into by certain parties to the McGreevey Litigation.  The McGreevey MOU contains the material terms of a proposed settlement under which the Debtor will receive a full release and discharge and withdrawal of any and all claims and causes of actions asserted  or filed and which could have been asserted or filed with respect to the McGreevey Litigation.  A stipulation of settlement in connection with the McGreevey MOU is currently being finalized.

The State of Montana has also asserted that the Debtor operates and continues to operate the Debtor and Clark Fork as a single economic entity.  The fraudulent conveyance claims asserted by various parties if successful, may effect the priorities between the unsecured creditors of the Debtor and the creditors of Clark Fork as well as distributions under the Debtors' Plan."

Second Amended Disclosure Statement (Exhibit8) at p. 113 (emphasis added).

Since the Plan of Reorganization expressly reserves the fraudulent transfer claim, 1) it is not a "released" claim that is enjoined by the Plan injunctions in Sections 10.5(a)-c) of the Plan of Reorganization; and 2) it is not a claim that affects the bankruptcy estate or administration of the Plan.

---

[6]Filed August 18,2004, portions attached as Exhibit 8.

DEL1 62991-1

2.    **The Plan had to pass through claims in the nature of fraudulent transfers because assets which are subject to the superior pre petition equitable interests are not part of the bankruptcy estate.**

Not only does the Plan expressly pass through fraudulent transfer actions, but the Plan had to do so. A plan of reorganization simply cannot dispose of assets which are not part of the property of the Debtor.

Fundamentally, property, to which a bankrupt debtor holds bare legal title, and which is subject to a superior equitable right, does not become property of the debtor's estate to the extent of such superior equitable interest. The governing provision of the Bankruptcy Code is 11 U.S.C. § 541. Subsection (a) defines "property of the estate" to include "all legal or equitable interests of the debtor in property as of the commencement of the case." This section of the Bankruptcy Code goes on to explicitly exempt certain interests from the definition of the estate property. Specifically, § 541(d) provides:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold. (Emphasis added.)

The courts have applied this statute to hold that equitable interests in property, such as a constructive trust which arises prior to the date of the bankruptcy filing, are outside of the bankrupt estate. *Morris v. Morris*, 260 F.3d 654 (6th Cir. 2001); *In re Unicom Computer Corp.*, 13 F.3d 321 (9th Cir. 1994); *Howards Appliance Corp. v. Sanyo Electric, Inc.*, 874 F.2d 88 (2nd Cir. 1999); *Quality Holstein Leasing v. McKenzie*, 752 F.2d 1009 (5th Cir. 1985); *General Coffee Corp.*, 828 F.2d 699 (11th Cir. 1987); *Chiu v. Wong*, 16 F.3d 306 (8th Cir. 1994); *U.S. Dept. of Energy v. Ceneco Oil Co.*, 906 F.2d 1445 (10th Cir. 1990); *American Service v. Henderon*, 120 F.2d 525 (4th Cir. 1941); *Connecticut General Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612

15

(1st Cir. 1998).

In the case of the McGreevey fraudulent transfer action, the McGreevey class has stated several bases for a prepetition interest in the Montana utility assets. Because of these interests, the NorthWestern **bankruptcy estate held title subject to** the following property interests (if provable) of the McGreevey class.

### i.    McGreevey property interests which arose upon November 15, 2002 in-court stipulations of NorthWestern.

One interest of the McGreevey Defendants is in the Montana utility arises out of NorthWestern's affirmative stipulation and representation to the Montana Court. This case is unique in that NorthWestern, the transferee, made **a judicial admission and stipulation** as to its limited interest in and restrictions on the uses it could make of the utility assets with respect to the McGreevey claim.[7] The significance of these admissions and stipulations is manifest in that they were made under the threat of a continuation of the then existing injunction of the Montana Court which would have prevented the transfer of the Montana utility from the subsidiary to NorthWestern. The stipulations functioned to assure that these utility assets remained available to satisfy the McGreevey claim. In other words, but for these limitations, NorthWestern would have remained enjoined to upstream the assets and would not have acquired even bare legal title in the utility business.

Thus, by reason of the express stipulations and representations to the *McGreevey* class and to the Court contained in Exhibit 4 attached hereto, NorthWestern Corporation has **agreed and judicially stipulated** that it holds the Montana utility assets subject to the McGreevey

---

[7]In this bankruptcy, the Court (Judge Case) ruled that these "stipulations and representations made by NorthWestern are an essential part and predicate of the order allowing NorthWestern to be added as party defendant" in the McGreevey state court action, such that "they survive and may be relied upon by the McGreevey class." *See* Exhibit 5.

claim, and further subject to the obligation to act with respect to such assets so as not to "frustrate" the satisfaction of any judgment of McGreevey. By reason of the judicial stipulation there is no justifiable dispute but that NorthWestern Corporation had only a limited interest in the transferred assets as of the date of its petition for bankruptcy. Therefore, by judicial stipulation, these assets were not available to be unconditionally distributed as part of the NorthWestern bankruptcy estate. What _could_ be done, however was the transfer of _title_ to the assets, subject to whatever equitable interests McGreevey held under the court stipulation. That is exactly what the Plan of Reorganization did. Section 5.13(b).

          **ii.**    **McGreevey's constructive trust interest which arose upon date of fraudulent transfer.**

NorthWestern Corporation expressly stipulated, at the time of the upstreaming transaction, that the _McGreevey_ class also reserved the right to challenge the transaction as a fraudulent transfer. (_See_ Exhibit 4 at ¶ 9.) This fraudulent transfer claim presents a second prepetition interest in the Montana utility. The November 15, 2002 transfer of assets from Clark Fork and Blackfoot to its parent, NorthWestern, constituted a fraudulent transfer under Montana's Uniform Fraudulent Transfer Act, § 31-2-301, _et seq._, MCA.

Section 31-2-333 of Montana's Uniform Fraudulent Transfer Act provides, in relevant part, as follows:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> (a) with actual intent to hinder, delay, or defraud any creditor of the debtor; _or_
> (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor:
>     (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) intended to incur, or believed or reasonably should have believed that he would incur, <u>debts beyond his ability to pay as they became due</u>. (Emphasis added.)

§ 31-2-334, MCA. Further, § 31-2-334, MCA, provides as follows:

A transfer made or obligation incurred by a debtor <u>is fraudulent as to a creditor</u> whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or <u>the debtor became insolvent as a result of the transfer</u> or obligation.

For purposes of the above quoted fraudulent transfer statutes, Montana law defines "creditor" as any person with a "claim." Montana law uses the broad definition of "claim" in the Uniform Fraudulent Transfer Act adopted by Montana and 40 other states, as follows:

"Claim" means a right to payment, <u>whether or not the right is reduced to judgment</u>, liquidated, <u>unliquidated</u>, fixed, contingent, matured, unmatured, legal, equitable, secured, or unsecured.

§ 31-2-328(3), MCA (emphasis added).

CF&B transferred in excess $1.1 billion of assets to NorthWestern Corporation. CF&B received no cash for the transfer, and the only consideration was the assumption by the debtor of certain liabilities of CF&B. At the time of the transfer or as a result thereof, CF&B was insolvent and undercapitalized, while NorthWestern Corporation gained net assets of at least $600 million above associated debts. Indeed, CF&B was unable even to meet its daily operating expenses without a transfer of $270,000 per month (*see* Order in <u>this</u> bankruptcy entered September 15, 2003 (Docket No. 21)).

As in most states, the interest of a claimant defrauded by a fraudulent transfer is that of the beneficiary of a constructive trust which <u>arises on the date of the transfer</u>. The rule in Montana is the majority rule of most states. *Paul J. Paradise & Assoc., Inc., v. Burtch*, 249 B.R. 360, 371 (D. Del. 2000) ("[T]he majority rule is that constructive trusts attach or relate back to

18

the <u>time of the unlawful act</u> that lead to the creation of the trust.")

Because the bankruptcy proceeding could not administer assets which are not part of the debtor's estate, and since the McGreevey fraudulent transfer claim remained unresolved, the Plan did the only thing that could be done: it transferred to the reorganized corporation the utility asset *subject to* future actions in the nature of a claim for pre-petition fraudulent transfers.   This is exactly the methodology McGreevey's counsel urged the Debtor and the Court to utilize to prevent the fraudulent transfer claim from being an impediment to the adoption and implementation of the Plan of Reorganization:

> "MR. McGARVEY: "And that enables us to do this process in a way that fits with the proposed reorganization plan.  The unsecured creditors walk away with equity in the reorganized NorthWestern <u>subject to whatever claims we have</u>.  Are they contingent? Are they unliquidated? Are they of no value?  Whatever they are, they go with it.  And so it doesn't – my point is that it doesn't slow down the reorganization Plan."
>
> "THE COURT: Okay. I understand now. I think we have covered it. I think I understand your position."

May17, 2004 Transcript Vol. 2 pp. 195-96

Upon a Disclosure Statement which explained that the Plan left the "**Fraudulent Conveyance Litigation**" as a continuing risk of the reorganized corporation (Second Amended Disclosure Statement at p. 117), the creditors voted in favor of and the Court confirmed a Plan which, in Section 5.13(b), preserves fraudulent transfer claims.

### 3.     The merits of the reserved fraudulent transfer claims are not an issue for the Bankruptcy Court.

Since the Plan of reorganization preserves fraudulent transfer claims, and since the Plan recognizes the reorganized corporation as subject to such claims, the Bankruptcy Court has no jurisdiction or grounds for interfering with the prosecution of the reserved claims.

19

The issue is not whether the McGreevey defendants have a meritorious fraudulent transfer claim to prosecute; rather, the issue is whether the Plan preserves claims in the nature of challenges to pre-petition fraudulent transfers. Here, the Plan expressly reserves such claims, and the McGreevey fraudulent transfer action is consistent with, indeed contemplated by, the Plan. The McGreevey fraudulent transfer action was an explicitly disclosed risk of the reorganized corporation to which the creditors agreed when voting for the Plan. Moreover, since there is no longer any bankruptcy estate, the McGreevey action has no effect on the estate – it only has an effect on the reorganized corporation-- and that effect is the very effect intended by the Plan and disclosed to the creditors.

Rather than addressing the threshold question of whether the Plan passes through fraudulent transfer claims, the Bankruptcy Court put the cart ahead of the horse and presumed to prejudge the merits of the McGreevey claim. Thus, after quoting the controlling section 5.13(b) of the Plan, the Bankruptcy Court stated that the McGreevey argument based thereon "may carry some weight if they had a viable fraudulent conveyance action...They do not." The Bankruptcy Court then undertook an analysis of the merits of the McGreevey claim based upon a patently erroneous factual basis. For example, the Court confused the sale by which NorthWestern purchased Clark Fork and Blackfoot, LLC  (formerly Montana Power Company) with the transaction by which the successor entity transferred the utility to its new parent more than a year later. The latter transfer was not only separate, but it required separate regulatory and court approval. Indeed, this latter (upstream) transfer was separately enjoined by the Montana Court until such time as NorthWestern stipulated that it would hold the assets subject to the McGreevey fraudulent transfer claim. The Bankruptcy Court further confused the basis of the underlying claim against Montana Power Company (now ClarkFork and Blackfoot), apparently

believing that the McGreevey claim was based in part on the sale to NorthWestern, rather than exclusively based on MPC's actions *before* the corporate reorganization or the sale of the successor entity.

The point is that the Bankruptcy Court should not have been making an analysis of the merits at all. The sole question is whether the post confirmation prosecution of the McGreevey claim –regardless of its merits – was prohibited by, or was expressly permitted by, the Plan.

**B.      The D&O Trust provisions have no application to the McGreevey claim in the absence of an agreement that the MPC policy proceeds may be handled through the NorthWestern bankruptcy estate.**

Notwithstanding the clearly expressed intent that NorthWestern would remain at risk for the fraudulent transfer action under the Plan of Reorganization, NorthWestern argues that the D&O Trust provisions[8] of the Plan preclude the McGreevey fraudulent transfer claim. This argument is quickly dispatched by reading the definitions of "D&O Proceedings" and "D&O Policies" in §§ 1.46 and 1.47 of the Plan. Specifically, the D&O Trust provisions apply only to "D&O Proceedings" which are defined in Section 1.47 of the Plan as only those claims "which may be covered by the D&O policies." Section 1.46, in turn, defines "D&O Policies" as meaning those policies identified on Exhibit C "to the extent such policies and the proceeds of such policies are property of the Debtor's estate." NorthWestern now concedes, as it must, that the MPC policies which cover the McGreevey claim are not part of the Northwestern bankruptcy estate. Therefore the D&O Trust provisions have no application to the McGreevey claim. The following arguments will further demonstrate that the D&O Trust was not intended to, does not, and cannot, affect the McGreevey fraudulent transfer claim.

---

[8]These D&O Trust provisions include the provisions of Article VI (§§ 6.1-6.10), the related D&O Trust Documents referenced therein, and the D&O Trust Channeling Injunction, § 10.5(e).

1.     **The D&O Trust was not intended to affect the McGreevey class claim in the absence of approval of the McGreevey Global Settlement.**

The D&O Trust provisions of the Plan of Reorganization (*see* Exhibit 9, Art. VI) were designed to handle the residual of claims for those class members who opted out of the settlement of the South Dakota Securities Litigation. The D&O Trust is funded <u>only</u> with the residual proceeds of NorthWestern's D&O policies (NOR Policies) which cover such claims. Indeed the <u>only</u> effect of the D&O Trust as presented to the Court at the confirmation hearing were NorthWestern's D&O policies which covered the South Dakota Securities claim:

> Ms. Denniston: Your Honor, I want to turn now to talk about the D&O trust, the funding of the D&O trust, the releases, the channeling injunction, and the exculpation provided for in the plan . . .
>
> The Court: This is the McGreevey or the securities?
>
> Ms. Denniston: This is the big one, Your Honor, with the securities class action, Mr. Etkin's client [the South Dakota class action].
>
>                      * * *
>
> Ms. Denniston: . . . [W]hen one looks at how do we get to where we are with the D&O trust, the releases, the channeling injunctions provided for the plan is <u>through the settlement with the class action claimants</u>. One led to the other because first and foremost the debtor needed to have a mechanism to address <u>those claimants that would potentially opt out of the securities class action settlement</u>. That being number one. Number two, is the use of the D&O insurance policies, the Aegis and the EIM policy that are being — — the proceeds of which are being transferred to the trust through the insurance assignment. . . . [T]he beneficiaries of those policies, as this Court knows from the hearing on the MOU are the debtors, directors, and officers, and the way this D&O trust has been structured is pursuant to the terms of the assignment agreement, those parties, including NorthWestern as the holder of the two policies, will be assigning to the trust its interest in the policy proceeds <u>except</u> for the amounts that have been set aside and will be segregated for the purposes of settling the securities and class action litigation, and that number is the $37 million that are subject to the MOU. That will be funded out of the Aegis and EIM policies.

Transcript pp. 85-87. (Transcript excerpts attached as Exhibit 10.)

It is clear from this transcript that, as of confirmation, it was the intent of the Debtor that the D&O Trust would only be used for NorthWestern's D&O policies (NOR Policies) and <u>not</u>

for the MPC Policies. This is consistent with the Plan of Reorganization provisions, Disclosure Statement descriptions, and the Order of Confirmation which permitted treatment of the McGreevey action as a D&O Trust claim only **if** the MPC Policies were found to be part of the estate (see *e.g.* "McGreevey Litigation ... shall be treated as a D&O Trust Claim only to the extent that such claim is covered by the D&O Policies."[9]; "to the extent such policies are part of the estate",[10] "[n]either this Plan nor this Confirmation Order seek to determine whether the MPC Policies are part of the Debtor's estate"[11] It is further consistent with the ultimate determination to leave the MPC policies out of the D&O Trust (see *e.g* "the insurance policies whose proceeds are subject to the [D&O] Insurance Assignment Agreement do not include the MPC Policies"[12] At confirmation, the Debtor did not in anyway suggest that the Debtor intended that the MPC Policies would be channeled into the Trust or that the McGreevey claim would be affected by the D&O Trust *as finally implemented*.

> **2. References in the D&O Trust provisions to the McGreevey claim and/or the 'disputed' MPC policies are artifacts of a second potential use of the D&O Trust which have no operative effect because the McGreevey claim does not meet the definition of a 'D&O Proceeding'.**

Originally, it was contemplated by the Debtor that the functions of the D&O Trust, with respect to litigants opting out of the South Dakota Securities case, might apply in a similar capacity for the McGreevey settlement in the event a settlement of the McGreevey class action case left individual claimants who opted out of the latter class settlement.

Thus, when originally proposed, the D&O Trust provisions included references to claims

---

[9] Exhibit 8 at pp 40-41.

[10] Exhibit 9 at p.6, § 1.46

[11] Confirmation Order (exhibit 11) at p.25.

[12] Confirmation Order (exhibit 11) at p.25.

arising under the MPC Policies, including the outstanding McGreevey action against the former Montana Power Company.  But such a use of the D&O Trust was objected to by McGreevey, Touch America, Milbank Tweed and Goldman Sachs and others on the basis that the proceeds of the MPC Policies were not part of the NorthWestern estate.  These objections consistently maintained that the MPC Policies only provided coverage for claims arising from occurrences which predated February 15, 2002, and which were therefore against the former Montana Power Company and its legal successor.[13]  Of course, regardless of these objections, the Northwestern Bankruptcy Court could not administer insurance policy proceeds which are not part of the Debtor's estate.

The Plan of Reorganization initially preserved the dispute over the MPC D&O Policies by making the D&O Trust provisions conditioned upon a future determination that the MPC Policies were part of the NorthWestern estate.  Specifically, the effect of the D&O Trust provisions on claims (including the McGreevey claim) covered by the "Disputed Policies" was expressly made conditioned upon and limited to the extent that a) the MPC policies did in fact provide coverage to claims and b) the policies and proceeds thereof were adjudicated or agreed to be part of NorthWestern's estate.  These substantive limitations are found in §§ 1.46 and 1.47 of the Plan.  Specifically, the D&O Trust only applies to "D&O proceedings" which are defined as in Section 1.47 of the Plan as only those claims "which may be covered by the D&O policies." Section 1.46 defines "D&O Policies" as meaning those policies identified on Exhibit C "to the extent such policies and the proceeds of such policies are property of the Debtor's estate."  Thus,

---

[13]These objections were addressed, in part, by designating the MPC policies (as distinguished from the NOR policies) as "Disputed Policies" (*see* Exhibit C to the Plan of Confirmation).  Specifically, Exhibit C provides:

> The TA Debtors and the plaintiffs to the McGreevey Litigation and the In re Touch America ERISA Litigation dispute the Debtor's status as an insured under, and its entitlement to any proceeds from the Montana Power Company Policies . . . (the "Disputed Policies").

until and unless, the dispute over the MPC Policies was resolved by a finding that a) the claims were covered by the MPC Policies, and b) the proceeds of such policies belong to the NorthWestern estate, the D&O Trust could have no effect on claims (such as McGreevey's) under the MPC Policies.[14]  In this way the Plan avoided an improper administration of assets which were not part of the estate. This handling of the MPC policies and the McGreevey claim was clearly disclosed in the Disclosure Statement ("McGreevey Litigation ... shall be treated as a D&O Trust Claim only to the extent that such claim is covered by the D&O Policies.") Exhibit 8 at pp 40-41.

Ultimately, the objections of McGreevey, et al. were addressed by eliminating the MPC Policies from the actual policies assigned to the D&O Trust.  Thus, the final Insurance Assignment and Funding Agreement not only excludes the MPC Policies, but NorthWestern ·affirmatively represents therein that the NOR Policies are the only policies which did or potentially provided coverage for D&O Trust claims:

> All insurance policies that the D&O insurance contributors have reason to believe potentially provide insurance coverage for D&O Trust claims are described accurately on Exhibit A to this Agreement.

Attached to this brief as part of Exhibit 7 is the operative 'Exhibit A' identifying only the NorthWestern Corporation policies as the "D&O policies." Thus, in the Order of Confirmation, the Bankruptcy Court observed, "the insurance policies whose proceeds are subject to the Insurance Assignment Agreement do not include the MPC Policies."  Confirmation Order Exhibit 11 at p. 25.

---

[14] As explained in the Second Amended and Restated Disclosure Statement, the "dispute regarding the Debtor's interest in the Disputed Policies and their proceeds must be determined either consensually or by a court of competent jurisdiction." (Disclosure Statement Exhibit 8 at p. 118.) Similarly, the Order of Confirmation confirmed that nothing in the "Plan nor this Confirmation Order seek to determine whether the MPC Policies are part of the Debtor's estate." Confirmation Order at p. 25

Notwithstanding that the Debtor abandoned the concept of requiring that the MPC policies be funneled through the D&O Trust, there remain references to the MPC Policies and to the underlying McGreevey claim in the D&O Trust provisions.    However, since the MPC Policies were ultimately excluded from the implementation of the D&O Trust, the references to the MPC Policies and to the McGreevey claim are artifacts only.    Indeed Northwestern has now conceded that the MPC Policies are **not** part of the NorthWestern estate.    Thus, the McGreevey claim is not covered by an insurance policy that is part of the NorthWestern estate and therefore is not a "D&O Proceeding."

In short, by the intention of the parties and the Court, by the express provisions of the Plan, the Disclosure Statement, the Insurance Assignment Agreement and the Confirmation Order, and by the limitations of the power of a Bankruptcy Court to only administer property which is part of the debtor's estate, the D&O Trust Provisions could have no application to the McGreevey Claim unless the "disputed" MPC policies were found to be part of the Northwestern estate.

## CONCLUSION

As recognized by the Delaware Bankruptcy Court, a preliminary injunction is an extraordinary and drastic remedy.    *In re Carematrix Corporation*, 306 B.R. 478, 485 (Bankr.D.Del. 2004).    This Court should find that the fraudulent transfer action is expressly reserved under the terms of the Plan of Reorganization (§ 5.13(b)), and therefore outside of the scope of the Plan Injunctions.    This Court should further find that the D&O Trust Provisions, including the D&O Channeling Injunction, could have no application to the McGreevey Claim since NorthWestern now admits that the "disputed" MPC Policies were not part of the

26

bankruptcy estate. Based on these findings, the Court should conclude that the bankruptcy Court

erred in enjoining McGreevey's prosecution of the fraudulent transfer action.

    A copy of the Memorandum of Decision and Order appealed from is attached hereto.

Dated: November 30, 2005          KLEHR, HARRISON, HARVEY, BRANZBURG
                            & ELLERS, LLP

                            *Steven K. Kortanek*

                            Steven K. Kortanek (#3106)
                            919 North Market Street, Suite 1000
                            Wilmington, DE 19801
                            (302) 552-5503

                                  -and-

                            McGARVEY, HEBERLING, SULLIVAN
                              & McGARVEY

                            Allan M. McGarvey, Esquire
                            745 South Main
                            Kalispell, MT 59901
                            (406) 752-5566
                                  and
                            Edward R. Murphy, Esquire
                            DATSOPOULOS, MacDONALD & LIND, P.C.
                            201 W. Main, Suite 201
                            Missoula, MT 59802
                            (406) 728-0810

                            Counsel for *McGreevey* Class Action Claimants

# EXHIBIT 1

MONTANA SECOND JUDICIAL DISTRICT COURT, BUTTE-SILVER BOW COUNTY

| | | |
|---|---|---|
| MARGARET A. MCGREEVEY; THOMAS G. TAYLOR; JOANNE BARKELL; JAMES DUDLEY; JOSEPH MARTELLI; and LAWRENCE A. LOMBARDO, Plaintiffs, vs. MONTANA POWER COMPANY, a Montana Corporation; R.P. GANNON; J.P. PETERSON; M.J. MELDAHL; KAY FOSTER; CARL LEHRKIND, III: DEBORAH D. McWHINNEY; TUCKER HART ADAMS; ALAN F. CAIN; JOHN G. CONNORS; R.D. CORETTE; JOHN R. JESTER; MICHAEL E. ZIMMERMAN; JOHN D. HAFFEY; NOBLE E. VOSBURG; PPL MONTANA, L.L.C.; THE GOLDMAN SACHS GROUP, INC.; and JOHN DOE, Defendants. | : : : : : : : : : : : : : : : : : : : : : : | No. DV-01-141<br><br>Thomas M. McKittrick<br><br><br>O R D E R |

Numerous motions have been filed in the above-captioned cause. All motions have been fully briefed by all parties. On June 20, 2002, oral arguments were held in Butte, Montana. The Court, having considered the arguments and authorities of all parties, now enters the following conclusions of law and rulings.

### CONCLUSIONS OF LAW

1. In a motion to dismiss, all allegations of fact contained in the Complaint are taken as true and are deemed admitted for purposes of the motion. Plaintiff need not plead all factual matters. The Complaint may be dismissed if it

appears beyond doubt that the Plaintiff will be unable to prove
any set of facts which would entitle her to relief.

2.    Section 35-1-823, M.C.A., requires a vote and approval
by two-thirds of the shareholders whenever a corporation sells or
otherwise disposes of all or substantially all of its assets
outside the regular course of business.

3.    The purpose of Section 35-1-823, M.C.A., is to protect
the shareholders from the destruction of the means to accomplish
the purpose for which the corporation was incorporated and to
protect the shareholders from a disposition of operational assets
which fundamentally alters the character of their investment.

4.    Section 35-1-823, M.C.A., must be construed to give
effect to the purpose of the statute.

5.    Section 35-1-823, M.C.A., must be followed whenever a
corporation determines or proposes to sell or dispose of all or
substantially all of the assets necessary to fulfill the
corporate purposes.  This requirement is mandated regardless of
the number of buyers or number of transactions utilized to
accomplish such a selling or disposition.

6.    A duty is created, and a right enforceable by, the
shareholders of the corporation through Section 35-1-823, M.C.A.
A claim based on this statute is a direct claim and is not
derivative of the corporation's rights.

7.    Officers and directors of a corporation are not
independent entities when conducting corporate affairs.  The
officers and directors of a corporation owe duties of care,
candor, and loyalty to the shareholders in any event that
fundamentally changes the character of the corporation and the

nature and quality of the shareholders' investment therein.

8.    Sales of corporate assets must comply with the requirements of Section 35-1-823, M.C.A.  Sales of corporate assets which do not comply with the requirements of Section 35-1-823, M.C.A., are void.

9.    One who acquires property through an illegal or void sale holds such property in constructive trust.

10.   A professional who undertakes to provide professional services to a corporation owes a duty of care to third parties who such professional foresees or reasonably should foresee would be harmed by the professional's failure to exercise reasonable care.

11.   A third party may be liable for aiding and abetting a breach of duty owed to shareholders by a corporation, its directors, and/or its officers, if the third party knowingly participates and/or substantially assists in that breach of duty.

12.   In extraordinary transactions in which shareholders voting rights are implicated, an investment banker may, by reason of its superior expertise and the depth of its involvement in the transaction, assume the fiduciary duties owed by the directors and officers to a corporation's shareholders as the shareholder's "agent's agent" and/or by stepping into the shoes of and assuming such directors and officers duties.

**THE COURT, AFTER REVIEWING THE ARGUMENTS AND AUTHORITIES CITED BY ALL PARTIES HEREIN, RULES AND ORDERS AS FOLLOWS:**

1.    The Motions of the Montana Power Company (MPC), R. P. Gannon, J.P. Pederson, M.J. Meldahl, Michael E. Zimmerman, and

John D. Haffey, are **DENIED**.  To be more specific, the Court rules
as follows:

     A.    Defendant's Motion to Dismiss on the grounds that
the claims against these Defendant's is derivative in nature is
**DENIED**.

     B.    Defendant's Motion to Dismiss on the grounds that
they are barred under the doctrines of laches and acquiescence is
**DENIED**.

     C.    Defendant's Motion to Dismiss the first claim for
declaratory relief and alternative claim for declaratory relief
on the grounds that as a matter of law MPC did not sell all or
substantially all of its property so as to trigger the
shareholders approval requirements of Section 35-1-823, M.C.A.,
is **DENIED**.

    2.    The Motion of Outside Directors Kay Foster, Carl
Lehibind, III, Deborah D. McWhinney, Tucker Hart Adams, Alan F.
Cain, John G. Connors, R. D. Corrett, John R. Jester, and Noble
E. Vosburg are **DENIED**.  To be more specific, the Court rules as
follows:

     A.    The Motion to Dismiss Plaintiff's claims II and V
on the grounds that they raise derivative claims is **DENIED**.

     B.    The Motion to Dismiss claim IV on the grounds that
it raises derivative claims is **GRANTED** in regards to the claim
that the "change of control" agreements be declared null and
void.  However, the Motion is **DENIED** with respect to the
Plaintiff's claim for compensatory damages for breach of

fiduciary duties owed to the shareholders.

3.  The Motions to Dismiss PPL Montana, L.L.C. (PPLM), are **DENIED**.  To be more specific, the Court rules as follows:

A.  The Motion to Dismiss the first claim on the grounds that the sale of generation assets to PPLM was not a sale or part of a sale of all or substantially all of the assets triggering the shareholder voting requirements of Section 35-1-823, M.C.A., is **DENIED**.

B.  The Motion to Dismiss the fifth claim on the grounds that it fails to state a claim for imposition of a constructive trust is **DENIED**.

C.  The Motion to Dismiss the first and fifth claims on the grounds that the claims are contradicted by information derived by documents referenced in the Second Amended Complaint is **DENIED**.

D.  The Motion to Dismiss the first and fifth claims on the grounds of laches is **DENIED**.

E.  The Motion to Dismiss on the grounds of equitable estoppel is **DENIED**.

4.  The Motion to Dismiss Goldman Sach Group, Inc., is **DENIED**.  To be more specific, the Court rules as follows:

A.  Goldman Sach's Motion to Dismiss on the grounds that the Second Amended Complaint fails to plead a cause of action for breach of an investment banker's duties to

shareholders is **DENIED**.

Dated this 1st day of August, 2002.

_Thomas M. McKittrick_
DISTRICT COURT JUDGE

cc: Steven Harman
    Scott Gratton
    John Warden
    John Hardiman
    Christopher Perrin
    Wade Dahood
    Frank Morrison, Jr.
    Dale L. McGarvey
    Roger Sullivan
    Alan McGarvey
    Milton Datsopoulos
    Dana Christensen
    Keith Strong
    Robert Murdo
    Patrick Fleming
    Michael Lisch

# EXHIBIT 2

# SECRETARY OF STATE
STATE OF MONTANA
BOB BROWN

**PRIORITY**

Business Services Bureau
Pat Haffey, Deputy



Montana State Capitol
PO Box 202801
Helena, MT 59620-2801
(406)444-3665
http://www.state.mt.us/sos/

MIKE HARRINGTON ESQ
TOUCH AMERICA
130 NORTH MAIN
BUTTE MT   59701

February 14, 2002

Dear Mr. Harrington:

> RE: MERGER OF THE
> MONTANA POWER COMPANY,
> A MONTANA CORPORATION
> INTO THE MONTANA POWER,
> L.L.C., A MONTANA LIMITED
> LIABILITY COMPANY
> ARTICLES OF MERGER
> Date of Filing: February 13, 2002
> Filing Number: 399480 - C105835

I've approved the filing of the documents for the above named entity. The document number and filing date have been recorded on the original document. This letter serves as your certificate of filing and should be maintained in your files for future reference.

Pursuant to your request, I have deducted $40.00 from your prepaid account to cover the costs of this transaction.

Thank you for giving this office the opportunity to serve you. If you have any questions in this regard, or need additional assistance, please do not hesitate to contact the Business Services Bureau professionals at (406) 444-3665.

Sincerely,

Bob Brown

Bob Brown
Secretary of State
Enclosure

You can correspond with our office via facsimile. Our fax number is (406) 444-3976. You can now fax in your search, copy, and certificate requests.

EXHIBIT A

ARTICLES OF MERGER
OF
THE MONTANA POWER COMPANY
(A Montana Corporation)

#399480

AND

THE MONTANA POWER, L.L.C.
( A Montana Limited Liability Company, whose Articles of Organization
were filed with the Montana Secretary of State on September 28, 2000)

Pursuant to the provisions of Section 35-1-1201 of the Montana Limited Liability Act and Section 35-1-816 of the Montana Business Corporations Act, the undersigned corporation and limited liability company adopt the following Articles of Merger for the purpose of merging The Montana Power Company with and into Montana Power, L.L.C. which shall be the Surviving Entity.

1.      The Restated and Amended Agreement and Plan of Merger, dated as of February 20, 2001, a copy of which is attached as Exhibit 1, was approved by the shareholders and member of the undersigned Montana corporation and Montana limited liability company in the manner prescribed by the Montana Business Corporation Act and Montana Limited Liability Act.

2.      As stated in the Restated and Amended Agreement and Plan of Merger, The Montana Power, L.L.C. will be the surviving entity and its address will be 40 East Broadway, Butte, Montana 59701-9934.

3.      These Articles of Merger operate as an Amendment to The Montana Power, L.L.C.'s Articles of Organization, but no further changes are necessary by reason of the merger.

4.      The name and address of the registered agent of The Montana Power, L.L.C., the surviving entity, is:

Corporation Service Company
26 West Sixth Avenue
Helena, MT  59601

5.      The effective date of the merger is the date the Secretary of State files this Articles of Merger.

6.      The number of shares of capital stock of the corporation and units of the limited liability company which, at the respective dates of the aforementioned shareholder and number actions, (a) were outstanding and

Page 1 of 2

entitled to vote and (b) did vote on the Agreement and Plan of Merger, is as follows:

| Name of Corporation | Number of Shares/Units | | |
|---|---|---|---|
| | Outstanding | Vote For | Vote Against |
| The Montana Power Company Common Stock | 103,774,500 | 73,252,467 | 7,804,469 |
| The Montana Power Company Cumulative Preferred Stock | 508,389 | 310,468 | 121,283 |
| Total Shares of Stock of The Montana Power Company | 104,354,889 | 73,562,935 | 7,925,752 |
| The Montana Power, L.L.C. | 10 units | 10 units | 0 |

7.     The number of shares and units voting in favor of the Plan of the Merger by the entities was sufficient approval by the voting group.

DATED this ___ day of February, 2002.

FOR:  THE MONTANA POWER COMPANY

Corporate      By: _Robert P. Gannon_
Seal           Chief Executive Officer

               By: _Pam T. Fl_____
                   Secretary

FOR:  TOUCH AMERICA HOLDINGS, INC.,
      The Manager of The Montana Power,
      L.L.C.

Corporate      By: _Robert P. Gannon_
Seal           Chief Executive Officer

               By: _Pam T. Fl_____
                   Secretary

# EXHIBIT 3

RECEIVED OCT 2 5 2002

FILED

OCT 2 4 2002

LORI MALONEY CLERK

By _____
              Deputy Clerk

Replaces fax filed
10-23-02

MONTANA SECOND JUDICIAL DISTRICT COURT
BUTTE-SILVER BOW COUNTY

MARGARET A. McGREEVEY, et al )
)
Plaintiffs, )
)
vs. )
)
MONTANA POWER COMPANY, et al )
)
Defendants. )
)

Cause No. DV-01-141

## ORDER JOINING NORTHWESTERN ENERGY, L.L.C.
## AS PARTY DEFENDANT AND RESTRICTING FURTHER TRANSFER
## OF INTEREST WITHOUT COURT APPROVAL

Plaintiffs and the plaintiff class having moved to join NorthWestern Energy, L.L.C. as a party defendant to this litigation and to restrict further transfers of the interest of this entity, and the Court having considered the positions of all parties, the Court finds and concludes as follows:

1.      NorthWestern Energy, L.L.C. (formerly known as The Montana Power, L.L.C.), a Montana limited liability company, is the surviving entity and successor in interest to the debts, liabilities and other obligations of the Montana Power Company.

2.      The motion to join NorthWestern Energy, L.L.C as a party to this litigation has been properly served upon NorthWestern Energy, L.L.C.

3.      Joinder of NorthWestern Energy, L.L.C. under Rule 25(c), M.R.Civ.P., is appropriate to assure  a) fair and final resolution of NorthWestern Energy, L.L.C.'s liabilities, duties and obligations as a successor entity, and b) efficient administration of justice and discovery procedures.

4.      NorthWestern Energy, L.L.C. has announced an intention to transfer its interests to its sole member and parent, NorthWestern Corporation (a Delaware corporation).

121

1

2     WHEREFORE, IT IS HEREBY ORDERED as follows:

3     1.    NorthWestern Energy, L.L.C., a Montana corporation, is added as additional

4   party defendant in this action as a successor entity answerable to the liabilities, duties and

5   obligations of the former Montana Power Company.

6     2.    NorthWestern Energy, L.L.C. shall not transfer its utility business and other

7   interests acquired from the Montana Power Company until such time as an appropriate entity

8   has appeared to be substituted for NorthWestern Energy, L.L.C. with the approval of this

9   Court.

10    Dated this 23rd day of October, 2002.

11

12

13     DISTRICT COURT JUDGE

14

15   cc: Counsel of Record

16

17

18

19

20

21

22

23

24

25

26

27

28   Order Joining Northwestern Energy, L.L.C. as Party Defendant and Restricting Further Transfer of Interest Without Court Approval    2

# EXHIBIT 4

RECEIVED NOV 1 8 2002

1   Wayne Harper
    NorthWestern Energy, LLC.
2   40 E. Broadway St.
    Butte, MT 59701-9394
3   (406)497-2257

4   Stanley T. Kaleczyc
    Kimberly A. Beatty
5   BROWNING, KALECZYC, BERRY & HOVEN, P.C.
    139 North Last Chance Gulch
6   Helena, Montana 59601
    (406) 443-6820

7
    Attorneys for NorthWestern Energy, LLC.
8
              MONTANA SECOND JUDICIAL DISTRICT COURT,
9                   BUTTE-SILVER BOW COUNTY

10  ────────────────────────────────────────────────
    MARGARET A. MCGREEVEY;                )
11  THOMAS G. TAYLOR; JOANNE              )
    BARKELL; PATRICK BURTON;              )
12  ROSALIE BURTON; JAMES                 )
    DUDLEY; JOSEPH MARTELLI;              )
13  and LAWRENCE A. LOMBARDO,             )    Cause No. DV-01-141
                                          )
14          Plaintiff,                    )
                                          )
15       v.                               )
                                          )
16  MONTANA POWER COMPANY, a              )    **SUBSTITUTE MOTION FOR LEAVE**
    Montana Corporation;                  )    **TO ADD NORTHWESTERN**
17  MONTANA POWER, L.L.C.;                )    **CORPORATION AS AN**
    TOUCH AMERICA HOLDINGS,               )    **ADDITIONAL PARTY-DEFENDANT**
18  INC.; R.P. GANNON;                    )
    J.P. PEDERSON; M.J.                   )
19  MELDAHL; KAY FOSTER; CARL             )
    LEHRKIND, III; DEBORAH D.             )
20  McWHINNEY; TUCKER HART                )
    ADAMS; ALAN F. CAIN; JOHN             )
21  G. CONNORS; R.D. CORETTE;             )
    JOHN R. JESTER; MICHAEL E.            )
22  ZIMMERMAN; JOHN D. HAFFEY;            )
    NOBLE E. VOSBURG; PPL                 )
23  MONTANA, LLC; GOLDMAN,                )
    SACHS & CO.,a Limited                 )
24  Partnership;                          )
    THE GOLDMAN SACHS GROUP,              )
25  INC.; PANCANADIAN PETROLEUM           )
    LIMITED, a Canadian                   )
26  Corporation;                          )
                                          )
27                                        )

                              1

109549

1  WESTMORELAND COAL COMPANY,           )
   a Delaware corporation, and          )
2  its wholly- owned                    )
   subsidiary CES ACQUISITION           )
3  CORP.; MILBANK, TWEED,               )
   HADLEY & McCLOY, LLP; and            )
4  JOHN DOES 3-5

5  Defendant.

6  _____

7      Northwestern Energy, LLC, (NWE) and NorthWestern Corporation

8  (NOR) through their counsel, hereby moves this Court for an order

9  to add NOR as an additional party-defendant in this action in full

10 compliance with this Court's Order of October 23, as reaffirmed by

11 this Court following the hearing on November 4.  In support of this

12 Motion, movants state:

13     1.  This Court, in its Order dated October 23, 2002 stated, in

14 pertinent part as follows:

15             NorthWestern Energy, L.L.C. shall not transfer
               its  utility  business  and  other  interests
16             acquired from the Montana Power Company until
               such  time  as  an  appropriate  entity  has
17             appeared  to  be  substituted  for  NorthWestern
               Energy,  L.L.C.  with  the  approval  of  this
18             Court.

19 Order at page 2, paragraph 2.

20     2.  This Court in its ruling from the bench on November 4,

21 2002 reaffirmed its October 23 Order.

22     3.  At the November 4 hearing, counsel for NWE represented to

23 the Court that it was and is the intention of NOR to reorganize the

24 manner in which it holds the Remaining Utility Business acquired

25 from Touch America Holdings, Inc. (TA Holdings) and The Montana

26 Power Company (MPC) by converting substantially

27

109949

1  all of those holdings from ownership by its subsidiary (NWE) to
2  NOR.

3      4.    This reorganization of the holding of the Remaining
4  Utility Business Assets was contemplated in the Final Order of the
5  Montana Public Service Commission dated January 31, 2002 as
6  explained in the affidavit of Dennis Lopach, Senior Vice President
7  Administrative Services for NWE, which is on file with this Court.
8  Lopach Affidavit at paragraphs 8-10.    Further, NWE and NOR
9  anticipate the approval of the Federal Energy Regulatory Commission
10 for the assumption of the debts of NWE by NOR on or about November
11 15, 2002.

12     5.    As Mr. Lopach also explained in his affidavit, this
13 reorganization is in the best interest of the shareholders,
14 customers and ratepayers of NOR.    Lopach Affidavit at paragraphs
15 12-15.

16     6.    NOR desires to proceed with the restructuring and
17 reorganization of the assets on or about November 15, 2002.
18 Restructuring by this date is anticipated by the financial markets,
19 the Securities and Exchange Commission and the shareholders of NOR.
20 As a result of such reorganization, substantially all of the assets
21 and liabilities of the Remaining Utility Business will be
22 transferred to NOR; however, certain of the assets and liabilities
23 will remain with NWE.

24     7.    In order to give effect to the Court's order of October
25 23, 2002, NWE requests and NOR stipulates and represents to this
26 Court that NOR may be added as an additional party-defendant to
27 these proceedings subject to the personal jurisdiction of this

                              3                          109549

1  Court. NOR further stipulates and represents to this Court that it
2  will be responsible for any judgment which might be entered in
3  these proceedings against NWE to the extent that NWE might not have
4  sufficient assets to satisfy such judgment and that NOR is subject
5  to the procedures for all forms of pre- and post-judgment relief
6  and execution procedures under applicable Montana Law.  NWE and NOR
7  shall retain any and  all defenses or claims which NWE and NOR, or
8  either of them, may have with respect to the matters which are or
9  may be pending in these proceedings.

10      8.   NOR stipulates that it has no present plans to spin
11 off, merge or reorganize any of the utility business assets which
12 are to be transferred from NWE to NOR in the reorganization
13 contemplated herein.  NOR will include the Plaintiffs' counsel on
14 the service list for all filings with the Federal Energy Regulatory
15 Commission (FERC) and the Montana Public Service Commission (MPSC)
16 which relate to the issuance of securities, incurrence of debt, any
17 pledge, lien, security interest or other encumbrance or the
18 transfer of utility assets of  NOR.  NOR represents that it will
19 not object to Plaintiff's assertion of standing in the dockets
20 established by the filings described above.  NOR represents it can
21 not pledge, incur a security interest, lien, assume additional
22 indebtedness except such that matures one year or less after the
23 date of such issue, renewal, or assumption as provided for in 18
24 C.F.R. § 34.3C2, or transfer utility assets within the State of
25 Montana, or transfer utility assets as provided in 16 U.S.C. §
26 842b, which provides in part a public utility can not transfer all
27 or any part of a public utility's facilities with a value in excess

4

109549

of $50,000, that are subject to the jurisdiction of FERC or MPSC
without the prior approval of FERC and MPSC.

9.   NOR further stipulates and represents to the Court it
will not take any action intentionally designed to frustrate the
ability of Plaintiffs to obtain the utility business assets if
there is a judgment entered in this case.

10.  It is stipulated by NOR and NWE that Plaintiffs,
including the Plaintiff Class, retain all rights and remedies to
hereafter challenge the transfer of assets from NWE as a fraudulent
transfer. NOR and NWE reserve any and all defenses or claims which
NOR and NWE or either of them may have with respect to any claim by
Plaintiffs regarding fraudulent transfer.

11.  Based on these understandings and stipulations,
Plaintiffs' counsel have been contacted and state that they have no
objection to the addition of NOR on the basis described above and
that Plaintiffs' counsel agree that the transfer described
satisfies the requirements of the Court's October 23, 2002 and
November 4, 2002 Orders.

DATED this *15th* day of November, 2002

BROWNING, KALECZYC, BERRY & HOVEN, P.C.


By *Kimberly Beatty*
Stanley T. Kaleczyc
Kimberly A Beatty


Counsel for NorthWestern Energy, LLC and
NorthWestern Corporation

5

169549

**CERTIFICATE OF SERVICE**

I hereby certify that on the _15th_ day of November, 2002, a true copy of the foregoing was faxed and mailed by first-class mail, postage prepaid, addressed as follows:

Dana L. Christensen
Christensen, Moore, Cockrell,
Cummings & Axelberg, P.C.
P.O. Box 7370
160 Heritage Way
Kalispell, MT 59904-0370

Robert M. Murdo
Jackson, Murdo, Grant
    & McFarland, P.C.
203 North Ewing
Helena, MT 59601

R. Keith Strong
Dorsey & Whitney
8 Third St. North
Davidson Building
Great Falls, MT 59403

Steven J. Harman
Scott G. Gratton
Brown Law Firm, P.C.
315 N. 24th St.
Billings, MT 59107-0849

John L. Warden
John Hardiman
Sullivan & Cromwell
125 Broad Street
New York, NY 10004

Stephen H. Orel
Michael Lesch
Leboeuf, Lamb, Greene
    & MacRae, LLP
125 West 55th Street
New York, NY 10019

Patrick T. Fleming
General Counsel
130 North Main
Butte, MT 59701-9332

Wade J. Dahood
Knight, Dahood, McLean
    & Everett
113 East Third Street
Anaconda, MT 59711

Frank B. Morrison, Jr.
Morrison Law Offices, P.C.
341 Central Avenue
Whitefish, MT 59937

Dale L. McGarvey
Roger M. Sullivan
McGarvey, Heberling, Sullivan
    & McGarvey, P.C.
745 S. Main
Kalispell, MT 59901

Milton Datsopoulos
Datsopoulos, MacDonald
    & Lind, P.C.
201 W. Main, Ste. 201
Missoula, MT 59802

_Jennifer DeSlag_
BROWNING, KALECZYC, BERRY & HOVEN, P.C.

6

103549

# EXHIBIT 5

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

In re:                                    )    Chapter 11
                                          )
NORTHWESTERN CORPORATION,                 )    Case No. 03-12872 (CGC)
                                          )
            Debtor.                       )
                                          )
_____

## MEMORANDUM DECISION

Scott D. Cousins
Victoria Watson Counihan
William E. Chipman, Jr.
Greenberg Traurig, LLP
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801

- and -

Jesse H. Austin, III
Karol K. Denniston
Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, Suite 2400
Atlanta, GA 30308

Attorneys for the Debtor and
        Debtor-in-Possession

Neil B. Glassman
Charlene Davis
Eric M. Sutty
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899

- and -

Steven K. Kortanek
Klehr, Harrison, Harvey, Branzburg
        & Ellers, LLP
919 North Market Street, Suite 1000
Wilmington, DE 19801

- and -

Allan M. McGarvey
McGarvey, Heberling, Sullivan &
        McGarvey
745 South Main
Kalispell, MT 59901

- and -

Edward R. Murphy
Datsopoulos, MacDonald & Lind, P.C.
201 W. Main Street, Suite 201
Missoula, MT 59802

Attorneys for the McGreevey Class
        Action Claimants

Alan W. Komberg
Margaret A. Phillips
Ephraim I. Diamond
Talia Gil
Paul, Weiss, Rifkind, Wharton &
        Garrison, LLP
1285 Avenue of the Americas
New York, NY 10019

Attorneys for the Official Committee of
        Unsecured Creditors

June 16, 2004

2

CASE, J.

Before the Court is the McGreevey Class Action Claimants' ("Class") Motion For an Order Granting Relief from the Automatic Stay to Commence an Adversary Proceeding Relating to Assets Upstreamed to the Debtor by Clark Fork and BlackFoot, LLC (the "Motion") (Docket No. 1163). NorthWestern Corporation filed an objection to the Motion which was joined by the Official Committee of Unsecured Creditors. After considering all relevant pleadings, oral argument heard on May 17, 2003, and for the reasons set forth below, the Motion is granted.

## BACKGROUND

On September 14, 2003 (the "Petition Date"), the Debtor filed a voluntary petition for relief under title 11 of the Bankruptcy Code. Pursuant to §§ 1107 and 1108 of the Bankruptcy Code, the Debtor continues to operate its business and manage its properties as debtor-in-possession.

The Debtor filed its initial disclosure statement and plan of reorganization on March 11, 2004. Numerous objections were filed by parties in interest. The Debtor filed an amended disclosure statement and a first amended plan of reorganization on May 14, 2004 and May 17, 2004, respectfully. After the hearing held on May, 17, 2004, the Court entered an Order on May 26, 2004 approving the Debtor's first amended disclosure statement. The confirmation hearing is currently scheduled for August 25, 2004.

By order dated October 10, 2003, the Court established January 15, 2004 (the "Bar Date") as the deadline for creditors to file proofs of claims with respect to claims that arose prior to the commencement of the bankruptcy case. On January 14, 2004, the McGreevey Claimants filed two proofs of claims (Claim Nos. 691 and 744).

3

Prior to the Petition Date, on or about August 16, 2002, the McGreevey Claimants filed an action against the Montana Power Company, pending in the Montana State Court.[1]  The McGreevey class is a certified class of over 100,000 former shareholders of the former Montana Power Company.  The Class asserts claims against the Montana Power Company that arise out of that company's sale of substantially all of its assets without shareholder approval.  The basic structure of the transaction has been described in this Court's  Memorandum Decision denying Comanche Park's motion for relief from stay of even date, and will not be repeated here.

### JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(b).  This is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2)(A) and (G).

### DISCUSSION

Although 11 U.S.C. § 362(a) provides for an automatic stay of the commencement of an adversary proceeding against a debtor, the Bankruptcy Code provides that a party may seek relief from stay in certain circumstances.  In relevant part § 362(d) states that:

> on request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay --- (1) for cause . . .

11 U.S.C. § 362(d)(1).

McGreevey argues that cause exists to allow the Class to file an adversary proceeding for determination of the equitable interests in the Montana utility property on the grounds that it is a necessary prerequisite to any plan of reorganization or confirmation, and should be resolved in

---

[1]    McGreevey, et al. v. Montana Power Company, et al., No. DV 01-141, Montana Second Judicial District Court.

4

the bankruptcy. In addition, McGreevey argues that the Debtor and/or any party in interest would not be prejudiced by such an adversary proceeding.

Unlike Comanche, the McGreevey class expressly asserted a fraudulent conveyance claim in its proof of claim. McGreevey further asserts that, pursuant to stipulation in the Montana State Court, it specifically preserved its right to assert a fraudulent conveyance claim at a later time. If that were the end of the analysis, then the McGreevey class would be entitled to stay relief just as Magten was. However, this Motion has a somewhat different twist. The Debtor asserts that, by virtue of an order entered in the state court litigation (pursuant to the stipulation referenced above) the McGreevey class is left only with an unsecured claim against NorthWestern and is barred from asserting a fraudulent conveyance claim that would return the assets to Clark Fork.

Both the stipulation, relied upon by McGreevey class, and the order, relied upon by NorthWestern, were entered in the Montana State Court litigation as a result of a motion by NorthWestern to be added an additional party defendant. The McGreevey class objected to the motion; following negotiations, NorthWestern filed a "Substitute Motion" which contained numerous stipulations and representations to the Court as part of the agreement of McGreevey class to withdraw its objection. Among the key provisions of the Substitute Motion are the following:

1. NorthWestern's stipulation and representation that it will be responsible for any judgment which might be entered in the proceedings against Clark Fork to the extent that Clark Fork might not have sufficient assets to satisfy such judgment;

2. NorthWestern's stipulation that it had no present plans to spin off, merge or reorganize any of the utility business assets which are to be transferred from Clark Fork to NorthWestern as part of the "going flat" transaction;

3. NorthWestern's representation that it would not pledge, incur a security interest, lien, or assume additional indebtedness except as specifically set forth in the Substitute Motion;

4. NorthWestern's stipulation and representation that it will not take any action intentionally designed to frustrate the ability of the McGreevey plaintiffs to obtain the utility business assets if there is a judgment entered in the pending state court case;

5. And finally, the stipulation by NorthWestern and Clark Fork that the McGreevey plaintiffs retained all rights and remedies to thereafter challenge the transfer of assets from Clark Fork as a fraudulent transfer.

The Substitute Motion was filed November 15, 2002. On the same day, the "Order Adding NorthWestern Corporation as an Additional Party Defendant" was signed by the Montana District Court Judge. That order did not specifically recite, reference, or incorporate the stipulations and representations contained in the substitute motion. It did, however, contain the following language: "That as stipulated and agreed to by Northwestern Corporation, Northwestern Corporation shall be responsible for any judgment which might be entered in these proceedings against NorthWestern Energy, LLC to the extent that NorthWestern Energy, LLC might not have sufficient assets to satisfy such a judgment."

The McGreevey class asserts that, as a result of the Substitute Motion, NorthWestern specifically agreed that it retained the right to pursue the fraudulent conveyance case for which it

6

is now seeking relief from stay. Further, the McGreevey class asserts that it has an additional claim based upon NorthWestern's violations of the stipulations and representations made in the Substitute Motion. NorthWestern, on the other hand, asserts that, as a result of the order, all that the McGreevey class has now is an unsecured claim against Northwestern. In effect, NorthWestern argues that any separate claims that the McGreevey class may have had, including the right to bring a fraudulent conveyance claim, have been merged into a general claim against NorthWestern which can, and should, be resolved through the claims objection process, rather than through the proposed separate adversary proceeding.

NorthWestern's arguments on this point are too clever, by far. Its reading of the order would eviscerate the specifically negotiated stipulations and representations in the Substitute Motion. The fact that the order only references one of the stipulations - that is that NorthWestern would be responsible itself for any judgment amount - does not render the other stipulations nullities. This Court's reading of the Montana State Court documents is that the stipulations and representations made by NorthWestern are an essential part and predicate of the order allowing NorthWestern to be added as a party defendant. As such, they survive and may be relied upon by the McGreevey class.

## CONCLUSION

For the foregoing reasons, the Court will grant the McGreevey Motion. Counsel for the McGreevey class is to submit a form of order.

_Charles G. Case II_
Charles G. Case II
United States Bankruptcy Judge

7

# EXHIBIT 6

EXHIBIT C

D&O POLICIES[1]

| Insurer | Policy Type | Policy Number | Policy Amount | Policy Period Begin Date | Policy Period End Date |
|---|---|---|---|---|---|
| **NORTHWESTERN CORPORATION POLICIES** | | | | | |
| Assoc. Electric & Gas Ins. Svcs. Ltd. (AEGIS) | D&O Liability Insurance Policy | D0626A1A00 | $35,000,000.00 | June 1, 2000 | June 1, 2003 |
| Energy Ins. Mutual (EIM) | Excess Liability Insurance Policy | 900588-00D0 | $25,000,000.00 | June 1, 2000 | June 1, 2003 |
| Assoc. Electric & Gas Ins. Svcs. Ltd. (AEGIS) | Excess Liability Insurance Policy | X0626A1A02 | $35,000,000.00 | June 1, 2002 | June 1, 2003 |
| **MONTANA POWER COMPANY POLICIES[2]** | | | | | |
| Assoc. Electric & Gas Ins. Svcs. Ltd. (AEGIS) | D&O Liability Insurance Policy | D0030A1A99 | $35,000,000.00 | May 1, 1999 | February 15, 2008 |
| Twin City Fire Ins. Co. (Hartford) | Excess Liability Insurance Policy | NDA0155398-99 | $15,000,000.00 | February 15, 2002 | February 15, 2008 |
| Federal Ins. Co. (Chubb) | Excess Liability Insurance Policy | 8141-60-17B | $25,000,000.00 | May 1, 1999 | February 15, 2008 |
| Reliance Ins. Co. | Excess D&O Liability Insurance Policy | NDA0155298-99H | $15,000,000.00 | May 1, 1999 | February 15, 2002 |
| AIG/Nat'l Union Fire Ins. Co. of Pittsburgh, PA | Excess Liability Insurance Policy | 213-9797 | $25,000,000.00 | February 15, 2002 | February 15, 2008 |

---

[1] The NorthWestern Corporation Policies are the only policies that have been utilized in connection with the proposed Stipulation of Settlement in the Class Action. The Debtor reserves the right to amend or modify this Exhibit C to add or delete policies as may be appropriate prior to Confirmation.

[2] The TA Debtors and the plaintiffs to the McGreevey Litigation and the In re Touch America ERISA Litigation dispute the Debtor's status as an insured under, and its entitlement to any proceeds from the Montana Power Company Policies and the Cornerstone Propane Partners, L.P. Policies (the "Disputed Policies").

| CORNERSTONE PROPANE PARTNERS LP POLICIES [3] | | | | | |
|---|---|---|---|---|---|
| Assoc. Electric & Gas Ins. Svcs. Ltd. (AEGIS) | General Partner Liability Insurance Policy | P0736A1A02 | $5,000,000.00 | June 30, 2002 | June 30, 2003 |
| ELU/Greenwich Ins. Co. | Excess Liability Insurance Policy | EX 71 01 09 99 | $15,000,000 | June 30, 2002 | June 30, 2003 |

\*      The fact of inclusion of an insurance policy on this Exhibit C does not constitute a
        determination or an admission as to whether any particular policy provides
        coverage for any matter resolved by the Plan or for any other matter.

---

[3] The Cornerston Propane Partners, L.P. Policies are not being channeled to the D&O
Trust.

ATL/1032803.3

# EXHIBIT 7

## **EXHIBIT 1**

Form of Insurance Assignment Agreement

## INSURANCE ASSIGNMENT AND FUNDING AGREEMENT

This INSURANCE ASSIGNMENT AND FUNDING AGREEMENT (this "Agreement") is made as of _____, 2004 by and among the D&O Insurance Contributors and the D&O Trust. Capitalized terms used herein without definition shall have the meanings given to such terms in the Plan of Reorganization of Northwestern Corporation (the "Plan") (as may be amended, modified or supplemented from time to time in accordance with the terms thereof).

WHEREAS, on September 14, 2003, Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court;

WHEREAS, to protect themselves from certain risks resulting from their businesses, the D&O Insurance Contributors maintained directors and officers liability insurance programs;

WHEREAS, certain of the Released Parties have been named as defendants in numerous actions involving D&O Trust Claims or have been identified as responsible persons or entities in claim letters;

WHEREAS, the Bankruptcy Court has entered a Confirmation Order in the matter of In re NorthWestern Corporation, No. 03-12872 (CGC), United States Bankruptcy Court for the District of Delaware, confirming the Plan;

WHEREAS, the Plan requires the D&O Insurance Contributors to assign certain insurance rights and fund certain amounts to the D&O Trust;

WHEREAS, the D&O Insurance Contributors wish to comply with the terms, conditions, and requirements of the Plan and the Confirmation Order;

WHEREAS, the D&O Insurance Contributors are receiving good and valuable consideration in exchange for the transfers, grants, assignments, and promises made in this Agreement, including the consideration described in the Plan;

NOW, THEREFORE, subject to and on the terms and conditions herein set forth, the D&O Insurance Contributors hereby agree as follows:

I.    ASSIGNMENT TO THE D&O TRUST

A.    Effective upon the Effective Date, the D&O Insurance Contributors hereby irrevocably transfer, grant and assign to the D&O Trust any and all of their D&O Insurance Rights to the D&O Policies identified in Exhibit A attached hereto.

B.    The D&O Insurance Assignment is made free and clear of all encumbrances, and other claims or causes of action.

ATL/1060335.5                    1

C.    The D&O Insurance Assignment is made to the maximum extent possible under applicable law.

D.    The D&O Insurance Assignment is absolute and does not require any further action by the Debtor, the non-Debtor Subsidiaries, non-Debtor Affiliates, the Reorganized Debtor, the D&O Trust, the Bankruptcy Court, or any other Person.

E.    The D&O Insurance Assignment is not an assignment of any insurance policy itself.

F.    To the extent the D&O Insurance Assignment is determined to be invalid by a court of competent jurisdiction, upon request by the D&O Trust, a D&O Insurance Contributor or the Reorganized Debtor, as applicable, shall (i) pursue any of the D&O Insurance Rights for the benefit of and to the fullest extent required by the D&O Trust, and (ii) immediately transfer any amounts recovered under or on account of any of the D&O Insurance Rights to the D&O Trust; provided, however, that while any such amounts are held by or under the control of the D&O Insurance Contributor, such amounts shall be held in trust for the benefit of the D&O Trust.

## II.    FUNDING

A.    On the Effective Date, the D&O Insurance Contributors shall irrevocably transfer all their right, title and interest in and to the D&O Policies to the D&O Trust (the "D&O Transfer").

B.    The D&O Transfer is made free and clear of all encumbrances, and other claims or causes of action.

## III.    COOPERATION

The D&O Insurance Contributors shall cooperate in the pursuit by the D&O Trust of the D&O Insurance Rights as reasonably requested by the D&O Trust. Such cooperation shall include, but not be limited to, making their books, records, employees, agents, and professionals available to the D&O Trust.

## IV.    WARRANTIES AND REPRESENTATIONS

The D&O Insurance Contributors warrant and represent that:

A.    All insurance policies that the D&O Insurance Contributors have reason to believe potentially provide insurance coverage for D&O Trust Claims are described accurately on Exhibit A to this Agreement.

B.    The D&O Insurance Contributors have not heretofore transferred, granted, or assigned, in whole or in part, any sums in excess of $37 million provided to the Settlement Fund under any of the D&O Insurance Policies, other than sums provided to the Settlement Fund.

IN WITNESS WHEREOF, the undersigned, by their authorized representatives as indicated below, have caused this D&O Insurance Assignment Agreement to be duty executed on their own behalf and on behalf of their respective predecessors, successors, parents, present and former Subsidiaries, divisions, Affiliates, and merged or acquired companies and operations.

**D&O TRUST:**

WALKER, TRUESDELL & ASSOCIATES, INC., as Managing Trustee

By: _____

Name:  Hobart G. Truesdell

Title:   Member

Date:


**D&O INSURANCE CONTRIBUTORS:**

NORTHWESTERN CORPORATION, Debtor and Debtor-in-Possession

By: _____

Name:

Title:

Date:

**D&O INSURANCE CONTRIBUTORS (continued):**

### Current Officers and Directors

_____

Marilyn R. Seymann

_____

Randy G. Darcy

_____

Jerry W. Johnson

_____

Larry F. Ness

_____

Lawrence J. Ramaekers

_____

Bruce I. Smith

_____

Gary G. Drook

_____

Michael J. Hanson

_____

Eric R. Jacobsen

_____

Roger P. Shrum

_____

Alan D. Dietrich

_____
Michael J. Young

_____
Brian B. Bird

_____
Mike Nieman

_____
Thomas Knapp

_____
Emilie Ng

_____
Kendall Kliewer

**D&O INSURANCE CONTRIBUTORS (continued)**

**Former Officers and Directors**

[TBD]

EXHIBIT "A"

D&O POLICIES

| Insurer | Policy Type | Policy Number | Policy Amount | Policy Period Begin Date | Policy Period End Date |
|---------|-------------|---------------|---------------|--------------------------|------------------------|
| **NORTHWESTERN CORPORATION POLICIES** | | | | | |
| Assoc. Electric & Gas Ins. Svcs. Ltd. (AEGIS) | D&O Liability Insurance Policy | D0626A1A00 | $35,000,000.00 | June 1, 2000 | June 1, 2003 |
| Energy Ins. Mutual (EIM) | Excess Liability Insurance Policy | 900588-00D0 | $25,000,000.00 | June 1, 2000 | June 1, 2003 |

# EXHIBIT 8

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NORTHWESTERN CORPORATION, | : | Case No. 03-12872 (CGC) |
| | : | |
| | : | |
| Debtor. | : | |

## SECOND AMENDED AND RESTATED DISCLOSURE STATEMENT
## PURSUANT TO SECTION 1125
## OF THE BANKRUPTCY CODE FOR THE
## PLAN OF REORGANIZATION OF THE DEBTOR

**PAUL, HASTINGS, JANOFSKY & WALKER , LLP**
Jesse H. Austin, III
Karol K. Denniston
Carolyn Chayavadhanangkur
600 Peachtree Street, N.E.
Suite 2400
Atlanta, Georgia 30308
Telephone: (404) 815-2400

Co-Counsel to the Debtor
and Debtor-in-Possession

**GREENBERG TRAURIG, LLP**
Scott D. Cousins
Victoria Watson Counihan
William E. Chipman, Jr.
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801
Telephone: (302) 661-7000

Dated:    August 18, 2004
             Wilmington, Delaware

ATL/1053554.14

## TABLE OF CONTENTS

Page

I        INTRODUCTION AND SUMMARY .................................................. 1

    A.    Overview.................................................................................. 1

    B.    Summary of Classification and Treatment Under the Plan .................................. 4

    C.    Voting and Confirmation Procedures ................................................. 12

    D.    Resolicitation Procedures......................................................... 13

II       DESCRIPTION OF DEBTOR AND EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASE..................................... 16

    A.    Overview of the Debtor and its Business Operations ........................................ 16

    B.    Pre-Petition Debt Structure of the Debtor............................................. 19

    C.    Current Compensation and Benefits Programs....................................... 20

    D.    Proceedings Before Montana Public Service Commission ................................ 22

    E.    Events Precipitating Chapter 11 Filing .............................................. 23

III     SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE ...................... 28

    A.    Overview of Chapter 11 and Commencement of Chapter 11 Case ..................... 28

    B.    First Day Orders................................................................... 29

    C.    Professional Retentions.............................................................. 29

    D.    Appointment of Creditors' Committee and Professionals ................................... 30

    E.    Post-Petition Financing ............................................................. 31

    F.    Sale of Expanets Assets ........................................................... 32

    G.    Sale of Blue Dot Assets ........................................................... 33

    H.    Extension of Time to Assume or Reject Leases ....................................... 33

    I.    Extension of Exclusive Periods ..................................................... 34

    J.    Claims Process and Bar Date....................................................... 34

    K.    Performance Bonuses.............................................................. 37

    L.    Proposed Equity Committee ........................................................ 37

    M.   Litigation – Pending and Asserted.................................................. 37

    N.    Inquiries to Purchase Debtor's Assets ............................................... 45

IV     OVERVIEW OF THE PLAN............................................................ 46

    A.    General............................................................................. 46

    B.    Classification of Claims and Equity Interests....................................... 46

TABLE OF CONTENTS
(continued)

|   | C. | Treatment of Claims and Equity Interests Under the Plan | 47 |
|   | D. | Description of Means of Execution and Transactions to be Implemented in Connection with the Plan | 59 |
|   | E. | Distributions and Treatment of Disputed, Contingent and Unliquidated Claims and Equity Interests | 66 |
|   | F. | Executory Contracts and Unexpired Leases; Indemnification Claims; and Retiree Benefits | 69 |
|   | G. | Corporate Governance and Management | 72 |
|   | H. | Exculpation; Release; Injunctions; and Discharge | 74 |
|   | I. | Confirmation and Effectiveness of Plan | 77 |
|   | J. | Regulation | 79 |
|   | K. | Retention of Jurisdiction | 80 |
| V |   | SUMMARY OF CERTAIN MATERIAL DOCUMENTS TO BE EXECUTED OR IMPLEMENTED IN CONNECTION WITH THE PLAN | 81 |
|   | A. | Reorganized Debtor Corporate Charter | 82 |
|   | B. | The New Incentive Plan | 82 |
|   | C. | Registration Rights Agreement | 82 |
|   | D. | Public Utility Holding Company Act | 83 |
| VI |   | ACCEPTANCE AND CONFIRMATION OF THE PLAN | 84 |
|   | A. | Acceptance of the Plan | 84 |
|   | B. | Confirmation | 85 |
| VII |   | VALUATION OF REORGANIZED DEBTOR | 88 |
|   | A. | Overview | 88 |
|   | B. | Valuation Methodology | 90 |
| VIII |   | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 96 |
|   | A. | Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Class 7, 8 and 9 Claims | 97 |
|   | B. | Certain U.S. Federal Income Tax Consequences of the Plan to Certain Holders of Class 9 Claims and Class 10 Claims that Receive Cash | 100 |
|   | C. | Certain U.S. Federal Income Tax Consequences of the Plan to the Holders of Class 12 Claims and Class 15 Claims | 100 |

TABLE OF CONTENTS
(continued)

| | D. | Certain U.S. Federal Income Tax Consequences of the Plan to the Debtor ...... 100 |
|---|---|---|
| | E. | Backup Withholding and Reporting ................................................. 103 |
| | F. | Deloitte & Touche LLP .................................................................. 104 |
| IX | | RISK FACTORS ........................................................................... 104 |
| | A. | Regulated Industry ....................................................................... 104 |
| | B. | PUHCA Compliance...................................................................... 105 |
| | C. | Relationship With Montana Public Service Commission and Montana Consumer Counsel............................................................................ 106 |
| | D. | Commodity Price and Supply Risks ................................................. 108 |
| | E. | Seasonal and Quarterly Energy Demand Fluctuations ....................... 109 |
| | F. | Dependence on Key Personnel ........................................................ 109 |
| | G. | Compliance With Environmental Laws.............................................. 109 |
| | H. | Projected Financial Information ...................................................... 110 |
| | I. | Lack of Market for Securities Issued Pursuant to the Plan................... 110 |
| | J. | Delay in Distributing Asset Sale Proceeds to Debtor and Adequate Liquidity...................................................................................... 110 |
| | K. | Fraudulent Conveyance Litigation.................................................... 111 |
| | L. | Disputes Under Certain Insurance Policies......................................... 111 |
| | M. | Cornerstone Asserted Claims.......................................................... 112 |
| | N. | Securities Class Action Settlements.................................................. 112 |
| | O. | Certain Bankruptcy Related Considerations....................................... 113 |
| | P. | Dividends ................................................................................... 114 |
| | Q. | Potential Treatment as Public Utility Holding Company ..................... 114 |
| X | | EXEMPTIONS FROM SECURITIES ACT REGISTRATION; REGISTRATION RIGHTS ................................................................. 115 |
| | A. | Issuance of New Securities Pursuant to the Plan ............................... 115 |
| | B. | Subsequent Transfer of Securities Issued Under the Plan ................... 116 |
| XI | | ALTERNATIVES TO THE PLAN AND CONSEQUENCES OF REJECTION ................................................................................... 117 |
| | A. | Alternative Plans.......................................................................... 117 |
| | B. | Chapter 7 Liquidation .................................................................. 117 |

TABLE OF CONTENTS
(continued)

Page

XII        RECOMMENDATION AND CONCLUSION.................................................. 118

## TABLE OF CONTENTS

XIII.  LIST OF EXHIBITS

Exhibit A   Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code

Exhibit B   Disclosure Statement Approval Order

Exhibit C   Resolicitation Order

Exhibit D   Debtor's Pre-Petition Debt Structure

Exhibit E-1  Proposed Released Parties – Securities Litigation Releases in connection with Class Action

Exhibit E-2  Proposed Released Parties – General Released Parties

Exhibit F-1  Agreement in Principle by and among NorthWestern Corporation, the Montana Public Service Commission and the Montana Consumer Counsel dated May 14, 2004

Exhibit F-2  Stipulation and Settlement Agreement among NorthWestern Corporation, the Montana Public Service Commission and the Montana Consumer Counsel dated July 8, 2004

Exhibit F-3  Bankruptcy Court Order Approving Stipulation and Settlement Agreement among Debtor, Montana Public Service Commission and Montana Consumer Counsel Pursuant to Sections 105(a) and 1129(a)(4) of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules entered on July 15, 2004

Exhibit G   Management

Exhibit H   NorthWestern Corporation Liquidation Analysis

Exhibit I   NorthWestern Corporation 2004-2008 Financial Projections

Exhibit J   NorthWestern Corporation Form 10-Q for the Fiscal Quarter Ended June 30, 2004

Exhibit K   NorthWestern Corporation Form 10-Q for the Fiscal Quarter Ended March 31, 2004

Exhibit L   NorthWestern Corporation Form 10-K, and Accompanying Audited Financial Statements, for the Fiscal Period Ended December 31, 2003

Exhibit M   NorthWestern Corporation Form 10-Q for the Fiscal Quarter Ended September 30, 2003

TABLE OF CONTENTS
(continued)

Exhibit N     Reorganized NorthWestern Corporation Charter

Exhibit O     Debtor's Projected Balance Sheet as of September 30, 2004

Exhibit P     QUIPS Litigation Decision

appointment of an official equity committee. The Movants' motion was denied by court order entered on May 13, 2004.

**M.     Litigation – Pending and Asserted**

(1)     AEP Adversary. On or about November 24, 2003, the Debtor filed an adversary complaint against American Electric Power Company, Inc., American Electric Power Service Corporation and Ohio Power Corporation (collectively, "AEP"). The Debtor and AEP are parties to a Letter of Confirmation entered on or about December 3, 2002 for the sale by the Debtor of a certain quantity of power to AEP. The Debtor contends AEP breached this contract by improperly terminating. The Debtor also contends AEP violated the automatic stay by attempting to collect additional funds post-petition. On or about May 28, 2004, the Debtor filed a motion to approve the settlement with AEP. The Court entered an Order approving the settlement with AEP on or about June 21, 2004.

(2)     Cornerstone and Mewhinney Litigation. The Debtor, and certain of its present and former officers and directors, are named as defendants in certain complaints filed against CornerStone Propane Partners LP, and other defendants filed in the United States District Court for the Northern District of California. This litigation is stayed as to the Debtor.

(3)     Hydrodynamics Litigation. On or about April 9, 2003, Hydrodynamics, Inc. ("Hydrodynamics") commenced a state court action against the Debtor styled Hydrodynamics, Inc. v. NorthWestern Corporation, Case No. DV-03-36, Montana Sixth Judicial District, Park County (the "Hydrodynamics Litigation"). In the Hydrodynamics Litigation, Hydrodynamics asserts breach of contract, breach of the duty of good faith and fair dealing, waiver and estoppel, breach of fiduciary duties and misrepresentation in connection with two (2) Cogeneration and Small Power Production Long-Term Power Purchase Agreements, dated as of October 31, 1984 and as of November 15, 1984 (collectively, the "Hydrodynamics Agreements"). On or about March 19, 2004, Hydrodynamics filed its motion for relief from the automatic stay. At the request of Hydrodynamics, on or about April 1, 2004, the Debtor filed its motion to assume the Hydrodynamics Agreements. On June 21, 2004, the Court entered an order approving the assumption of the Hydrodynamics Agreements. The Debtor and Hydrodynamics are currently negotiating a final settlement agreement which addresses the cure amount and other issues as between the Debtor and Hydrodynamics.

(4)     Hylland Arbitration. On April 30, 2003, Mr. Richard Hylland filed a demand for arbitration of contract claims under his employment agreement, as well as tort claims for defamation, infliction of emotional distress and tortious interference and a claim for punitive damages. The arbitration has been stayed by the Debtor's bankruptcy filing and Mr. Hylland's motion seeking lifting of the automatic stay was denied by the Bankruptcy Court pursuant to a written Memorandum Order. On or about January 23, 2004, Mr. Hylland filed a notice of

appeal of the Bankruptcy Court's order denying his motion for relief from stay.[38] The Debtor has filed a motion to dismiss Mr. Hylland's appeal. In connection with the settlement of the Securities Litigation, the Debtor and Mr. Hylland reached an agreement whereby Mr. Hylland will dismiss his claims against the Debtor asserted in the Debtor's bankruptcy proceeding, except for those claims arising from Mr. Hylland's employment, Mr. Hylland and the Debtor shall attempt to negotiate a liquidated amount and if such negotiations are successful, Mr. Hylland will withdraw his pending appeal in the Debtor's bankruptcy proceeding. If an agreed liquidated amount cannot be reached, Mr. Hylland may continue to pursue his appeal and the pending arbitration of his employment claim.

Mr. Hylland asserts total claims in excess of $30.0 million, of which he asserts he is owed $4.0 million in fully vested retirement benefits under the Supplemental Income Security Plan ("SISP") and over $1.4 million for damages relating to administration and/or termination of the Debtor's Family Protector Plan. In connection with his employment agreement, Mr. Hylland further asserts that the Debtor breached specific employment contract provisions, defamation, and other tortious conduct. Mr. Hylland asserts that the Debtor repeatedly subjected Mr. Hylland to "fundamental change conduct" and pursuant to the employment agreement, Mr. Hylland could terminate his employment at any time after providing the Debtor with notice of the fundamental change conduct and a reasonable period of time for the Debtor to cure the fundamental change. The Debtor strongly disagrees with Mr. Hylland's assertions and intends to object to Mr. Hylland's claims.

On or about April 30, 2004, Mr. Hylland filed his Second Motion for Relief from the Automatic Stay to Continue Pre-Petition Arbitration (the "Second Motion"). On May 17, 2004, the Court denied Mr. Hylland's Second Motion without prejudice.

(5)    Lewis Adversary. On April 22, 2004, Merle D. Lewis filed an adversary proceeding asserting that the Debtor (i) impermissibly cutback Mr. Lewis' qualified benefits and breached its fiduciary duty to protect the plan benefits, (ii) impermissibly alienated Mr. Lewis' qualified benefits, and (iii) failed to provide consistent treatment to plan recipients. The Debtor believes Mr. Lewis' claims are without merit and intends to timely respond to and vigorously defend the adversary proceeding.

(6)    McGreevey, et al. v. The Montana Power Company (the "McGreevey Litigation"). The Debtor is one of several defendants in the McGreevey Litigation now pending in federal court in Montana. The lawsuit was filed by former stockholders of The Montana Power Company (most of whom became stockholders of Touch America Holdings, Inc. as a result of a corporate

---

[38]    Mr. Hylland has filed numerous claims totaling approximately $61.2 million of which $30.6 million are duplicative. The Debtor intends to strongly object to all of Mr. Hylland's claims.

reorganization of The Montana Power Company). The parties to the McGreevey Litigation proposed to mediate before a federal court judge in Montana. On April 8, 2004, the Court entered an order approving a stipulation granting relief from stay to the extent necessary to permit the Debtor to participate in the mediation. The plaintiffs in the McGreevey Litigation also filed a joinder to the motion of Magten Asset Management Corporation ("Magten") for an Order Granting Relief from the Automatic Stay to Commence Adversary Proceeding Seeking to Avoid Fraudulent Transfer. The Bankruptcy Court denied the joinder of the plaintiffs in the McGreevey Litigation. On April 27, 2004, the McGreevey plaintiffs filed a motion for relief from stay to commence adversary proceeding relating to assets upstreamed to the Debtor by Clark Fork and Blackfoot, LLC ("Clark Fork"). On May 12, 2004, the Debtor filed its objection to the motion for relief from stay. The motion was heard at the May 17, 2004 hearing, and on or about June 16, 2004, the Bankruptcy Court entered an order granting the McGreevey Plaintiffs relief from stay. On July 10, 2004, certain parties to the McGeevey Litigation participated in a mediation before Antonio Piazza of Gregoria, Haldeman, Piazza, Rotman & Matityahu. As a result of the mediation, the parties entered into a memorandum of understanding. On or about August 13, 2004, the Debtor filed a Motion to Approve a Memorandum of Understanding (the "McGreevey MOU") entered into by certain parties to the McGreevey Litigation. The McGeevey MOU contains the material terms of a proposed settlement under which the Debtor will receive a full release and discharge, and withdrawal of any and all claims and causes of actions asserted or filed and which could have been asserted or filed with respect to the McGreevey Litigation. Under the proposed settlement, the Debtor shall give up whatever rights it may have had as a beneficiary under the insurance policies purchased by the Montana Power Company listed on Exhibit C to the Plan as "Disputed Policies." A stipulation of settlement is currently being finalized. The Debtor will file the stipulation of settlement with the Bankruptcy Court prior to a hearing on the McGreevey MOU.

The plaintiffs to the McGreevey Litigation timely filed two (2) proofs of claim in the Debtor's bankruptcy proceeding, claim nos. 691 and 744. In claim no. 691, the plaintiffs claim $3,000,000,000 in connection with the Debtor's agreement to be responsible for any judgment which might be entered in the McGreevey Litigation against NorthWestern Energy, LLC to the extent that NorthWestern Energy, LLC (n/k/a Clark, Fork and Blackfoot, LLC) might not have sufficient assets to satisfy such judgment. Claim No. 691, to the extent Allowed, shall be treated as a D&O Trust Claim only to the extent that such claim is covered by the D&O Policies. In the event that a judgment and/or settlement is reached, Claim No. 691, to the extent it is Allowed, shall be treated as a General Unsecured Claim, Class 9. In the event that the McGreevey Litigation is not resolved by mediation, the Debtor intends to object to the claims prior to the Confirmation Hearing.

In claim no. 744, the plaintiffs claim $600,000,000 asserting that the assets of NorthWestern Energy, LLC were transferred to the Debtor in violation of

Montana fraudulent transfer law. Both the claims filed by the McGreevey Plaintiffs would be resolved as part of the settlement.

(7)    QUIPS Litigation. On April 16, 2004, Law Debenture Company of New York as a Trustee ("Law Debenture") under the QUIPS Indenture and Magten Asset Management Corporation ("Magten") a QUIPS holder, commenced an adversary proceeding (the "QUIPS Litigation") seeking, among other things, to avoid the transfer of the Montana Operations assets of Clark Fork and Blackfoot LLC (f/k/a NorthWestern Energy LLC) to the Debtor in November 2002 pursuant to what is generally referred to as the "going flat" transaction. In the QUIPS Litigation, Law Debenture and Magten contend that the "going flat" transaction was a fraudulent transfer and seek to recover the Montana Operations assets on behalf of all QUIPS holders. Law Debenture and Magten assert that if a judgment is obtained against the Debtor in the QUIPS Litigation, the obligations evidenced by the QUIPS could be paid in full, with interest and in Cash.[39] Not only does the Debtor intend to vigorously defend the QUIPS Litigation but the Debtor also strongly disagrees with Law Debenture's and Magten's analysis of the treatment of any recovery in connection with such litigation. The Debtor believes that the Second Amended Plan provides that any recovery in the QUIPS Litigation would be treated as a Class 9 General Unsecured Claim.

On or about May 15, 2004, the Debtor filed a motion to dismiss the complaint in the QUIPS Litigation. As stated in the motion, the Debtor believed that: (a) Law Debenture and Magten lacked standing to bring the fraudulent transfer claims asserted against the Debtor because the QUIPS holders were no longer creditors of Clark Fork and Blackfoot LLC; (b) the transfer of the Montana assets were expressly allowed by the documents governing the QUIPS holders' claim; and (c) the trustee to the QUIPS waived any right to object to the transfer of assets because of a failure to object at the time of each transfer. In response, Law Debenture and Magten asserted that: (a) the QUIPS holders continue to be creditors of Clark Fork and Blackfoot LLC because any purported release of their claims against Clark Fork and Blackfoot LLC under the QUIPS Indenture or otherwise was obtained by fraud and, therefore, ineffective; (b) the Debtor's attempt to assume Clark Fork and Blackfoot LLC's obligations under the QUIPS Indenture was part of a fraudulent scheme to obtain the Montana assets; and (c) at the time of the "going flat" transaction, the Debtor intentionally and fraudulently concealed, among other things, that its financial conditions were much worse than publicly reported. On August 20, 2004, the Bankruptcy Court entered a decision on the Debtor's motion to dismiss (the "QUIPS Litigation Decision"). The

---

[39]  Magten has indicated that in the event Class 8(b), as a Class, votes to reject the Second Amended Plan, Magten intends to prosecute the QUIPS Litigation. Magten has indicated that it will seek to require the Debtor to place into escrow cash equal to the face amount of the QUIPS plus interest. The Debtor believes that the Second Amended Plan provides that any recovery related to the QUIPS Litigation will be treated as a Class 9 General Unsecured Claim. On or about August 20, 2004, the Debtor filed its Motion Pursuant to Sections 105(a), 363(b) and 502(c) of the Bankruptcy Code for Estimation of Magten Asset Management's Claim and to Establish Disputed Claim Reserve. The motion is currently scheduled to be heard on September 15, 2004.

Bankruptcy Court held that Law Debenture and Magten lack standing as creditors of Clark Fork and Blackfoot LLC to pursue a fraudulent conveyance action against the Debtor because of the release provided in Section 1102 of the QUIPS Indenture, unless Law Debenture and Magten can prove under applicable law that the release was obtained through actual fraud or as part of a fraudulent scheme.[40] To the extent Law Debenture and Magten can prove under applicable law that the release was obtained through actual fraud or as part of fraudulent scheme, Law Debenture and Magten assert that the release may be ineffective and Law Debenture and Magten may be able to pursue the fraudulent transfer claims which have been asserted on behalf of the QUIPS Notes.  The Debtor will continue to strongly oppose any continued prosecution of such fraudulent transfer claims.

**(8)**  Magten Montana Action.  In addition to the QUIPS Litigation, Magten filed an action in the United States District Court of Montana, Butte Division styled as Civil Action File No. CO-04-26-BU-RFC (the "Magten Montana Action") against certain former officers of Clark Fork at the time of the going flat transaction and has asserted in such action breach of fiduciary obligations owed to Magten in allowing the going flat transaction to be completed.  The defendants have moved to dismiss this action.

The Debtor and the defendants in the Magten Montana Action intend to vigorously defend the positions asserted by Magten.  The Debtor believes that Magten and holders of the QUIPS are not creditors of Clark Fork but are creditors solely of the Debtor and, as a result, neither Magten nor Law Debenture has standing to pursue the Magten Montana Action.  If Magten is a creditor only of the Debtor, it also does not have standing to pursue a breach of fiduciary duty case against the Defendants in the Magten Montana Action.

**(9)**  Debtor's Motion to Estimate Magten Claim and Other Action.  Magten also disputes the treatment of its claim under the Debtor's Plan and asserts that its claims are senior to all unsecured creditors.  As the documents supporting Magten's claim fail to provide for the priority treatment asserted by Magten, the Debtor disagrees with Magten's assertion of its priority status.  On or about August 20, 2004, the Debtor filed its Motion Pursuant to Sections 105(a), 363(b) and 502(c) of the Bankruptcy Code for Estimation of Magten Asset Management's Claim and to Establish Disputed Claim Reserve (the "Estimation Motion").  The motion requests that the Bankruptcy Court estimate the amount of Magten's claim for all purposes, including for purposes of distribution under the Second Amended Plan.  The Estimation Motion is currently scheduled to be heard on September 15, 2004.

The Debtor also filed its complaint initiating an adversary proceeding styled, NorthWestern Corporation v. Magten Asset Management Corporation, and Talton R. Embry, Adv. Proc. No. 04-55051 (the "NorthWestern Magten Adversary").  In

---

[40]  A copy of the QUIPS Litigation Decision is attached to the Second Amended Disclosure Statement as Exhibit P.

the NorthWestern Magten Adversary, the Debtor seeks damages and equitable relief relating to Magten's alleged improper trading activity post-Chapter 11. In particular, the Debtor seeks damages (including disgorgement of any ill-gotten gains) to compensate itself and its creditors for Magten's alleged breach of fiduciary duty, breach of contract, and violation of an express Bankruptcy Court order prohibiting the very trading activity in which Magten engaged. The Debtor also seeks subordination of Magten's claim in the Chapter 11 Case under Section 510(c) of the Bankruptcy Code. The Debtor anticipates that Magten will vigorously defend against the Estimation Motion and the NorthWestern Magten Adversary.

(10)    Comanche Park Lift Stay Motion. Comanche Park LLC ("Comanche Park") had filed a complaint against the Debtor and the predecessor-in-interest to Clark Fork prior to the Debtor's filing its Chapter 11 case. Like the plaintiffs in the McGreevey Litigation, Comanche Park also filed a joinder to Magten's motion seeking relief from the automatic stay to pursue the QUIPS Litigation. As with the plaintiffs in the McGreevey Litigation, the Bankruptcy Court denied Comanche Park's joinder. On April 29, 2004, Comanche Park filed its own motion for relief from stay to commence adversary proceeding relating to the assets upstreamed to the Debtor by Clark Fork. On May 12, 2004, the Debtor filed its opposition to Comanche Park's lift stay motion. Comanche Park's motion was heard at the May 17, 2004 hearing and on or about June 16, 2004 the Bankruptcy Court entered an order denying Comanche Park's motion for relief from stay. By order dated August 4, 2004, the Bankruptcy Court approved a compromise and settlement between the Debtor and Comanche Park resolving all of Comanche Park's claims against the Debtor by providing for a $750,000 Allowed Class 9 General Unsecured Claim for Comanche Park.

(11)    Milltown Dam. On September 10, 2003, Atlantic Richfield Company ("ARCO") and NorthWestern Energy executed a confidential settlement agreement ("Milltown Settlement"). On October 17, 2003, the Debtor filed a motion with the Bankruptcy Court seeking approval of the Milltown Settlement.[41] Under the terms of the Milltown Settlement, consistent with the Milltown Stipulation described below, commencing the month following Bankruptcy Court approval of such settlement and each month thereafter, the Debtor is to pay $500,000 into an escrow account until the total settlement amount of $10.0 million ($7.5 million for the benefit of ARCO and $2.5 million for the benefit of the government parties) is fully funded. No interest is to accrue on the unpaid settlement amount. The escrow account is to remain funded until a final, nonappealable consent decree is entered by the United States District Court. If a consent decree acceptable to all parties is not

---

[41]    The United States of America, on behalf of the United States Environmental Protection Agency and the United States Department of the Interior, has asserted that the Debtor, as the alter-ego of Clark Fork, was and still is the owner and operator of the Milltown Site. The State of Montana has asserted that the Debtor and Clark Fork may be substantively consolidated. The State of Montana asserts that in the event the Debtor and Clark Fork are substantively consolidated, the distribution to the Debtor's creditors may be diluted.

power sales agreement with FERC on August 18, 2003 requesting that the FERC accept for filing the cost-based power sales agreement between Montana Megawatts I, LLC and its affiliate, NWE. The MPSC and MCC moved to intervene and protested such agreement. The Debtor has been attempting to work with the MPSC, MCC, FERC staff and the FERC-appointed settlement judge to resolve MPSC's and MCC's opposition and concerns in a timely manner. However, it appears that no such resolution will be forthcoming and the Debtor, in the exercise of its business judgment, will proceed to liquidate the MFM project and assets. The Debtor can give no assurance when MFM's assets may be liquidated and the value received from such liquidation.

The implementation of the Plan also assumes that there will be sufficient liquidity on the Effective Date to fund payments under the Plan and to meet the Debtor's ongoing working capital needs. The Debtor currently projects that as of the Effective Date it will have on hand either through cash generated from operations and/or borrowings available under a working capital facility liquidity of at least $75 million. The failure of the Debtor to achieve this level of liquidity or to maintain adequate working capital resources may impair the Debtors ability to implement the Plan and could require further restructuring of the Debtor.

**K.    Fraudulent Conveyance Litigation**

The QUIPS Litigation and the potential litigation which may be filed by the plaintiffs in the McGreevey Litigation concerning the going flat transaction could take time to resolve. While the Debtor believes that Law Debenture, Magten and the plaintiffs in the McGreevey Litigation do not have standing to pursue a claim for a fraudulent transfer, resolution of this litigation may take some time and the outcome of such litigation is unknown at this time. The Debtor has filed on or about August 13, 2004 its Motion to Approve a Memorandum of Understanding (the "McGreevey MOU") entered into by certain parties to the McGreevey Litigation. The McGreevey MOU contains the material terms of a proposed settlement under which the Debtor will receive a full release and discharge and withdrawal of any and all claims and causes of actions asserted or filed and which could have been asserted or filed with respect to the McGreevey Litigation. A stipulation of settlement in connection with the McGreevey MOU is currently being finalized.

The State of Montana has also asserted that the Debtor operates and continues to operate the Debtor and Clark Fork as a single economic entity. The fraudulent conveyance claims asserted by various parties if successful may effect the priorities between the unsecured creditors of the Debtor and the creditors of Clark Fork as well as distributions under the Debtor's Plan.

**L.    Disputes Under Certain Insurance Policies**

Certain parties, including the TA Debtors and Cornerstone dispute the Debtor's status as an insured under, and the Debtor's entitlements to any proceeds from, certain policies, the Disputed Policies, identified on Exhibit C to the Plan, namely the Montana Power Company Policies and the Cornerstone Propane Partners LP Policies. The Debtor disagrees with these assertions and intends to enforce its right to coverage under the Disputed Policies. No provision in the Plan (as filed or thereafter amended) nor any confirmation order presented or proposed to, or entered by, the Bankruptcy Court, shall (i) determine whether the Debtor is an insured or

otherwise entitled to any of the benefits or proceeds of the Disputed Policies, or (ii) prejudice or in any way impair any parties rights with respect to the Disputed Policies and their proceeds. The dispute regarding the Debtor's interest in the Disputed Policies and their proceeds must be determined either consensually or by a court of competent jurisdiction.

Nothing in the Plan is intended to determine the Debtor's interest, if any, in the Disputed Policies and the Debtor agrees that in any proceeding to determine the Debtor's interest in, or its right to proceeds of, any of the Disputed Policies it will not assert any defense based on res judicata, collateral estoppel, or any other similar preclusion doctrine as a result of entry by the Bankruptcy Court of an order confirming the Plan (as filed or thereafter amended) except to the extent that the matters are specifically addressed in the confirmation process or by separate order entered in the Chapter 11 Case.

Nothing in the Plan or Confirmation Order is intended to channel the Disputed Polices to the D&O Trust. In addition, notwithstanding any language to the contrary, no provision of the Plan or Confirmation Order enjoins, releases or otherwise impairs any claims that Goldman Sachs & Co. or Milbank Tweed Hadley & McCloy LLP against any person or entity other than the Debtor and the Reorganized Debtor or otherwise limits any defense, setoff, counterclaim or cross claim either may have against any person or entity, except that any recovery by Goldman Sachs & Co. or Milbank Tweed Hadley & McCloy LLP on such counterclaim or cross claim against the Debtor or Reorganized Debtor shall be limited by the Plan.

## M.    Cornerstone Asserted Claims

Cornerstone has filed significant claims against the Debtor's estate and has advised the Debtor that it will seek to unwind the deconsolidation of the Debtor's interest in Cornerstone completed in November 2002. Moreover, Cornerstone has asserted that any claim the Debtor has against Cornerstone in the form of a promissory note held by the Debtor should either be set off against Cornerstone's Claims against the Debtor's estate or equitably subordinated to all creditors and other parties-in-interest claims against Cornerstone. While the Debtor believes that the assertions and allegations by Cornerstone are without merit and the Debtor should recover on its promissory note against Cornerstone in the same manner as similarly situated Cornerstone creditors, the Debtor can give no assurances when and if these issues will be resolved.

## N.    Securities Class Action Settlements

The Debtor's Plan incorporates various compromises and settlements, which, to the extent not already approved by order of the Bankruptcy Court, will be made operative and effective under Section 1123(b)(3)(A) of the Bankruptcy Code. That section expressly permits a plan of reorganization to provide for the settlement of any claim or any interest belonging to the debtor or to the estate. However, each of the compromises and settlements incorporated into the Plan, including settlement of several class action lawsuits and shareholder derivative actions commenced in or removed to federal court naming the Debtor and certain of its present and former officers and directors, is subject to the approval of the Bankruptcy Court. The Bankruptcy Court must make an independent determination that each of the settlements is fair and equitable and is in

# EXHIBIT 9

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| NORTHWESTERN CORPORATION, | : Case No. 03-12872 (CGC) |
| | : |
| Debtor. | : |
| | : |
| | : |

## DEBTOR'S SECOND AMENDED AND RESTATED PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**PAUL, HASTINGS, JANOFSKY &
WALKER LLP**
Jesse H. Austin, III
Karol K. Denniston
Carolyn Chayavadhanangkur
600 Peachtree Street, N.E.
Suite 2400
Atlanta, Georgia 30308
(404) 815-2400

**GREENBERG TRAURIG, LLP**
Scott D. Cousins
Victoria Watson Counihan
William E. Chipman, Jr.
The Brandywine Building
1000 West Street
Suite 1540
Wilmington, DE 19801
(302) 661-7000

Co-Counsel to the Debtor and Debtor-in-Possession

Dated:  August 18, 2004
        Wilmington, Delaware

ARTICLE I  DEFINITIONS AND CONSTRUCTION OF TERMS ........................1

ARTICLE II  TREATMENT OF ALLOWED ADMINISTRATIVE CLAIMS AND ALLOWED PRIORITY TAX CLAIMS ..................29

ARTICLE III  CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ......................................................................................31

ARTICLE IV  TREATMENT OF CLAIMS AND EQUITY INTERESTS ..............31

ARTICLE V  MEANS OF IMPLEMENTATION AND EFFECT OF CONFIRMATION OF PLAN ...............................................................43

ARTICLE VI  IMPLEMENTATION OF THE D&O TRUST...................................49

ARTICLE VII  VOTING AND DISTRIBUTIONS; AND TREATMENT OF DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS AND EQUITY INTERESTS ................................................54

ARTICLE VIII  EXECUTORY CONTRACTS AND UNEXPIRED LEASES ; INDEMNIFICATION CLAIMS; AND RETIREE BENEFITS ........58

ARTICLE IX  CORPORATE GOVERNANCE, MANAGEMENT  AND STRUCTURE OF REORGANIZED DEBTOR ................................61

ARTICLE X  EXCULPATION, INJUNCTIONS, AND DISCHARGE.................62

ARTICLE XI  EFFECTIVENESS OF THIS PLAN ...................................................67

ARTICLE XII  REGULATION.....................................................................................71

ARTICLE XIII  RETENTION OF JURISDICTION.......................................................72

ARTICLE XIV  MISCELLANEOUS PROVISIONS ....................................................73

SCHEDULES

SCHEDULE 4.8  WARRANT TERM SHEET

SCHEDULE 9.3  SPECIAL RECOGNITION GRANTS

EXHIBITS

EXHIBIT A  CERTIFICATE OF INCORPORATION OF REORGANIZED DEBTOR

EXHIBIT B  FORM OF INSURANCE ASSIGNMENT AGREEMENT

EXHIBIT C  D&O POLICIES

EXHIBIT D  D&O PROTECTED PARTIES SETTLEMENT AGREEMENT

EXHIBIT E  NORTHWESTERN CORPORATION D&O TRUST AGREEMENT

EXHIBIT F      NORTHWESTERN CORPORATION D&O TRUST
               DISTRIBUTION PROCEDURES

EXHIBIT G      WARRANT AGREEMENT (TO BE FILED AT A LATER
               DATE)

EXHIBIT H      REGISTRATION RIGHTS AGREEMENT (TO BE FILED
               AT A LATER DATE)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NORTHWESTERN CORPORATION, | : | Case No. 03-12872 (CGC) |
| | : | |
| Debtor. | : | |
| | : | |
| | : | |

## DEBTOR'S SECOND AMENDED AND RESTATED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

NorthWestern Corporation, the above captioned debtor and debtor-in-possession, proposes the following second amended and restated plan of reorganization (the "Plan") under Sections 1121(a) and 1127(a) of title 11 of the United States Code:

## ARTICLE I

## DEFINITIONS AND CONSTRUCTION OF TERMS

Definitions; Interpretation; Application of Definitions and Rules of Construction. For purposes of this Plan, the following terms shall have the meanings specified in this Article I. A term used herein that is not defined herein, but that is used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code and the rules of construction contained in Section 102 of the Bankruptcy Code shall apply to the construction hereof. Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter. Unless otherwise specified, all section, article, schedule or exhibit references in this Plan are to the respective Section in, Article of, Schedule to, or Exhibit to, this Plan and headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to this Plan as a whole and not to any particular Section, sub-Section or clause contained in this Plan.

1.1     "Additional Indemnitees" shall mean each past, present and future member of the TAC.

1.2     "Administrative Claim" shall mean a right to payment under Sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Estate or administering the Chapter 11 Case as authorized and approved by a Final Order, (b) any actual and

necessary costs and expenses incurred after the Petition Date in the ordinary course of the Debtor's business, (c) fees and expenses of Professionals to the extent allowed by Final Order under Sections 330, 331, or 503 of the Bankruptcy Code, and (d) all fees and charges assessed against the Estate pursuant to 28 U.S.C. § 1930.

  1.3 "Administrative Claim Bar Date" shall mean the last date established for filing Administrative Claims, as ordered by the Bankruptcy Court.

  1.4 "Affiliate" shall have the meaning set forth in 11 U.S.C. § 101(2).

  1.5 "Allowed" shall mean, with reference to any Claim: (a) a Claim that has been listed by the Debtor in its Schedules, as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009, and (i) is not listed as disputed, contingent or unliquidated, and (ii) is not a Claim as to which a proof of claim has been filed; (b) a Claim as to which a timely proof of claim has been filed as of the Bar Date in a sum certain and either (i) no objection thereto, or application to estimate, equitably subordinate, reclassify or otherwise limit recovery, has been made on or before any applicable deadline, or (ii) if an objection thereto, or application to estimate, equitably subordinate, reclassify or otherwise limit recovery, has been interposed, the extent to which such Claim (whether in whole or in part) has been allowed by a Final Order; (c) a Claim arising from the recovery of property under Section 550 or 553 of the Bankruptcy Code and allowed in accordance with Section 502(h) of the Bankruptcy Code; (d) any Claim expressly allowed under this Plan; or (e) any Claim expressly allowed by Final Order.

  1.6 "Allowed Class Designation/Type" shall mean an Allowed Claim of a specified class or of a specified type.

  1.7 "Avoidance Action" shall mean an action brought pursuant to Section 544, 547, 548, 549, 550 or 553 of the Bankruptcy Code by or on behalf of the Debtor.

  1.8 "Ballot" shall mean the form or forms distributed to each holder of an impaired Claim entitled to vote on this Plan upon which an acceptance or rejection of this Plan shall be indicated in accordance with the instructions specified in such form or forms.

  1.9 "Bank One DIP Financing Claims" shall mean the Claims of Bank One, N.A., as agent, or any successor agent thereto, under the DIP Financing Order and the DIP Loan Documents.

  1.10 "Bankruptcy Code" shall mean the Bankruptcy Reform Act of 1978, as codified in Title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Case.

1.11    "Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Case and, to the extent of any reference under 28 U.S.C. § 157, the bankruptcy unit of such District Court under 28 U.S.C. § 151.

1.12    "Bankruptcy Rules" shall mean the following: (i) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated under Section 2075 of Title 28 of the United States Code; (ii) the applicable Federal Rules of Civil Procedure, as amended and promulgated under Section 2072 of Title 28 of the United States Code; (iii) the applicable Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware; and (iv) any standing orders governing practice and procedure issued by the Bankruptcy Court, each as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Case or proceeding therein, as the case may be.

1.13    "Bar Date" shall mean the date(s) fixed by the order of the Bankruptcy Court dated October 10, 2003 (the "Bar Date Order") by which Persons asserting a Claim against the Debtor, and who are required to file a proof of claim on account of such Claim, must file a proof of claim or be forever barred from asserting a Claim against the Debtor or its property and from voting on this Plan and/or sharing in distributions hereunder as provided in the Bar Date Order.

1.14    "Business Day" shall mean any day other than a Saturday, Sunday or a day which in Wilmington, Delaware or Sioux Falls, South Dakota, is a legal holiday or any day designated in Bankruptcy Rule 9006(a) as a "legal holiday".

1.15    "Cash" shall mean cash, cash equivalents and other readily marketable direct obligations of the United States of America and certificates of deposit issued by banks.

1.16    "Causes of Action" shall mean, without limitation, any and all actions, causes of action, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, Claims and demands whatsoever, whether known or unknown, in law, equity or otherwise.

1.17    "Chapter 11 Case" shall mean the Debtor's case under Chapter 11 of the Bankruptcy Code administered in the Bankruptcy Court.

1.18    "Claim" shall have the meaning set forth in Section 101(5) of the Bankruptcy Code, including, without limitation, (a) any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right to

payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

1.19    "Claimant's Jurisdiction" shall mean the jurisdiction in which the Claim was filed (if at all) against the Debtor in the court system prior to the Petition Date.

1.20    "Claims Agent" shall mean Kurtzman Carson Consultants, LLC, the claims agent appointed by order of the Bankruptcy Court dated September 15, 2003.

1.21    "Class" shall mean any category of Claims or Equity Interests which are substantially similar to each other as classified.

1.22    "Class Action" shall mean those certain consolidated actions:

(a)    In re NorthWestern Corporation Securities Litigation (Case No. CIV 03-3049), a consolidated securities class action lawsuit pending in the United States District Court for the District of South Dakota before the Honorable Lawrence L. Piersol; and

(b)    In re NorthWestern Corporation Derivative Litigation (Case No. 03-4091), a consolidated action of two derivative securities lawsuits pending in the United States District Court for the District of South Dakota before the Honorable Lawrence L. Piersol.

1.23    "Class Action Settlement Documents" shall mean the Stipulation of Settlement, memorandum of understanding and any agreements entered into in connection therewith or pursuant hereto or thereto and the orders of the District Court in the Class Action in furtherance thereof.

1.24    "Collateral" shall mean any property or interest in property of the Estate subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable law.

1.25    "Committee" shall mean any committee appointed in the Chapter 11 Case pursuant to Section 1102(a) of the Bankruptcy Code by the United States Trustee, as the membership of such committee is from time to time constituted and reconstituted.

1.26    "Confirmation Date" shall mean the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

1.27    "Confirmation Hearing" shall mean the hearing held by the Bankruptcy Court to consider confirmation of this Plan pursuant to Section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.28    "Confirmation Order" shall mean the order of the Bankruptcy Court confirming this Plan pursuant to the provisions of the Bankruptcy Code.

1.29    "Contingent Claim" shall mean any Claim for which a proof of claim has been filed with the Bankruptcy Court which was not filed in a sum certain, or which has not accrued and is dependent upon a future event that has not occurred or may never occur.

1.30    "Convenience Claim" shall mean an Unsecured Claim that is $20,000 or less and held by a Person that is not an Insider but excluding any Unsecured Note Claims, Trust Originated Preferred Securities (TOPrS) Claims and QUIPS Claims.

1.31    "Creditor" shall mean a Person that has a Claim against the Debtor that arose at the time of or before the Petition Date, or a Person that has a Claim against the Estate of the Debtor of a kind specified in Sections 502(g), 502(h), or 502(i) of the Bankruptcy Code.

1.32    "Creditors' Committee" shall mean the Official Committee of Unsecured Creditors appointed in this Chapter 11 Case.

1.33    "CSFB Facility" shall mean that certain Amended and Restated Credit Agreement, dated as of November 10, 2003, amending a pre-petition financing arrangement with Credit Suisse First Boston, acting through its Cayman Islands Branch, as administrative agent, such amended pre-petition financing arrangement approved by the Bankruptcy Court on or about December 15, 2003, as the same shall be amended or modified from time to time.

1.34    "CSFB Facility Montana First Mortgage Bonds" shall mean any outstanding First Mortgage Bonds, Credit Agreement (2002) Series, due 2006, issued under the Montana Indenture.

1.35    "CSFB Facility South Dakota First Mortgage Bonds" shall mean any New Mortgage Bonds, Credit Agreement (2002) Series, due 2006, issued under the South Dakota Indenture.

1.36    "CSFB Financing Claims" shall mean the Claims of Credit Suisse First Boston, as agent, under the CSFB Order and CSFB Financing Documents.

1.37    "CSFB Financing Documents" shall mean the CSFB Facility and all other documents and instruments evidencing and/or setting forth the terms of the financing arrangements under the CSFB Facility as approved by the CSFB Order, as the same shall be amended or modified from time to time.

1.38    "CSFB Lenders" shall mean the syndicate of financial institutions party to the CSFB Financing Documents.

1.39 "CSFB Order" shall mean that certain Final Order Granting Motion pursuant to 11 U.S.C. §§ 105, 362, 363 and 364 for Entry of an Order (A) Amending Pre-Petition Credit Facility, (B) Providing Protections under Section 364(c)(1), on a permanent basis, and (C) Granting Related Relief.

1.40 "Current Employee Claim" shall mean an Allowed Claim entitled to priority under Section 507 of the Bankruptcy Code and any Unsecured Claims for wages in excess of the Claims entitled to priority under Section 507 of the Bankruptcy Code.

1.41 "D&O Insurance Assignment" shall mean the transactions contemplated by the Insurance Assignment Agreement.

1.42 "D&O Insurance Contributor" shall mean the Debtor, former and current directors and officers and any non-debtor affiliate of the Debtor who makes a D&O Insurance Assignment.

1.43 "D&O Insurance Entity" shall mean any Person other than the Debtor and Reorganized Debtor including, but not limited to, any insurance company, broker, or guaranty association, that has issued or that has actual or potential liability, duties or obligations with respect to, any D&O Policies.

1.44 "D&O Insurance Entity Injunction" shall mean the injunction described in Section 6.9 of this Plan.

1.45 "D&O Insurance Rights" shall mean rights arising under or related to the D&O Policies.

1.46 "D&O Policies" shall mean the insurance policies, to the extent such policies and the proceeds of such policies are property of the Debtor's estate, held by the Debtor identified in Exhibit C to this Plan. As reflected by Exhibit C, the Cornerstone Propane Partners, L.P. insurance policies are not being channeled to the D&O Trust.

1.47 "D&O Proceedings" shall mean any proceeding and/or claim against the Debtor or D&O Protected Party, currently existing or initiated prior to the Effective Date, which may be covered by the D&O Policies, including, but not limited to, the following:

(a) In re Cornerstone Propane Partners LP Securities Litigation (Case No. 03-2522 MHP), a consolidated securities class action pending in the United States District Court for the Northern District of California before the Honorable Marilyn Hall Patel;

(b)    Mewhinney v. Cornerstone Propane, GP, Inc. (Case No. 032-01181(a), Cir. Ct of the City of St. Louis, MO), a securities class action in the city court of St. Louis, Missouri;

(c)    McGreevey, et al. v. The Montana Power Company, et al. (Case No. CV 03-01-BU-SEH), a securities class action pending in the United States District Court for the District of Montana before the Honorable Sam E. Haddon;

(d)    In re Touch America ERISA Litigation (Case No. CV-02-106-BU-SEH), an ERISA class action pending in the United States District Court for the District of Montana before the Honorable Sam E. Haddon;

(e)    Securities and Exchange Commission ("SEC") Inquiry (D-02572-A) (the "SEC Inquiry"), a non-public SEC inquiry into various issues;

(f)    the Class Action; and

(g)    any proceeding and/or claim against any D&O Protected Party which may be covered by the D&O Policies and brought by the Netexit Debtors, or any creditor, trustee, or the Official Committee of Unsecured Creditors appointed in the Netexit Cases, at any time before or after the Effective Date, but not later than the date the Netexit Cases are closed by final decree; provided, however, that any such claim shall remain subject to the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction.

1.48    "D&O Proceedings Final Order" shall mean the final, non-appealable order of the relevant court providing a Final Award in any D&O Proceeding or finally approving a settlement, or the final judgment of the SEC (in the case of the SEC Inquiry).

1.49    "D&O Protected Party" shall mean the following: (i) the Debtor; (ii) Reorganized Debtor; (iii) any subsidiary and/or Affiliate of the Debtor; or (iv) any Person that, pursuant to this Plan or otherwise after the Effective Date, was a former or present director or officer of the Debtor or becomes a director or officer or indirect transferee of, or successor to, the Debtor, Reorganized Debtor or any subsidiary or Affiliate of the Debtor; provided, however, that D&O Protected Party shall exclude any individual who previously served as an officer or director of any of the TA Debtors, or their present or former predecessors, in such individual's capacity as an officer or director of such TA Debtor.

1.50    "D&O Protected Parties Settlement Agreement" shall mean that D&O Protected Parties Settlement Agreement attached as Exhibit D to this Plan.

1.51    "D&O Trust" shall mean the trust created pursuant to the D&O Trust Agreement and related documents.

1.52    "D&O Trust Agreement" shall mean that certain NorthWestern Corporation D&O Trust Agreement attached as Exhibit E to this Plan.

1.53    "D&O Trust Assets" shall mean the proceeds of the D&O Insurance Rights assigned to the D&O Trust pursuant to the Insurance Assignment Agreement and any interest on or appreciation of such D&O Insurance Rights or any other sums collected by the trustee of the D&O Trust to enforce such D&O Insurance Rights.

1.54    "D&O Trust Channeling Injunction" shall mean the injunction described in Section 10.5(d) of this Plan.

1.55    "D&O Trust Claim Holder" shall mean the holder of a D&O Trust Claim.

1.56    "D&O Trust Claims" shall mean the amount of any Final Award apportioned to an individual plaintiff in any D&O Proceeding in accordance with any court order fully and finally awarding a judgment to the plaintiffs in any D&O Proceeding and the amount of any Defense Costs.

1.57    "D&O Trust Distribution Procedures" or "TDP" shall mean that certain trust distribution procedures attached as Exhibit F to this Plan.

1.58    "D&O Trust Documents" shall mean the D&O Trust Agreement, the by-laws of the D&O Trust and the other agreements, instruments and documents governing the establishment and administration of the D&O Trust as such may be amended from time to time.

1.59    "Debt" shall mean liability on a Claim.

1.60    "Debtor" shall mean NorthWestern Corporation, as debtor and debtor-in-possession in the Chapter 11 Case.

1.61    "Debtor Indemnified Parties" shall mean the Persons which the Debtor is obligated to indemnify and exculpate, including its present and former officers and directors, as provided in any of: (i) the Debtor's certificate of incorporation; (ii) the Debtor's by-laws; (iii) any written agreement with the Debtor; (iv) similar documents or agreements of or with the Debtor; or (v) state or common law.

1.62    "Defense Cost Motion" shall mean that certain Motion for an Order (I) Authorizing Reimbursement for Defense Costs Incurred on Behalf of Itself and its Present and Former Officers and Directors (II) Authorizing Reimbursement for Defense Costs Incurred by Other Insureds, and (III) Granting Related Relief, as such motion was approved by the Court on January 14, 2004 in an Order Authorizing (I) Reimbursement for Defense Costs Incurred on behalf of itself and its Present and Former

Officers and Directors, (II) Reimbursement for Defense Costs Incurred by Other Insureds and (III) Granting Related Relief, as amended by a stipulated order entered on February 17, 2004.

1.63    "Defense Costs" shall mean the legal fees and associated expenses (including expert fee(s)) incurred in defending the D&O Proceedings by the Debtor or any D&O Protected Party on behalf of the Debtor or any D&O Protected Party.

1.64    "Delaware General Corporation Law" shall mean Title 8 of the Delaware Code, as now in effect or hereafter amended.

1.65    "DIP Financing Order" shall mean that certain Final Order (I) Authorizing Debtor-in-Possession to Enter into Post-petition Credit Agreement and Obtain Post-petition Financing pursuant to Sections 363 and 364 of the Bankruptcy Code, (II) Granting Liens, Security Interests and Superpriority Claims, (III) Authorizing Adequate Protection Payments to Debtor's Senior Secured Debt.

1.66    "DIP Lenders" shall mean Bank One, N.A., as agent and lender, and the syndicate of financial institutions party to the DIP Loan Documents.

1.67    "DIP Loan Agreement" shall mean that certain Senior Secured, Pari Passu Debtor-in-Possession Credit Agreement, dated as of September 19, 2003 (as same has been or may be amended), among the Debtor, the lender parties thereto and Bank One, N.A., as DIP Agent.

1.68    "DIP Loan Documents" shall mean the DIP Loan Agreement and all other documents and instruments evidencing and/or setting forth the terms of debtor-in-possession financing arrangements in the Chapter 11 Case as approved by the DIP Financing Order.

1.69    "Disallowed" shall mean, with respect to any Claim or Interest or portion thereof, any Claim against or Interest in the Debtor which: (a) has been disallowed, in whole or part, by a Final Order of the Bankruptcy Court; (b) has been withdrawn by agreement of the Debtor and the holder thereof, in whole or in part; (c) has been withdrawn, in whole or in part, by the holder thereof; (d) if listed in the Schedules as zero or as Disputed, contingent or unliquidated and in respect of which a proof of claim has not been timely filed or deemed timely filed pursuant to this Plan, the Bankruptcy Code or any Final Order of the Bankruptcy Court or other applicable bankruptcy law; (e) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the filed amount of any proof of claim or proof of interest; or (f) is evidenced by a proof of claim or a proof of interest which has been filed, or which has been deemed to be filed under applicable law or order of the Bankruptcy Court or which is required to be filed by order of the Bankruptcy Court but as to which such proof of claim or proof of interest was not timely or properly filed.   In each case a Disallowed Claim or a

Disallowed Interest is disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination or estimation.

1.70    "Disallowed Claim" shall mean a Claim, or any portion thereof, that is Disallowed.

1.71    "Disbursing Agent" shall mean Reorganized Debtor or such other Person to be identified by Reorganized Debtor at or prior to the Confirmation Hearing, which shall (i) make the distributions to be made pursuant to and in accordance with the terms of this Plan, the Confirmation Order or any other relevant Final Order of the Bankruptcy Court, and (ii) perform any other act or task that is or may be delegated to the Disbursing Agent under this Plan.

1.72    "Disclosure Statement" shall mean the disclosure statement relating to this Plan in the form approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code and all exhibits and schedules thereto.

1.73    "Disputed" shall mean, with respect to Claims or Equity Interests, any such Claim or Equity Interest:  (a) that is listed in the Schedules as unliquidated, disputed or contingent for which no proof of claim has been timely filed; (b) as to which the Debtor or any other party-in-interest has interposed a timely objection or request for estimation, or have sought to equitably subordinate or otherwise limit recovery in accordance with the Bankruptcy Code and the Bankruptcy Rules, or which is otherwise disputed by the Debtor in accordance with applicable law, which objection, request for estimation, action to limit recovery or dispute has not been withdrawn or determined by Final Order; (c) which is a contingent Claim; or (d) which has not been Allowed.

1.74    "Disputed Claims Reserve" shall mean the reserve established pursuant to Section 7.5 of this Plan.

1.75    "Disputed Policies" shall have the meaning set forth on Exhibit C to this Plan.

1.76    "Distribution" shall mean the distribution in accordance with this Plan of Cash or other property, as the case may be.

1.77    "Distribution Address" shall mean the last known address of a Creditor, whether derived from the Schedules, a proof of claim filed with the Bankruptcy Court or other written notification of the Debtor as to where a Distribution under this Plan is to be sent.

1.78    "Distribution Date" shall mean any date that is:  (a) the Initial Distribution Date; (b) any Subsequent Distribution Date; or (c) the Final Distribution Date.

1.79    "District Court" shall mean the United States District Court for the District of South Dakota.

1.80    "Effective Date" shall mean a Business Day on or after the Confirmation Date specified by the Debtor on which all conditions precedent to the occurrence of the Effective Date set forth in Section 11.2 of this Plan have been satisfied or waived pursuant to Section 11.3 of this Plan.

1.81    "Environmental Claims" shall mean all Claims against the Debtor, including, but not limited to, the Claims listed on Attachments 17(a), (b), and (c) of the Debtor's Statement of Financial Affairs, as may be amended from time to time, arising from (i) any accusation, allegation, notice of violation, action, claim, environmental Lien, demand, abatement or other order, restriction or direction (conditional or otherwise) by any governmental entity or other Person for personal injury (including, but not limited to, sickness, disease or death), tangible or intangible property damage, punitive damages, damage to the environment, nuisance, pollution, contamination or other adverse effect on the environment or costs (to the extent recoverable under applicable non-bankruptcy law) of any governmental entity related thereto, in each case resulting from or based upon (a) the existence, or the continuation of the existence, of a release of (including, but not limited to, sudden or non-sudden accidental or non-accidental releases), or exposure to, any hazardous or deleterious material, substance, waste, pollutant or contaminant, odor or audible noise in, into or onto the environment (including, but not limited to, the air, soil, surface water or groundwater) at, in, by, from or related to any property (including any vessels or facilities of the Debtor) presently or formerly owned, operated or leased by the Debtor, or one of its non-debtor subsidiaries, to the extent the Debtor may have liability on behalf of such subsidiary, or any activities or operations thereof, (b) the transportation, storage, treatment or disposal of any hazardous or deleterious material, substance, waste, pollutant or contaminant in connection with any property (including any vessels or facilities of the Debtor) presently or formerly owned, operated or leased by the Debtor, or one of its non-debtor subsidiaries, to the extent the Debtor may have liability on behalf of such subsidiary, its operation or facilities, or (c) the violation or alleged violation, of any environmental law, order or environmental permit or license of or from any governmental entity relating to environmental matters connected with any property (including any vessels or facilities of the Debtor) presently or formerly owned, operated or leased by the Debtor or one of its non-debtor subsidiaries, to the extent the Debtor may have liability on behalf of such subsidiary (including, without limitation, any FERC license pertaining to any environmental matter); and (ii) any claim for indemnification or contribution (whether based on contract, statute or common law) against the Debtor by any third party, where such indemnification or contribution claim of such third party is based on a claim against such third party that if asserted directly against the Debtor would be a claim included within the immediately preceding clause (i); provided, however, that Environmental Claims shall not include any Claims (other than the Claims of Atlantic Richfield Company addressed in the Milltown Settlement) fully settled, liquidated or determined by a final order of an appropriate court or a binding award, agreement or

settlement, which has become fully effective on the terms of such final order, binding award, agreement or settlement, prior to the Petition Date for amounts payable by the Debtor for damages or other obligations in a fixed dollar amount payable in a lump sum or by a series of payments.

      1.82   "Equity Interests" or "Interests" shall mean: (a) a share in the capital stock of the Debtor, whether or not transferable or denominated "stock" or a similar security; or (b) an option, a warrant, or a right, other than a right to convert, to purchase, sell, or subscribe to a share, security, or interest of a kind specified in subparagraph (a) of this paragraph, whether vested or unvested, exercised or outstanding.

      1.83   "Estate" shall mean the estate created in the Chapter 11 Case pursuant to Section 541 of the Bankruptcy Code.

      1.84   "Exculpated Parties" shall have the meaning set forth in Section 10.1 of this Plan.

      1.85   "FERC" shall mean the Federal Energy Regulatory Commission.

      1.86   "FIFO" shall mean first-in-first-out.

      1.87   "Final Approval" shall mean the date on which all of the following events have occurred: (a) entry of judgment by the District Court in the Class Action, including a bar order, approving the Stipulation of Settlement and dismissing the Class Action as against all defendants in the Class Action with prejudice and without cost to any party, that has become final and no longer subject to further appeal or review, whether by exhaustion of any possible appeal, lapse of time, or otherwise; (b) an order of the Bankruptcy Court in the Chapter 11 Case approving the Stipulation of Settlement pursuant to the terms of any executed memorandum of understanding and that has become final and no longer subject to further appeal or review, whether by exhaustion of any possible appeal, lapse of time, or otherwise; and (c) an order in the Chapter 11 Case confirming a plan of reorganization for the Debtor that has become final and no longer subject to further appeal or review, whether by exhaustion of any possible appeal, lapse of time, or otherwise.

      1.88   "Final Distribution Date" shall mean the date established by the Debtor pursuant to which all Distributions shall have been made.

      1.89   "Final Order" shall mean an order, ruling or judgment of the Bankruptcy Court as to which the time to appeal, petition for *certiorari,* or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari,* or other proceedings for reargument or rehearing shall then be pending, or as to which any right to appeal, petition for *certiorari,* reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtor or, on and after the Effective Date, Reorganized Debtor or, in the event that an appeal, writ of *certiorari,* or reargument

or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari* or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order not to be a Final Order.

1.90    "Gas Transition Bond" shall mean any outstanding bonds issued in accordance with, or related to, *inter alia*, the (i) Indenture between MPC Natural Gas Funding Trust, as Issuer, and U.S. Bank National Association, as Trustee, dated as of December 22, 1998; (ii) MPC Natural Gas Funding Trust Trust Agreement among Patrick Corcoran and Ellen Senechal, as Beneficiary Trustees, Wilmington Trust Company, as Issuer Trustee, Delaware Trustee and Independent Trustee, and The Montana Power Company, as Grantor and Owner, dated as of December 11, 1998; (iii) Transition Property Purchase and Sale Agreement between MPC Natural Gas Funding Trust, as Issuer, and The Montana Power Company, as Seller, dated as of December 22, 1998; and (iv) Transition Property Servicing Agreement between MPC Natural Gas Funding Trust, as Issuer, and The Montana Power Company, as Servicer, dated as of December 22, 1998.

1.91    "Gas Transition Bond Claims" shall mean an Allowed Claim by the holder of a Gas Transition Bond.

1.92    "Gas Transition Bond Obligations" shall mean any obligations under any of the following, and related documents: (i) Indenture between MPC Natural Gas Funding Trust, as Issuer, and U.S. Bank National Association, as Trustee, dated as of December 22, 1998; (ii) MPC Natural Gas Funding Trust Trust Agreement among Patrick Corcoran and Ellen Senechal, as Beneficiary Trustees, Wilmington Trust Company, as Issuer Trustee, Delaware Trustee and Independent Trustee, and The Montana Power Company, as Grantor and Owner, dated as of December 11, 1998; (iii) Transition Property Purchase and Sale Agreement between MPC Natural Gas Funding Trust, as Issuer, and The Montana Power Company, as Seller, dated as of December 22, 1998; and (iv) Transition Property Servicing Agreement between MPC Natural Gas Funding Trust, as Issuer, and The Montana Power Company, as Servicer, dated as of December 22, 1998.

1.93    "Gas Transition Indenture" shall mean the Indenture between MPC Natural Gas Funding Trust, as Issuer, and U.S. Bank National Association, as Trustee, dated as of December 22, 1998.

1.94    "General Released Parties" shall have the meaning set forth in Section 10.2 of the Plan.

1.95    "General Unsecured Claim" shall mean any Claim that is not a Administrative Claim, Fee Claim, Priority Tax Claim, Priority Claim, Unsecured Priority Claim, Bank One DIP Financing Claim, CSFB Financing Claim, Secured Claim, Unsecured Note Claim, Unsecured Subordinated Note Claim, Unsecured Convenience Claim, D&O Trust Claim, Other Equity Interest, Securities Claim, Opt-Out Securities Claim or Environmental Claim, but shall specifically include an Allowed QF Claim.

1.96    "Harbert" shall mean Harbert Management Corporation on behalf of itself and Harbert Distressed Investment Master Fund, Ltd. and Alpha Sub Fund VI, LLC.

1.97    "Indemnification Claims" shall mean all obligations relating to contribution, indemnification and exculpation by the Debtor Indemnified Parties as provided in any of: (i) the Debtor's certificate of incorporation as in effect prior to or as of the Confirmation Date; (ii) the Debtor's by-laws as in effect prior to or as of the Confirmation Date; (iii) any written agreement with the Debtor; (iv) similar documents or agreements of or with the Debtor as in effect prior to or as of the Confirmation Date; or (v) the result of the application of state or common law.

1.98    "Indenture Trustee Charging Lien" shall mean any Lien or other priority in payment or right available to an Indenture Trustee pursuant to an Unsecured Note Indenture, an Unsecured Subordinated Note Indenture, the South Dakota Pollution Control Indentures, the Montana Pollution Control indentures the Montana Indenture, the South Dakota Indenture, or the Gas Transition Indenture or otherwise available to an Indenture Trustee under applicable law, for the payment of reasonable fees, costs and expenses, including, without limitation, the reasonable fees and expenses of an Indenture Trustee's professional.

1.99    "Indentures" shall mean the Unsecured Note Indentures, the Unsecured Subordinated Note Indentures, the South Dakota Pollution Control Indentures, the Montana Pollution Control Indentures, the Montana Indenture, the South Dakota Indenture, and the Gas Transition Indenture.

1.100    "Indenture Trustees" shall mean the Unsecured Notes Trustee, the Unsecured Subordinated Notes Trustees, and the trustees under the South Dakota Pollution Control Indentures, the Montana Pollution Control Indentures, the Montana Indenture, South Dakota Indenture, and the Gas Transition Indenture.

1.101    "Indenture Trustees' Fees and Expenses" means the reasonable compensation, fees, costs, expenses and indemnity claims (including, without limitation, reasonable legal fees, costs and expenses) incurred by any of the Indenture Trustees, whether prior to or after the Petition Date.

1.102    "Initial Distribution Date" shall mean, with respect to Allowed Claims in Class 10, the first Business Day which is twenty (20) days (or such longer

period not to exceed sixty (60) days as may be reasonably determined by Reorganized Debtor) after the Effective Date.

1.103  "Injunction Default" shall mean a default under the D&O Trust Channeling Injunction.

1.104  "Insider" shall have the meaning set forth in Section 101(31) of the Bankruptcy Code.

1.105  "Insurance Assignment Agreement" shall mean that certain insurance assignment and funding agreement attached as Exhibit B to this Plan.

1.106  "Insured Claim" shall mean any claim arising from an incident or occurrence that is covered under any applicable insurance policy.

1.107  "Investment Grade" shall mean, when used in respect of a security, that such security has been rated higher than Ba1 and BB+ by Moody's Investors Service, Inc. and Standard & Poor's Rating Group, respectively.

1.108  "Landlord Priority Claim" shall mean a Claim held by a landlord or Person that leased non-residential property to the Debtor, that is entitled to priority under Section 507 of the Bankruptcy Code.

1.109  "Lien" shall have the meaning set forth in Section 101(37) of the Bankruptcy Code; except that a lien that has been avoided in accordance with Sections 544, 545, 546, 547, 548 or 549 of the Bankruptcy Code shall not constitute a lien.

1.110  "McGreevey Litigation" shall mean that certain litigation styled as McGreevey, et al. v. The Montana Power Company, et al. (Case No. CV 03-01-BU-SEH), a securities class action pending in the United States District Court for the District of Montana before the Honorable Sam E. Haddon.

1.111  "MPSC" shall mean The Montana Department of Public Service Regulation, Montana Public Service Commission, or any successor agency.

1.112  "Milltown Settlement" shall mean that certain settlement agreement among the Debtor, Clark Fork and Blackfoot, LLC and Atlantic Richfield Company.

1.113  "Milltown Stipulation" shall meant that certain stipulation among the Debtor, Clark Fork and Blackfoot, LLC, Atlantic Richfield Company, the United States, the State of Montana and the Confederated Salish and Kootenai Tribes.

1.114  "Montana Consumer Counsel" shall mean the State of Montana Consumer Counsel or any successor thereto.

1.115  "Montana Indenture" shall mean the First Mortgage and Deed of Trust, dated as of October 1, 1945, between the Montana Power Company, as issuer, and Guaranty Trust Company of New York and Arthur E. Burke, as trustees, and any supplements thereto.

1.116  "Montana First Mortgage Bond Claims" shall mean an Allowed Claim by the holder of a Montana First Mortgage Bond.

1.117  "Montana First Mortgage Bonds" shall mean any outstanding bonds issued under the Montana Indenture other than any CSFB Facility Montana First Mortgage Bonds or any Montana Pollution Control Bonds, specifically any of the following:

> First Mortgage Bonds, 7% Series due 2005;
>
> First Mortgage Bonds, 7.30% Series due 2006;
>
> First Mortgage Bonds, 8-1/4% Series due 2007;
>
> First Mortgage Bonds, 8.95% Series due 2022;
>
> First Mortgage Bonds, 6.125% Series due 2003;
>
> First Mortgage Bonds, 5.70% due 2003;
>
> Secured Medium-Term Notes due 2008; and
>
> CSFB Facility Montana First Mortgage Bonds.

1.118  "Montana Pollution Control Bonds" shall mean, collectively, the Montana Pollution Control Bond Obligations and any outstanding bonds issued under the Montana Indenture of either of the following two series:

> First Mortgage Bonds, 6-1/8% Series due 2023; and
>
> First Mortgage Bonds, 5.90% Series due 2023.

1.119  "Montana Pollution Control Bond Obligations" shall mean any and all obligations under any of the following agreements and indentures:

> Indenture of Trust dated as of December 1, 1993 between City of Forsyth, Rosebud County and the First National Bank of Chicago related to the $80,000,000 Pollution Control Revenue Refunding Bonds, Series 1993B;

Loan Agreement dated as of December 1, 1993 between City of Forsyth, Rosebud County and the Montana Power Company, related to the $80,000,000 Pollution Control Revenue Refunding Bonds, Series 1993B

Indenture of Trust dated as of December 1, 1993 between City of Forsyth, Rosebud County and the relevant indenture trustee related to the $90,205,000 Pollution Control Revenue Refunding Bonds, Series 1993A; and

Loan Agreement dated as of December 1, 1993 between City of Forsyth, Rosebud County and the Montana Power Company, related to the $90,205,000 Pollution Control Revenue Refunding Bonds, Series 1993A.

1.120   "Montana Pollution Control Bond Claims" shall mean an Allowed Claim by the holders of a Montana Pollution Control Bond.

The "Montana Pollution Control Indentures" means the following indentures:

The indenture of Trust dated as of December 1, 1993 between City of Forsyth, Rosebud County, and the First National Bank of Chicago related to the $80,000,000 Pollution Control Revenue Refunding Bonds, Series 1993B;

The Indenture of Trust dated as of December 1, 1993 and between City of Forsyth, Rosebud County and the relevant indenture trustee related to the $90,205,000 Pollution Control Revenue Refunding Bonds, Series 1993A

1.121   "Montana Public Utilities Law" means Title 69 of the Montana Code Annotated, Title 38 of the Administrative Rules of Montana, or any rules or regulations promulgated thereunder, as the same may be amended or modified from time to time.

1.122   "Netexit Cases" shall mean those jointly administered chapter 11 cases of the Netexit Debtors, captioned In re Netexit, Inc., et al, Case No. 04-11321 (CGC).

1.123   "Netexit Debtors" shall mean Netexit Inc., ATS Financial Services, Inc., Netexit of California Construction, Inc., Netexit of California, Inc., Netexit of Indiana, Inc., Netexit of Indiana, LLC, Netexit of North America, LLC, Netexit of Tennessee, Inc., Netexit of Pacific Northwest, Inc., Netexit of Oklahoma, Inc., Netexit of New York, Inc., Netexit of Mississippi, Inc., Netexit of Hawaii, Inc., and Eagle a Netexit Company Inc., as debtors and debtors-in-possession in the Netexit Cases.

1.124  "New Board" shall have the meaning set forth in Section 9.1 hereof.

1.125  "New Common Stock" shall mean the shares of authorized common stock of Reorganized Debtor issued pursuant to this Plan.

1.126  "New Incentive Plan" shall mean the incentive plans to be established by the New Board. Such plans may, at the sole discretion of the New Board, provide for the granting of options for or the outright issuance of up to 2,265,957 additional shares of New Common Stock (inclusive of any shares of New Common Stock issued as Special Reorganization Grants). Any stock, warrants or options issued in connection with the New Incentive Plan when issued or fully exercised shall dilute New Common Stock issued by the Reorganized Debtor to the holders of Allowed Claims in Class 7, Class 8 and Class 9.

1.127  "NPSC" shall mean the Nebraska Public Service Commission, or any successor thereto.

1.128  "Officers and Directors" shall mean (i) with respect to the Debtor, Reorganized Debtor and their Affiliates all of the officers and directors of such entities, in each case, as determined commencing with the Petition Date and (ii) with respect to all other entities, all present and former officers and directors of such entities.

1.129  "Opt-Out Election" has the meaning set forth in Section 4.14 hereof.

1.130  "Opt-Out Form" means a form approved by the District Court for submission by a holder of a Securities Claim to evidence its exercise of the Opt-Out Election.

1.131  "Opt-Out Securities Claim" means a Securities Claim the holder of which has exercised the Opt-Out Election in compliance with the requirements of the Class Action Settlement Documents.

1.132  "Other Secured Claims" shall mean any Secured Claim, exclusive of Priority Claims, Bank One DIP Financing Claims, CSFB Financing Claims and Secured Bondholder Claims.

1.133  "Person" shall mean any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, estate, trust, unincorporated association or organization, governmental agency or political subdivision thereof, or other entity.

1.134 "Petition Date" shall mean September 14, 2003, the date on which the Debtor filed its voluntary Chapter 11 petition with the Bankruptcy Court pursuant to the Bankruptcy Code.

1.135 "Plan" shall mean this Chapter 11 plan of reorganization, including, without limitation, all exhibits, supplements, appendices and schedules hereto, either in its present form or as the same may be altered, amended or modified from time to time in accordance with the terms hereof or as approved by the Bankruptcy Court.

1.136 "Plan Committee" shall have the meaning set forth in Section 7.9 hereof.

1.137 "Plan Committee By-Laws" shall mean the by-laws of the Plan Committee, which shall be filed with the Bankruptcy Court on or prior to five (5) business days prior to the commencement date of the Confirmation Hearing, or such other date as the Bankruptcy Court may establish.

1.138 "Plan Documents" shall mean the Plan, the Disclosure Statement, all exhibits and schedules attached to the Plan and to the Disclosure Statement, including the D&O Protected Parties Settlement Agreement (including all exhibits, schedules and documents referred to therein or attached thereto or to be entered into thereunder), the D&O Trust Agreement, the TDP, the Insurance Assignment Agreement, the Warrant Agreement and the Registration Rights Agreement.

1.139 "Plan Supplement" shall mean those documents which may be filed pursuant to Section 14.6 hereof.

1.140 "PPL Montana" shall have the meaning set forth in Section 10.5(b) hereof.

1.141 "Priority Claims" shall mean any and all Claims (or portions thereof), if any, entitled to priority under Sections 503(b) and 507(a) of the Bankruptcy Code other than Priority Tax Claims and Administrative Claims.

1.142 "Priority Tax Claim" shall mean any Claim of a governmental unit entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

1.143 "Pro Rata Share" shall mean a proportionate share, so that the ratio of the consideration distributed on account of an Allowed Claim in a Class to the amount of such Allowed Claim is the same as the ratio of the amount of the consideration distributed on account of all Allowed Claims in such Class to the amount of all Allowed Claims in such Class.

1.144 "Professional Fees" shall mean the reasonable fees and expenses of Professionals.

1.145 "Professionals" shall mean those Persons (a) employed by the Debtor or the Creditors' Committee pursuant to an order of the Bankruptcy Court in accordance with Sections 327 or 1103 of the Bankruptcy Code and to be compensated for services pursuant to Sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

1.146 "QF Claim" shall mean any Claims related to the qualifying facilities operating pursuant to the Public Utility Regulatory Policies Act of 1978, 16 U.S.C. § 2601, P.L. 95-617 and related regulations and include the following:

(a)     Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated November 14, 1984 (Barney Creek);

(b)     Cogeneration and Small Power Production Power Purchase Agreement dated March 1, 1991 (BGI);

(c)     Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated October 30, 1987 (Broadwater Dam);

(d)     Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated October 1, 1984 (Cascade Creek);

(e)     Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated November 26, 1984 (Jenni Hydro);

(f)     Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated October 15, 1984 (Montana One-Colstrip);

(g)     Power Purchase Agreement dated April 1, 1998 (Mission Creek);

(h)     Power Purchase Agreement dated January 1, 1998 (Montana Marginal Energy);

(i)     Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated November 15, 1984 (Pine Creek);

(j)     Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated July 1, 1984 (Pony Generating Station);

(k)     Power Purchase Agreement dated July 24, 1996 (Ross Creek Hydro);

(l)     Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated November 16, 1984 (Wisconsin Creek);

(m) Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated November 15, 1984 (Strawberry Creek); and

(n) Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated October 31, 1984 (South Dry Creek).

1.147 "QSF" shall mean a "qualified settlement fund" within the meaning of Section 1.468B-1(c) of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code of 1986, as amended from time to time.

1.148 "QUIPS" shall mean any outstanding 8.45% Cumulative Quarterly Income Preferred Securities, Series A, issued by Montana Power Capital I, a Delaware statutory business trust.

1.149 "QUIPS Claims" shall mean an Allowed Claim by the holder of a QUIPS Note.

1.150 "QUIPS Indenture" shall mean the Indenture, dated as of November 1, 1996, between The Montana Power Company, as issuer, and The Bank of New York, as trustee, as amended or supplemented from time to time.

1.151 "QUIPS Notes" shall mean any outstanding 8.45% Junior Subordinated Debentures of the Montana Power Company due 2036, issued under the QUIPS Indenture.

1.152 "Record Date" shall mean the date established in the Confirmation Order for determining the identity of holders of Allowed Claims entitled to Distributions under this Plan. If no Record Date is established in the Confirmation Order, then the Record Date shall be the Confirmation Date.

1.153 "Registration Rights Agreement" shall mean that certain registration rights agreement with certain entities providing for the registration of the New Common Stock, including New Common Stock issuable pursuant to the Warrants.

1.154 "Reinstated" or "Reinstatement" shall mean: (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the holder of such Claim so as to leave such Claim Unimpaired in accordance with Section 1124 of the Bankruptcy Code; or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code, (ii) reinstating the maturity of such Claim as such maturity existed before such default, (iii) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law, and (iv) not otherwise altering the legal, equitable, or

contractual rights to which such Claim entitled the holder of such Claim. Anything to the contrary notwithstanding, the South Dakota First Mortgage Bond Claims, the Montana First Mortgage Bond Claims, the CSFB Facility Montana First Mortgage Bonds, the CSFB Facility South Dakota First Mortgage Bonds, South Dakota Pollution Control Bond Claims, the Gas Transition Bond Obligations and the Montana Pollution Control Bond Claims, and the documents evidencing same, shall remain in full force and effect and not be cancelled, and the Debtor's obligations thereunder, and the obligations of the MPC Natural Gas Funding Trust, shall not be discharged pursuant to the terms of this Plan or otherwise, and the Debtor shall cause and require the MPC Natural Gas Funding Trust to act in accordance therewith.

1.155 "Released Parties" shall mean the Debtor, Reorganized Debtor, Officers and Directors, or any of their former or present employees (excluding persons whose service as Officers or Directors of the Debtor or any Affiliate thereof terminated prior to the Petition Date), advisors, attorneys, financial advisors, accountants and other professionals in their capacities as such, and each of their representatives and agents (including any professionals retained by such persons or entities).

1.156 "Reorganized Debtor" shall mean the Debtor after the Effective Date.

1.157 "Reorganized Debtor Charter" shall mean the certificate of incorporation of Reorganized Debtor attached as Exhibit A to this Plan.

1.158 "Retiree Benefits" shall mean payments to any Person for the purpose of providing or reimbursing payments for retired employees of the Debtor and of any other entities as to which the Debtor is obligated to provide retiree benefits and the eligible spouses and eligible dependents of such retired employees, for medical, surgical, or hospital care benefits, or in the event of death of a retiree under any plan, fund or program (through the purchase of insurance or otherwise) maintained or established by the Debtor prior to the Petition Date, as such plan, fund or program was then in effect or as heretofore or hereafter amended.

1.159 "SEC" shall have the meaning set forth in Section 1.46, D&O Proceedings definition, supra.

1.160 "SEC Inquiry" shall have the meaning set forth in Section 1.46, D&O Proceedings definition, supra.

1.161 "Securities Claims" means any Claim or claim asserted in, arising under or related to the Class Action other than any Claim asserted therein on behalf of any Person that is a defendant in the Class Action and other than any Claim asserted therein on behalf of any Person whose liability in respect of the subject matter of the Class Action will be released pursuant to the Class Action Settlement Documents.

1.162 "Schedules" shall mean, collectively, the schedules of assets and liabilities, the list of holders of interests and the statements of financial affairs filed by the Debtor under Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules, lists and statements have been or may be supplemented or amended from time to time.

1.163 "SDPUC" shall mean the South Dakota Public Utilities Commission, or any successor thereto.

1.164 "Secured Bondholder Claims" shall mean an Allowed Claim by the holder of any Secured Bond.

1.165 "Secured Bonds" shall mean any and all of the Gas Transition Bonds, the South Dakota First Mortgage Bonds, the Montana First Mortgage Bonds, CSFB Facility Montana First Mortgage Bonds, CSFB Facility South Dakota First Mortgage Bonds, the Montana Pollution Control Bonds, or the South Dakota Pollution Control Bonds.

1.166 "Secured Claim" shall mean any Claim which is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with Section 506(a) of the Bankruptcy Code, or in the event that such Claim is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of such setoff.

1.167 "Setoff" shall mean any right of a Creditor to offset a mutual debt owing by such Creditor and any right of the Debtor to offset a mutual debt owing by such Debtor to a Creditor against a Claim of the Debtor, including, without limitation, such rights under Section 553 of the Bankruptcy Code.

1.168 "South Dakota First Mortgage Bond Claims" shall mean an Allowed Claim by the holder of a South Dakota Mortgage Bond.

1.169 "South Dakota First Mortgage Bonds" shall mean any outstanding bonds issued under the South Dakota Indenture other than any CSFB Facility South Dakota First Mortgage Bonds, specifically any of the following:

First Mortgage Bonds, 7% Series due 2023; and

New Mortgage Bonds, 7.10% Series due 2005.

1.170 "South Dakota Indenture" shall mean the General Mortgage Indenture and Deed of Trust, dated as of August 1, 1993, between Northwestern Public Service Company, as issuer, and The Chase Manhattan Bank, as trustee, and any supplements thereto.

1.171 "South Dakota Pollution Control Bonds" shall mean any outstanding bonds issued under the South Dakota Pollution Control Indentures.

1.172 "South Dakota Pollution Control Bond Claims" shall mean an Allowed Claim by the holder of a South Dakota Pollution Control Bond.

1.173 "South Dakota Pollution Control Bond Obligations" shall mean any obligations under any of the following agreements or indentures:

Sale Agreement, dated as of June 1, 1993, between Mercer County, North Dakota and Northwestern Public Service Company, relating to $7,550,000 Pollution Control Refunding Revenue Bonds Series 1993;

Indenture and Security Agreement, dated as of June 1, 1993, from Northwestern Public Service to Mercer County, North Dakota, relating to $7,550,000 Pollution Control Refunding Revenue Bonds Series 1993;

Loan Agreement, dated as of June 1, 1993, between Grant County, South Dakota and Northwestern Public Service Company, relating to $6,400,000 Pollution Control Refunding Revenue Bonds Series 1993A;

Indenture and Security Agreement, dated as of June 1, 1993, from Northwestern Public Service to Grant County, South Dakota, relating to $6,400,000 Pollution Control Refunding Revenue Bonds Series 1993A;

Loan Agreement, dated as of June 1, 1993, between Grant County, South Dakota and Northwestern Public Service Company, relating to $3,400,000 Pollution Control Refunding Revenue Bonds Series 1993B;

Indenture and Security Agreement, dated as of June 1, 1993, from Northwestern Public Service to Grant County, South Dakota, relating to $3,400,000 Pollution Control Refunding Revenue Bonds Series 1993B;

Loan Agreement, dated as of June 1, 1993, between City of Salix, Iowa and Northwestern Public Service Company, relating to $4,000,000 Pollution Control Refunding Revenue Bonds Series 1993; and

Indenture and Security Agreement, dated as of June 1, 1993, from Northwestern Public Service to City of Salix, Iowa, relating to $4,000,000 Pollution Control Refunding Revenue Bonds Series 1993.

1.174   "South Dakota Pollution Control Indentures" means the following indentures:

Indenture of Trust, dated as of June 1, 1993, between Grant County, South Dakota, as issuer, and Wells Fargo Bank Minnesota, National Association, as trustee (Series A);

Indenture of Trust, dated as of June 1, 1993, between Grant County, South Dakota, as issuer, and Wells Fargo Bank Minnesota, National Association, as trustee (Series B);

Indenture of Trust, dated as of June 1, 1993, between Mercer County, North Dakota, as issuer, and Wells Fargo Bank Minnesota, National Association, as trustee; and

Indenture of Trust, dated as of June 1, 1993, between the City of Salix, Iowa, as issuer, and Wells Fargo Bank Minnesota, National Association, as trustee.

1.175   "South Dakota Public Utilities Law" means the provisions of Chapter 49-34A of the South Dakota Codified Laws, and any rules and regulations promulgated in connection therewith, and as the same may be amended or modified from time to time, including any order previously issued by the South Dakota Public Utilities Commission.

1.176   "Special Recognition Grants" shall have the meaning set forth in Section 9.3(b) hereof.

1.177   "Stipulation of Settlement" shall mean that certain stipulation of settlement to be entered in the Class Action.

1.178   "Subordinated Claim" shall mean any Claim:  (a) payment of which is subordinated in right of treatment or payment to other Claims under an agreement enforceable under applicable non-bankruptcy law, but only to the extent provided in such agreement; (b) for reimbursement or contribution of a Person that is liable with the Debtor on another Creditor's Allowed Claim unless and until such Claim is paid in full; or (c) subordinated in right of treatment or payment pursuant to Sections 509(c) or 510 of the Bankruptcy Code.

1.179 "Subsequent Distribution Date" shall mean each six (6) month anniversary of the Effective Date.

1.180 "Surplus Distributions" shall mean the Distributions created pursuant to Section 7.7 of this Plan.

1.181 "TAC" shall mean the Trust Advisory Committee established pursuant to Article 5 of the D&O Trust Agreement.

1.182 "TA Debtors" shall mean the debtors and debtors-in-possession in the jointly administered bankruptcy cases of Touch America Holdings, Inc, *et al.*

1.183 "TDP" or "D&O Trust Distribution Procedures" shall mean that certain trust distribution procedures attached as Exhibit F to this Plan.

1.184 "Tax Claim" shall mean an Allowed Claim for an amount entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

1.185 "TOPrS Indenture" shall mean the Subordinated Debt Securities Indenture, dated as of August 1, 1995, between Northwestern Public Service Company, as issuer, and The Chase Manhattan Bank, as trustee, as amended or supplemented from time to time.

1.186 "TOPrS Notes" shall mean any outstanding Subordinated Debentures issued pursuant to the TOPrS Indenture, specifically any of the following:

> 8.125% Junior Subordinated Deferrable Interest Debentures due 2025, issued pursuant to a First Supplemental Indenture, dated as of August 1, 1995;

> 7.20% Junior Subordinated Deferrable Interest Debentures due 2038, issued pursuant to a Second Supplemental Indenture, dated as of November 15, 1995;

> 8.25% Junior Subordinated Deferrable Interest Debentures due 2031, issued pursuant to a Third Supplemental Indenture, dated as of December 21, 2001; and

> 8.10% Junior Subordinated Deferrable Interest Debentures due 2032, issued pursuant to a Fourth Supplemental Indenture, dated as of January 31, 2002.

1.187 "Tort Claim" shall mean any Claim relating to personal injury, property damage or products liability or other similar Claim asserted against the Debtor, its subsidiaries and/or Affiliates that has not been compromised and settled or otherwise

resolved.  Tort Claims include Claims arising from or related to products or services provided by the Debtor, its subsidiaries and/or Affiliates or their predecessors prior to the Petition Date regardless of when the accident or injury occurs.

1.188  "Trust Expenses" shall mean the expenses incurred by the D&O Trust as contemplated by the D&O Trust Agreement.

1.189  "Trust Originated Preferred Securities (TOPrS) Claims" shall mean an Allowed Claim by the holder of a TOPrS Note.

1.190  "Trustee" shall mean any Person appointed by the Bankruptcy Court pursuant to Section 6.2 of this Plan and pursuant to the D&O Trust Agreement.

1.191  "Unclaimed Property" shall mean any Distribution of Cash or any other property made to the holder of an Allowed Claim pursuant to this Plan that: (a) is returned to Reorganized Debtor as undeliverable and no appropriate forwarding address is received within the later of (x) one (1) year after the Effective Date and (y) one (1) year after Distribution is made to such holder; or (b) in the case of a Distribution made in the form of a check, is not negotiated and no request for reissuance is made by the holder of such Allowed Claim.

1.192  "Unsecured Claim" shall mean a Claim for which no property of any kind of the Debtor's Estate serves as security or Collateral other than Claims with respect to Unsecured Note Claims, Trust Originated Preferred Securities (TOPrS) Claims and QUIPS Claims.

1.193  "Unsecured Insider Claims" shall mean Unsecured Claims held by Insiders.

1.194  "Unsecured Note Claims" shall mean an Allowed Claim by the holder of an Unsecured Note.

1.195  "Unsecured Note Indentures" shall mean:

(a)    the Indenture, dated as of November 1, 1998, between the Debtor, as issuer, and The Chase Manhattan Bank, as trustee, and any supplements thereto (the "1998 Indenture"); and

(b)    the Indenture, dated as of December 1, 1989, between The Montana Power Company, as issuer, and Citibank, N.A., as trustee, and any supplements thereto (the "1989 Indenture").

1.196  "Unsecured Note Trustee" shall mean HSBC Bank USA, or any successor thereto (whether under the 1998 Indenture or the 1989 Indenture), in such Person's capacity as indenture trustee under such Unsecured Note Indenture.

1.197 "<u>Unsecured Notes</u>" shall mean any outstanding notes issued under:

(a)     the Indenture, dated as of November 1, 1998, between the Debtor, as issuer, and The Chase Manhattan Bank, as trustee, and any supplements thereto, specifically any of the following:

6.95% Senior Unsecured Debentures due 2028;

7.875% Senior Notes due 2007; and

8.75% Senior Notes due 2012; and

(b)     the Indenture, dated as of December 1, 1989, between The Montana Power Company, as issuer, and Citibank, N.A., as trustee, and any supplements thereto, specifically any of the following:

7.07% Unsecured Medium-Term Notes due 2006;

7.875% Unsecured Medium-Term Notes due 2026; and

7.96% Unsecured Medium-Term Notes due 2026.

1.198 "<u>Unsecured Priority Claims</u>" shall mean Unsecured Claims entitled to priority status pursuant to Section 507 of the Bankruptcy Code.

1.199 "<u>Unsecured Subordinated Note Claims</u>" shall mean an Allowed Claim by the holder of an Unsecured Subordinated Note.

1.200 "<u>Unsecured Subordinated Note Indentures</u>" shall mean the QUIPS Indenture and the TOPrS Indenture.

1.201 "<u>Unsecured Subordinated Note Trustees</u>" shall mean:

(a)     with respect to the QUIPS Indenture, Law Debenture Trust Company of New York; and

(b)     with respect to the TOPrS Indenture, Wilmington Trust,

in either case, or any successor thereto, in such Person's capacity as indenture trustee under such Unsecured Subordinated Note Indenture.

1.202 "<u>Unsecured Subordinated Notes</u>" shall mean the QUIPS Notes and the TOPrS Notes.

1.203 "<u>Warrant Agreement</u>" shall have the meaning set forth in Section 4.7(c) hereof.

1.204 "Warrants" shall have the meaning set forth in Section 4.7(c) hereof.

1.205 "Wilmington Trust" shall mean Wilmington Trust Company in its capacity as Indenture Trustee with respect to the TOPrS Notes.

## ARTICLE II

### TREATMENT OF ALLOWED ADMINISTRATIVE CLAIMS AND ALLOWED PRIORITY TAX CLAIMS

2.1    Non-Classification.  As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims against the Debtor are not classified for the purposes of voting on or receiving Distributions under this Plan.  All such Claims are instead treated separately upon the terms set forth in this Article II.

2.2    Administrative Claims.

(a)    In General.  All Administrative Claims shall be paid in full, in Cash, in such amounts as (a) are actual and necessary costs and expenses incurred after the Petition Date in the ordinary course of the Debtor's business when and as such Claims become due and owing or (b) are Allowed by the Bankruptcy Court upon the later of (i) the Effective Date, (ii) the date upon which there is a Final Order allowing such Claim as an Administrative Claim, or (iii) any other date specified in such order, or as may be agreed upon between the holder of such Administrative Claim and the Debtor.  Such Administrative Claims shall include all obligations owing to the DIP Lenders arising under the DIP Loan Documents and the DIP Financing Order (including, without limitation, the payment of all fees and expenses required thereunder), costs incurred in the operation of the Debtor's businesses after the Petition Date, the reasonable fees and expenses of Professionals retained by the Debtor and the Creditors' Committee, and the fees due to the United States Trustee pursuant to 28 U.S.C. § 1930.

(b)    Professional Compensation and Expense Reimbursement Claims.  Except as otherwise provided here, all Persons seeking an award by the Bankruptcy Court of Professional Fees, or of compensation for services rendered to the Debtor or a Committee or reimbursement of expenses incurred through and including the Effective Date under Sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code, (a) shall file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Effective Date within thirty (30) days after the Effective Date, and (b) if granted such an award by the Bankruptcy Court, shall be paid in full in such amounts as are Allowed by the Bankruptcy Court (i) on the later of the Effective Date or the date such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable,

(ii) upon such other terms as may be mutually agreed upon between such holder of an Allowed Administrative Claim and the Debtor or, on and after the Effective Date, Reorganized Debtor, or (iii) in accordance with the terms of any applicable administrative procedures order entered by the Bankruptcy Court. Parties-in-interest shall have thirty (30) days after the filing of a final fee application to object to such fee application. All Professional Fees for services rendered in connection with the Chapter 11 Case and this Plan after the Effective Date, including, without limitation, those relating to the occurrence of the Effective Date, the prosecution of Causes of Action preserved hereunder and the resolution of Disputed Claims, shall be paid by Reorganized Debtor upon receipt of an invoice therefor, or on such other terms as Reorganized Debtor may agree to, without the need for further Bankruptcy Court authorization or entry of a Final Order. If Reorganized Debtor and any Professional cannot agree on the amount of post-Effective Date fees and expenses to be paid to such Professional, such amount shall be determined by the Bankruptcy Court.

(c)     Claims of DIP Lenders.  On the Effective Date, all outstanding obligations of the Debtor to the DIP Lenders pursuant to the DIP Loan Documents, if any, shall be fully and finally satisfied in accordance with the terms of the DIP Loan Documents, the DIP Financing Order, and this Plan.

(d)     U.S. Trustee's Claims.  U.S. Trustee Claims that are unpaid as of the Effective Date will be paid in cash on the Effective Date.

2.3     Priority Tax Claims.  Allowed Priority Tax Claims shall be paid in full, in cash, upon the later of: (a) the Effective Date; (b) the date upon which there is a Final Order allowing such Claim as an Allowed Priority Tax Claim; (c) the date that such Allowed Priority Tax Claim would have been due if the Chapter 11 Case had not been commenced; or (d) upon such other terms as may be agreed to between the Debtor and any holder of an Allowed Priority Tax Claim; provided, however, that the Debtor may, at its option, in lieu of payment in full of Allowed Priority Tax Claims on the Effective Date, make cash payments respecting Allowed Priority Tax Claims deferred to the extent permitted by Section 1129(a)(9) of the Bankruptcy Code and, in such event, the principal amount of such Allowed Priority Tax Claims shall be amortized in equal annual installments over six (6) years from the Effective Date and interest shall accrue from the Effective Date on the unpaid portion of such Allowed Priority Tax Claim at: (x) any applicable statutory rate; (y) the rate applicable to federal judgments pursuant to 28 U.S.C. § 1961; or (z) a rate to be agreed to by the Debtor (or Reorganized Debtor, as the case may be) and the appropriate governmental unit or, if they are unable to agree, as determined by the Bankruptcy Court.

## ARTICLE III

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

Claims (other than Allowed Administrative Claims and Allowed Priority Tax Claims) and Equity Interests are classified for all purposes, including voting on, confirmation of and distribution pursuant to this Plan, as follows:

| Class | | Status |
|---|---|---|
| Class 1 - - | Priority Claims | Unimpaired |
| Class 2 - - | Unsecured Priority Claims | Unimpaired |
| Class 3 - - | Bank One DIP Financing Claims | Unimpaired |
| Class 4 - - | CSFB Financing Claims | Unimpaired |
| Class 5 - - | Secured Bondholder Claims | Unimpaired |
| Class 6 - - | Other Secured Claims | Unimpaired |
| Class 7 - - | Unsecured Note Claims | Impaired |
| Class 8 - - | Unsecured Subordinated Note Claims | Impaired |
| | Class 8 (a) - Unsecured Subordinated Note Claims Represented by TOPrS Notes | Impaired |
| | Class 8 (b) - Unsecured Subordinated Note Claims Represented by QUIPS Notes | Impaired |
| Class 9 - - | General Unsecured Claims | Impaired |
| Class 10 - - | Unsecured Convenience Claims of $20,000 or Less | Unimpaired |
| Class 11 - - | Environmental Claims | Unimpaired |
| Class 12 - - | D&O Trust Claims | Impaired |
| Class 13 - - | Other Equity Interests | Impaired |
| Class 14 - - | Securities Claims | Unimpaired |
| Class 15 - - | Opt-Out Securities Claims | Impaired |

# ARTICLE IV

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

### 4.1    CLASS 1 – PRIORITY CLAIMS

(a)    Impairment and Voting.    Class 1 is unimpaired by this Plan. Consequently, each holder of an Allowed Priority Claim is conclusively presumed to have accepted this Plan and is not entitled to vote to accept or reject this Plan.

(b)    Distributions.    Each holder of an Allowed Priority Claim shall receive, in full satisfaction, settlement, release and discharge thereof, Cash in an amount equal to such Allowed Priority Claim on the later of: (i) the Effective Date; and (ii) the date upon which there is a Final Order allowing such Claim as an Allowed Priority Claim or any other date specified in such Final Order, or as soon thereafter as is practicable, unless the holder of an Allowed Priority Claim and the Debtor or Reorganized Debtor, as the case may be, agree to a different treatment thereof.

### 4.2    CLASS 2 – UNSECURED PRIORITY CLAIMS

(a)    Impairment and Voting.    Class 2 is unimpaired by this Plan. Consequently, each holder of an Allowed Unsecured Priority Claim is conclusively presumed to have accepted this Plan and is not entitled to vote to accept or reject this Plan.

(b)    Distributions.    Each holder of an Allowed Unsecured Priority Claim shall receive, in full satisfaction, settlement, release and discharge thereof, Cash in an amount equal to such Allowed Unsecured Priority Claim on the later of: (i) the Effective Date; and (ii) the date that is ten (10) Business Days after the date upon which there is a Final Order allowing such Claim as an Allowed Unsecured Priority Claim or any other date specified in such Final Order, or as soon thereafter as is practicable, unless the holder of an Allowed Unsecured Priority Claim and the Debtor or Reorganized Debtor, as the case may be, agree to a different treatment thereof.

### 4.3    CLASS 3 – BANK ONE DIP FINANCING CLAIMS

(a)    Impairment and Voting.    Class 3 is unimpaired by this Plan. Consequently, each holder of an Allowed Bank One DIP Financing Claim is conclusively presumed to have accepted this Plan and is not entitled to vote to accept or reject this Plan.

(b)    Distributions.    Each holder of an Allowed Bank One DIP Financing Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge thereof, the amount of such Allowed Claim pursuant to the DIP Financing Order and the DIP Loan Documents on the Effective Date, unless the holder of the

Allowed Bank One DIP Financing Claim and the Debtor or Reorganized Debtor, as the case may be, agree to a different treatment thereof.

### 4.4    CLASS 4 – CSFB FINANCING CLAIMS

(a)    Impairment and Voting.    Class 4 is unimpaired by this Plan. Consequently, each holder of an Allowed CSFB Financing Claim is conclusively presumed to have accepted this Plan and is not entitled to vote to accept or reject this Plan.

(b)    Distributions.  Each holder of an Allowed CSFB Financing Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge thereof, full Reinstatement of such Allowed Claim pursuant to the CSFB Order and the CSFB Financing Documents.

### 4.5    CLASS 5 – SECURED BONDHOLDER CLAIMS

(a)    Impairment and Voting.    Class 5 is unimpaired by this Plan. Consequently, each holder of an Allowed Secured Bondholder Claim is conclusively presumed to have accepted this Plan and is not entitled to vote to accept or reject this Plan.

(b)    Distributions.    Each holder of an Allowed Secured Bondholder Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge thereof, full Reinstatement of such Allowed Claim.

### 4.6    CLASS 6 – OTHER SECURED CLAIMS

(a)    Impairment and Voting.    Class 6 is unimpaired by this Plan. Consequently, each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted this Plan and is not entitled to vote to accept or reject this Plan.

(b)    Distributions.    Each holder of an Allowed Other Secured Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge thereof, full Reinstatement of such Allowed Claim.

### 4.7    CLASS 7 – UNSECURED NOTE CLAIMS

(a)    Impairment and Voting.    Class 7 is impaired by this Plan and holders of Allowed Unsecured Note Claims are entitled to vote to accept or reject this Plan.

(b)    Allowance of Unsecured Note Claims.  On the Effective Date, the Unsecured Note Claims shall be deemed Allowed in the aggregate amount of

$898,264,683, which includes accrued and unpaid interest on the Unsecured Note Claims relating to the period up to but not including the Petition Date.

(c)    Distributions and Effects Thereof.    On the Effective Date the Unsecured Notes shall be automatically cancelled, annulled and extinguished.[1]  On the Effective Date, or as soon thereafter as practicable, each holder of an Unsecured Note Claim, along with holders of Allowed Class 9 General Unsecured Claims which do not choose to be an Allowed Convenience Claim, shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim its Pro Rata Share of: (i) 32,660,000 shares of New Common Stock (such 32,660,000 shares representing 92% of the New Common Stock to be issued and outstanding on the Effective Date prior to any dilution resulting from shares of New Common Stock issued pursuant to the New Incentive Plan and exercise of the warrants to purchase additional shares of New Common Stock allocated to the Class 8(a) and Class 8(b) holders described below (the "Warrants" and the agreement pursuant to which such Warrants are to be issued, the "Warrant Agreement")); plus (ii) the 497,000 shares of New Common Stock allocated to Class 8(b) if Class 8(b) as a class rejects the Plan.  The New Common Stock issued pursuant to this Section 4.7(c) shall be subject to dilution by shares of New Common Stock issued and distributed in accordance with exercise of the Warrants, the New Incentive Plan and such other shares as may be authorized and issued pursuant to the Reorganized Debtor Charter, as may be amended from time to time.

(d)    Cancellation of Unsecured Notes and Related Instruments.  As of the Effective Date, (i) all Unsecured Notes, shall be cancelled and deemed null and void and of no further force and effect, and (ii) all obligations of any Person under the Unsecured Notes, the Unsecured Note Indentures and all other agreements, instruments and documents evidencing the Unsecured Notes and the rights of the holders thereof, shall be automatically cancelled and deemed null and void and of no further force and effect (all without further act or action by any Person), except that such Unsecured Notes Indentures and other agreements that govern the rights of holders of the Unsecured Notes shall continue in effect solely for the purposes of allowing the Indenture Trustee, agent or servicer thereunder to make the distributions to be made on account of such Claims under the Plan, as provided herein, and allowing such Indenture Trustee, agent or servicer to enforce its Indenture Trustee Charging Lien, as more particularly described in Section 5.18 hereof.  Without limiting the foregoing, each holder of an Unsecured Note Claim shall be deemed to consent to the cancellation and release of any guarantee, instrument, agreement or other documents respecting payment of the Unsecured Notes and the release of any and all Claims it may have with respect to any property or assets of the Debtor and/or Reorganized Debtor.

---

[1]    Any securities held by the Debtor for Unsecured Note Claims, Class 7, shall be cancelled, annulled, and extinguished.  The Debtor will not share in any Distributions on account of such holdings.

4.8    **CLASS 8 – UNSECURED SUBORDINATED NOTE CLAIMS**

(a)    Impairment and Voting.   Class 8(a) is comprised of holders of Allowed Unsecured Subordinated Note Claims represented by the TOPrS Notes and is impaired by this Plan.  Holders of Allowed Unsecured Subordinated Note Claims represented by the TOPrS Notes are entitled to vote to accept or reject this Plan.

(i)    Allowance of Unsecured Subordinated Note Claims.   On the Effective Date, the Unsecured Subordinated Note Claims represented by the TOPrS Notes shall be deemed Allowed in the aggregate amount of $321,069,399, which includes accrued and unpaid interest on the TOPrS Notes relating to the period up to but not including the Petition Date.

(ii)    Distributions and the Effects Thereof.   On the Effective Date the Unsecured Subordinated Notes represented by the TOPrS Notes shall be automatically cancelled, annulled and extinguished.[2]  On the Effective Date, or as soon thereafter as practicable, each holder of an Unsecured Subordinated Note Claim represented by the TOPrS Notes shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim a Pro Rata Share of: (i) 2,343,000 shares of New Common Stock (such 2,343,000 shares representing 6.6% of the New Common Stock to be issued and outstanding on the Effective Date prior to any dilution resulting from shares of New Common Stock issued pursuant to the New Incentive Plan and exercise of the Warrants); plus (ii) Warrants exercisable for an additional 10.7% of New Common Stock.  The New Common Stock issued pursuant to this Section 4.8(a)(ii) of this Plan shall be subject to dilution by shares of New Common Stock issued and distributed in accordance with exercise of the Warrants, the New Incentive Plan and such other shares as may be authorized and issued pursuant to the Reorganized Debtor Charter as the same may be amended from time to time.  The Warrants to be issued pursuant to this Section 4.8(a)(ii) shall be exercised no later than three years following the Effective Date and shall have such terms and conditions as more particularly set forth on Schedule 4.8 to this Plan.

(b)    Impairment and Voting.   Class 8(b) is comprised of holders of Allowed Unsecured Subordinated Note Claims represented by the QUIPS Notes and is

---

[2]    Any securities held by the Debtor for Unsecured Subordinated Note Claims in Class 8(a) shall be cancelled, annulled, and extinguished.  The Debtor will not share in any Distributions on account of such holdings.

impaired by this Plan.  Holders of Allowed Unsecured Subordinated Note Claims represented by the QUIPS Notes are entitled to vote to accept or reject this Plan.

(i)    Allowance of Unsecured Subordinated Note Claims.  Unless the Debtor or another party-in-interest either objects or specifically reserves the right to object to claims of a holder of Unsecured Subordinated Note Claims represented by the QUIPS Notes, then on the Effective Date, the Unsecured Subordinated Note Claims represented by the QUIPS Notes shall be deemed Allowed in the aggregate amount of $69,537,873, which includes accrued and unpaid interest on the QUIPS Notes relating to the period up to but not including the Petition Date.  The Debtor specifically reserves the right to object to all the claims and recoveries of Magten Asset Management Corporation, as a holder of Claims and Causes of Action pursuant to the QUIPS Notes.

(ii)    Distributions and the Effects Thereof.  On the Effective Date, (i) the Unsecured Subordinated Notes represented by the QUIPS Notes and (ii) all Claims and Causes of Action against the Debtor related thereto, including, but not limited to, fraudulent transfer claims against the Debtor, shall be automatically cancelled, annulled and extinguished.[3]  On the Effective Date, or as soon thereafter as practicable, and so long as the holders of Class 8(b) Unsecured Subordinated Note Claims represented by the QUIPS Notes as a class vote to accept the Plan, each holder of an Unsecured Subordinated Note Claim represented by the QUIPS Notes and related Claims and Causes of Action shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim a Pro Rata Share of: (i) 497,000 shares of New Common Stock (such 497,000 shares representing 1.4% of the New Common Stock to be issued and outstanding on the Effective Date prior to any dilution resulting from shares of New Common Stock issued pursuant to the New Incentive Plan and exercise of the Warrants); plus (ii) Warrants exercisable for an additional 2.3% of New Common Stock.  In the event that Class 8(b), as a class, votes to reject the Plan, then the holders of Unsecured Subordinated Note Claims represented by the QUIPS Notes and related Claims and Causes of Action shall receive nothing under the Plan and (i) the New Common Stock to be distributed to such holders shall be distributed, pro rata, to Class 7 and Class 9, and

_____

[3] Any securities held by the Debtor for Unsecured Subordinated Note Claims in Class 8(b) shall be cancelled, annulled, and extinguished.  The Debtor will not share in any Distributions on account of such holdings.

(ii) the Warrants otherwise distributable to Class 8(b) will be canceled. The New Common Stock issued pursuant to this Section 4.8(b)(ii) of this Plan shall be subject to dilution by shares of New Common Stock issued and distributed in accordance with exercise of the Warrants, the New Incentive Plan and such other shares as may be authorized and issued pursuant to the Reorganized Debtor Charter as the same may be amended from time to time. The Warrants to be issued pursuant to this Section 4.8(b)(ii) shall be exercised, if at all, no later than three years following the Effective Date and shall have such terms and conditions as more particularly set forth on Schedule 4.8 to this Plan.

(c)    Cancellation of Unsecured Subordinated Notes and Related Instruments. As of the Effective Date, (i) all Unsecured Subordinated Notes, shall be automatically cancelled and deemed null and void and of no further force and effect, and (ii) all obligations of any Person under or in respect of the Unsecured Subordinated Notes, the Unsecured Subordinated Note Indentures and all other agreements, instruments and documents evidencing the Unsecured Subordinated Notes and the rights of the holders thereof, including, but not limited to, any related Claims and Causes of Action, including, but not limited to, fraudulent transfer claims against the Debtor, shall be cancelled and deemed null and void and of no further force and effect (all without further act or action by any Person), except that such Unsecured Subordinated Notes Indentures and other agreements that govern the rights of the holders of the Unsecured Subordinated Notes shall continue in effect solely for the purposes of allowing the Indenture Trustee, agent or servicer thereunder to make the distributions to be made on account of such Claims under the Plan, as provided herein, and allowing such Indenture Trustee, agent or servicer to enforce its Indenture Trustee Charging Lien, as more particularly described in Section 5.18 hereof. Without limiting the foregoing, each holder of an Unsecured Subordinated Note Claim shall be deemed to consent to the cancellation and release of any guarantee, instrument, agreement or other documents respecting payment of the Unsecured Subordinated Notes and the release of any and all Claims it may have with respect to any property or assets of the Debtor and/or Reorganized Debtor.

## 4.9    CLASS 9 –GENERAL UNSECURED CLAIMS

(a)    Impairment and Voting. Class 9 is impaired by this Plan and holders of Allowed General Unsecured Claims are entitled to vote to accept or reject this Plan. Insiders are entitled to vote on the Debtor's Plan; provided, however, pursuant to Section 1129(a)(10) of the Bankruptcy Code, if a class of claims is impaired under the Plan, in order to determine if at least one class of claims that is impaired under the Plan has accepted the Plan, such determination shall be made without including any acceptances of the Plan by any Insiders.

(b)    <u>Allowance of General Unsecured Claims</u>.  On the Effective Date, the holders of Allowed General Unsecured Claims shall be deemed, at their election, eligible to participate in Distributions, as described in Sections 4.9(c) and/or 4.10 up to the amount of the Allowed Claim.

(c)    <u>Distributions</u>.  On the Effective Date, or as soon thereafter as practicable, each holder of an Allowed General Unsecured Claim which does not choose to be an Allowed Convenience Claim, along with holders of Class 7 Unsecured Note Claims, shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim its Pro Rata Share of: (i) 32,660,000 shares of New Common Stock (such 32,660,000 shares representing 92% of the New Common Stock issued and outstanding on the Effective Date prior to any dilution resulting from shares of New Common Stock issued pursuant to the New Incentive Plan and exercise of the Warrants), plus (ii) the 497,000 shares of New Common Stock allocated to Class 8(b) if Class 8(b), as a class, votes to reject the Plan. The New Common Stock issued pursuant to this Section 4.9(c) shall be subject to dilution by shares of New Common Stock issued and distributed in accordance with exercise of, the Warrants, the New Incentive Plan and such other shares as may be authorized and issued pursuant to the Reorganized Debtor Charter as the same may be amended from time to time.

(d)    <u>Classification of Insider Claims</u>.  Insider claims included in Class 9 – General Unsecured Claims include, but are not limited to, claims related to the rejection of certain non-qualified plans and claims related to employment and separation of Insiders by the Debtor.[4]  To the extent that Insiders have claims for indemnification, advancements, and/or legal fees and expenses related to the Class Action and D&O Proceedings, such claims shall be channeled to and included in Class 12 – D&O Trust Claims.

### 4.10    **CLASS 10 – UNSECURED CONVENIENCE CLAIMS OF $20,000 OR LESS**

(a)    <u>Impairment and Voting</u>.  Class 10 is unimpaired by this Plan. Consequently, each holder of an Allowed Convenience Claim is conclusively presumed to have accepted this Plan and is not entitled to vote to accept or reject this Plan.

(b)    <u>Distributions</u>.  Each holder of an Allowed Convenience Claim shall receive in full satisfaction, settlement, release extinguishment and discharge of such Claim, one of the following forms of treatment:

---

[4]    The Debtor intends to object to the allowance of a number of Insider claims, including, but not necessarily limited to the claims of Cornerstone Propane, L.P., Cornerstone Propane Partners LP, John Charters, Richard Hylland, Merle Lewis, and Daniel K. Newell. Richard Hylland filed a claim in the amount of $30.4 million in connection with his employment with the Debtor and benefits under the Debtor's non-qualified benefit plans. The Debtor intends to object to Mr. Hylland's claim.

(i)     Cash equal to the amount of the Allowed Convenience Claim up to $20,000, on or as soon as practicable after the later of (1) the Effective Date and (2) the date that is ten (10) Business Days after a Class 2 Unsecured Priority Claim becomes an Allowed Convenience Claim by a Final Order; or

(ii)    Such other treatment as the Debtor and such holder shall have agreed upon in writing.

(c)     Effect of Convenience Class Election.  Holders of Allowed General Unsecured Claims of up to $20,000 or less in Class 9, may elect to participate in Class 10 up to $20,000 by voting to accept this Plan and marking the Ballot in the space provided.  Holders of Allowed General Unsecured Claims in excess of $20,000 may elect to reduce the amount of such holder's Allowed Claim to $20,000 and participate in Distributions to be paid to holders of Class 10 Convenience Claims.  Such an election constitutes a waiver of the amount of such holder's Allowed General Unsecured Claim in excess of $20,000, and such holder shall be deemed to release the Debtor and Reorganized Debtor from any and all liability for such excess amount.

### 4.11    CLASS 11 - ENVIRONMENTAL CLAIMS

(a)     Impairment and Voting.  Class 11 is not impaired under this Plan and holders of Allowed Environmental Claims are not entitled to vote to accept or reject this Plan.

(b)     Distributions.  All of the Debtor's federal, state and local environmental and regulatory obligations including all Environmental Claims, shall be unaffected by the Plan and shall become obligations of the Reorganized Debtor and its Affiliates except as specifically provided for herein.   Holders of an Allowed Environmental Claim shall receive in full satisfaction and settlement thereof full Reinstatement of such Allowed Environmental Claim; provided however, that Claims related to the Milltown Settlement and Stipulation shall be treated as provided for in the Milltown Settlement, Milltown Stipulation, the final consent decree and FERC order related to Milltown Dam.

Claims related to the Milltown Settlement and the Milltown Stipulation shall be treated in accordance with the Milltown Settlement, Milltown Stipulation and any consent decree entered by a court relating to the Milltown Dam site. Assuming that the Debtor's Plan is confirmed and the Effective Date occurs before a consent decree is entered or becomes fully effective, and if such consent decree is subsequently not entered or does not become fully effective, then all of the United States, the State of Montana, and the Confederated Salish and Kootenai Tribes, and Atlantic Richfield Company's rights, claims, arguments and objections with respect to matters within the scope of the Milltown Settlement and Milltown Stipulation shall be preserved until the consent decree is entered and effective.  In the event that (a) the consent decree is not entered after it is lodged with the court, (b) the consent decree does not become

fully effective pursuant to the conditions in the consent decree, or (c) after entry of the consent decree, the consent decree is overturned on appeal and subsequent negotiations are required, and any of the parties to the Milltown Stipulation assert that the negotiations have irretrievably broken down, then the Milltown Settlement shall be deemed void *ab initio*, and all funds in the escrow account shall continue to be held in trust in the escrow account pending further order of the Bankruptcy Court.

### 4.12    **CLASS 12 - D&O TRUST CLAIMS**

(a)    <u>Impairment and Voting</u>.  Class 12 is impaired under this Plan and holders of Allowed D&O Trust Claims are entitled to vote to accept or reject this Plan. To the extent that holders of Allowed D&O Trust Claims are Insiders, such votes shall not be counted in determining whether at least one class of impaired claims has accepted the Plan, as required by Section 1129(a)(10) of the Bankruptcy Code.

(b)    <u>Allowance of D&O Claims</u>.  All Allowed D&O Trust Claims shall be determined and paid pursuant to the terms, provisions, and procedures of the D&O Trust, the D&O Trust Agreement, and the D&O Trust Distribution Procedures.  The D&O Trust will be funded in accordance with the provision of Article VI of this Plan and the D&O Trust Documents, including the Insurance Assignment Agreement.

(c)    <u>Distributions</u>.

(i)    D&O Trust Claims shall be paid from the D&O Trust in FIFO order based on the date of entry of the D&O Proceeding Final Order providing for a Final Award in the D&O Proceeding giving rise to such D&O Trust Claim.  Among D&O Trust Claims created by the same D&O Proceeding Final Order, D&O Trust Claims will be paid in accordance with the D&O Proceeding Final Order giving rise to such D&O Trust Claim.

(ii)    Post Effective Date, on a monthly basis the Reorganized Debtor and any other applicable D&O Trust Claim Holders shall submit to the Trustee a notice setting forth the amount of such D&O Trust Claim Holders' Defense Costs approved and incurred during the previous month, together with all documentation necessary to reasonably satisfy the Trustee of the reasonableness of the claimed Defense Costs (collectively, the "<u>Defense Cost Notice</u>").  The Trustee shall reimburse the Reorganized Debtor and any applicable D&O Trust Claim Holders promptly upon receipt of a Defense Cost Notice and the Trustee's determination that such Defense Costs are reasonable but in no event later than thirty (30) days after receipt of the Defense Cost Notice.

(iii)    The D&O Trust shall be funded by the balance of the remaining proceeds in the D&O Policies after contributions to the Settlement Fund.  The Debtor estimates the remaining proceeds to be approximately $13.0 million, after funding the Settlement Fund and payment of Defense Costs reimbursable pursuant to the Defense

Cost Motion. In the event the D&O Trust funds are exhausted, so long as the SEC Investigation is pending and unresolved, the Reorganized Debtor shall contribute up to and not to exceed $2.5 million for defense costs of the Debtor's current officers and directors, as determined commencing with the Petition Date, when such claims are determined to be valid by the Trustee under the D&O Trust.

### 4.13    CLASS 13 - OTHER EQUITY INTERESTS

(a)    Impairment and Voting. Class 13 is impaired under this Plan, the holders of Class 13 Claims are entitled to no Distributions under this Plan, and all Equity Interests shall be deemed canceled as of the Effective Date. Class 13 is deemed to have rejected this Plan, and therefore, shall not be entitled to vote to accept or reject this Plan.

(b)    Distributions. On the Effective Date, all Equity Interests shall be canceled, annulled and extinguished and all other agreements, instruments and documents evidencing the Equity Interests and the rights of the holders thereof, shall be automatically cancelled and deemed null and void and of no further force and effect (all without further actor action by any Person) and holders of Equity Interests shall not be entitled to receive or retain any property or interest in property under this Plan on account of such Equity Interests.

### 4.14    CLASS 14 – SECURITIES CLAIMS

Class 14 Claims are claims of holders of claims pursuant to the proposed Stipulation of Settlement entered in the Class Action.[5] Pursuant to the Plan and the Stipulation of Settlement, the Debtor and various D&O Insurance Contributors will establish a settlement fund (the "Settlement Fund") in the amount of $41 million (of which approximately $37 million is to be contributed from certain of the D&O Policies, excluding the Cornerstone and Montana Power Company policies identified on Exhibit C, and $4 million is to be contributed from other Persons and parties) to settle the Class Action.

Class 14 Claims will be discharged and the Holders thereof shall be forever barred from seeking to recover any payment on their Securities Claims from the Debtor, the Reorganized Debtor, or the Released Parties.

---

[5]    In the event the proposed Stipulation of Settlement is not approved and does not become effective: (a) the Plan and any proposed Order confirming the Plan (i) will not release any non-Debtor for that matter, from the claims asserted or to be asserted in the Securities Litigation; and (ii) will not affect, in any way, the Class Claimants' rights to obtain relief for their claims in the Securities Litigation; (b) the Lead Plaintiffs and the Class Claimants shall retain their rights to pursue their claims and access the proceeds of any available D&O Policies that provide coverage for the claims asserted in the Securities Litigation; and (c) the Debtor's current and former officers and directors, financial advisors, accountants, auditors, agents or professional will not be released and discharged from any cause of action in connection with the Class Action.

Holders of Securities Claims may elect to refuse to accept the proposed treatment provided in the Class Action Settlement Documents (the "Opt-Out Election"). The holders of Securities Claims who exercise the Opt-Out Election and preserve their rights to proceed against the Debtor in the District Court in accordance with the requirements of the Class Action Settlement Documents, shall be holders of Class 15 Claims.

Holders of Securities Claim who choose the Opt-Out Election prior to Final Approval and become holders of Class 15 Claims shall not be entitled to any Distributions under the Plan and Class 14 Claims when liquidated. Any D&O Proceedings Final Order obtained by such holders of Securities Claims shall be channeled to the D&O Trust.

Distributions from the Settlement Fund shall be made in the amounts, at the times and in the manner provided for in the Class Action Settlement Documents, which shall also govern requirements for qualifying for distributions, the manner and time of the giving of notices, the forms of the documents to be filed by holders of Securities Claims and all other matters concerning the Class Action and its settlement other than as specifically provided for in the Plan. Neither the Debtor nor Reorganized Debtor shall have any responsibility with respect to the Class Action Settlement Documents or the disposition of the Settlement Fund after Final Approval, other than to cooperate in certain respects in the gathering of certain information with respect thereto and coordinating with the carriers of the D&O Policies regarding payment.

The defendants in the Class Action have the option, in their sole discretion, to terminate the Stipulation of Settlement if the amount of the securities as to which an Opt-Out Election is properly exercised exceeds five percent (5%) of such securities, or an amount otherwise agreed to by the defendants in the Class Action.

If the option to terminate the Stipulation of Settlement is not exercised, each holder of a Class 14 Claim will, pursuant to the Class Action Settlement Documents, release all Securities Claims such holder may have against the D&O Protected Parties and the other defendants in the Class Action. Class 14 Claims are unimpaired, and therefore, shall not be entitled to vote to accept or reject this Plan.

### 4.15    CLASS 15 – OPT-OUT SECURITIES CLAIMS

(a)    Impairment and Voting. Class 15 is impaired under this Plan and the holders thereof are entitled to no Distributions under this Plan. Class 15 is deemed to have rejected this Plan, and therefore, shall not be entitled to vote to accept or reject this Plan.

(b)    Distributions. On the Effective Date, all holders of Opt-Out Securities Claims upon receipt of a D&O Proceeding Final Order shall be channeled to the D&O Trust and shall receive the same treatment as holders of Class 12 Claims.

Holders of Class 15 Claims shall not be entitled to receive or retain any property or interest in property under this Plan.

(c)    In order to preserve any Securities Claim it may have against the Debtor, each holder of an Opt-Out Securities Claim must execute an Opt-Out Form. Submission of an Opt-Out Form that does not indicate to the contrary, will be deemed to be an election to preserve such Claim in the District Court sitting in bankruptcy and seek a D&O Proceedings Final Order from the District Court.

## ARTICLE V

## MEANS OF IMPLEMENTATION AND EFFECT OF CONFIRMATION OF PLAN

5.1    Plan Funding.  The funds utilized to make cash payments under this Plan have been and/or will be generated from, among other things, the operation of the Debtor's businesses, the sale of certain subsidiary assets and distribution of the proceeds to the Debtor, and cash on hand on the Effective Date.  In addition, the Debtor may enter into a new revolving credit facility to be effective upon the Debtor's exit from Chapter 11.

The D&O Trust shall be funded by the balance of the remaining proceeds in the D&O Policies after contributions to the Settlement Fund as described above.  The Debtor estimates the remaining proceeds to be approximately $13 million.  In the event the D&O Trust Funds are exhausted, the Reorganized Debtor shall contribute up to $2.5 million for defense costs of the Debtor's current officers and directors, as determined commencing with the Petition Date, until the SEC Investigation has concluded.

5.2    CSFB Facility and Secured Bonds.  Claims and interests granted by the CSFB Facility will continue on the Effective Date pursuant to the CSFB Order and the CSFB Financing Documents and will be an obligation of the Reorganized Debtor. The Secured Bonds will be Reinstated on the Effective Date and will be an obligation of the Reorganized Debtor.

5.3    Reorganized Debtor Charter.   On the Effective Date, the Reorganized Debtor Charter and by-laws will become effective.  The Reorganized Debtor Charter, together with the provisions of this Plan, shall, as applicable, provide for, among other things, the incorporation of Reorganized Debtor as a "C" corporation and the authorization of the New Common Stock, and such other provisions as are necessary to facilitate consummation of this Plan, including a provision prohibiting the issuance of non-voting equity securities in accordance with Section 1123(a)(6) of the Bankruptcy Code, all without any further action by the stockholders or directors of the Debtor or Reorganized Debtor.  The issuance of New Common Stock is hereby authorized without the need for any further corporate action or action by the New Board or stockholders of Reorganized Debtor.

5.4    New Common Stock.  On the Effective Date, Reorganized Debtor shall: (i) have authorized capital of 200,000,000 shares of New Common Stock and 50,000,000 shares of "blank check" preferred stock; and (ii) issue, in accordance with the terms of this Plan, up to 37,765,957 shares of New Common Stock plus Warrants representing an additional 5,305,000 shares of New Common Stock upon exercise of all of the Warrants pursuant to their terms.  All shares of New Common Stock and Warrants to be issued pursuant to this Plan shall be, upon issuance, fully paid and non-assessable, and shall be subject to dilution as of the Effective Date only as may be expressly set forth in this Plan, the Plan Documents or the Reorganized Debtor Charter.  After the Effective Date, the holders thereof shall have no preemptive or other rights to subscribe for additional shares except as may otherwise be allowed pursuant to the Reorganized Debtor Charter.

5.5    Cancellation and Surrender of Existing Securities Agreements

(a)    Except as may otherwise be provided in this Plan, on the date Distributions are made, (i) the promissory notes, share certificates, bonds and other instruments evidencing any Claim or Equity Interest, to the extent not already cancelled shall be deemed cancelled without further act or action under any applicable agreement, law, regulation, order or rule; and (ii) the obligations of the Debtor under the certificate of incorporation, agreements, indentures and certificates of designations governing such Claims and Equity Interests, as the case may be, shall be discharged and released; provided, however, that any such indenture or other agreement that governs the rights of the holder of a Claim based on an existing promissory note, bond and other instrument that is administered by an Indenture Trustee, agent or servicer shall continue in effect solely for the purposes of allowing such Indenture Trustee, agent, or servicer to make the distributions to be made on account of such Claims under the Plan, as provided hereunder, and allowing such Indenture Trustee, agent or servicer to enforce its Indenture Trustee Charging Lien, as more particularly described in Section 5.18 hereof. Notwithstanding the foregoing, the documents and instruments evidencing Claims that are Reinstated and rendered unimpaired pursuant to Article IV hereof, including without limitation the Montana First Mortgage Bond Claims, the South Dakota First Mortgage Bond Claims, South Dakota Pollution Control Bond Claims, the Gas Transition Bond Claims and the Montana Pollution Control Bond Claims, shall not be deemed cancelled.

(b)    Except as otherwise provided herein or agreed by Reorganized Debtor, each holder of a promissory note, share, certificate, bond or other instrument evidencing a Claim or Equity Interest, shall surrender such promissory note, share certificate, bond or instrument to Reorganized Debtor (or the Disbursing Agent), or, with respect to indebtedness that is governed by the Unsecured Note Indentures or the Unsecured Subordinated Note Indentures, the respective indenture trustee, agent or servicer, as the case may be.  Notwithstanding the foregoing, each holder of a promissory note, share certificate, bond or other instrument evidencing those Claims that are Reinstated and rendered unimpaired pursuant to Article IV hereof, including without

limitation the Montana First Mortgage Bond Claims, the South Dakota First Mortgage Bond Claims, South Dakota Pollution Control Bond Claims, Gas Transition Bond Claims and the Montana Pollution Control Bond Claims, shall not be required to surrender such promissory note, share certificate, bond or instrument to Reorganized Debtor (or the Disbursing Agent).

(c)     No Distribution of property hereunder shall be made to or on behalf of any holders required to surrender their bonds pursuant to Section 5.5(b) above unless and until such promissory note, share certificate, bond or instrument is received by Reorganized Debtor (or the Disbursing Agent), or the respective Indenture Trustee, agent or servicer, as the case may be, or the unavailability of such promissory note, share certificate, bond or instrument is established to the reasonable satisfaction of Reorganized Debtor (or the Disbursing Agent), or such requirement is waived by Reorganized Debtor. Reorganized Debtor may require any holder that is unable to surrender or cause to be surrendered any such promissory notes, share certificates, bonds or instruments to deliver an affidavit of loss and indemnity reasonably satisfactory to Reorganized Debtor. Any holder that fails within the later of one year after the Effective Date and the date of Allowance of its Claim or Equity Interest: (i) to surrender or cause to be surrendered such promissory note, share certificate, bond or instrument; and (ii) if requested, to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to Reorganized Debtor (or the Disbursing Agent), shall be deemed to have forfeited all rights, Claims and Causes of Action against the Debtor and Reorganized Debtor and shall not participate in any Distribution hereunder.

5.6     Continuation of Bankruptcy Injunction or Stays.

(a)     All injunctions or stays provided for in the Chapter 11 Case under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

(b)     Each of the injunctions relating to the D&O Proceedings and the D&O Trust as set forth in this Plan shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by this Plan. Notwithstanding anything to the contrary contained in this Plan, all actions in the nature of those to be enjoined by such injunctions shall be enjoined during the period between the Confirmation Date and the Effective Date.

(c)     In the event that the D&O Trust determines that an Injunction Default may have occurred, the D&O Trust shall be entitled, by motion or adversary proceeding, in its sole discretion, to seek a determination by the Bankruptcy Court that an Injunction Default has occurred, and the D&O Trust Channeling Injunction shall be of no further force and effect with respect to the Released Parties.

(d)     Any and all injunctions contemplated by the Plan shall be limited to the extent necessary to permit the Debtor and/or the TA Debtors, or any trustee, agent

or committee of creditors acting on behalf of or in the place of the Debtor and/or the TA Debtors, to commence and litigate any and all Claims or Causes of Action with respect to the alleged ownership interests in the Montana Power Company Policies.

        5.7    Revesting of Assets. Except as otherwise provided by this Plan, upon the Effective Date, title to all properties and assets of the Debtor shall pass from the Debtor to Reorganized Debtor free and clear of all Claims, Liens, encumbrances and interests of creditors and (except those Claims, Liens, encumbrances and interests created or permitted to continue to be retained pursuant to this Plan) and the Confirmation Order shall be a judicial determination of discharge and extinguishment of all Claims, Liens or Equity Interests (except those created or permitted to continue to be retained pursuant to this Plan). All pre-Effective Date Claims, liabilities and obligations of the Debtor are treated and/or discharged in accordance with the terms of this Plan and, except as otherwise set forth herein, shall not in any manner be (or be deemed to be) transferred or assumed by Reorganized Debtor. On the Effective Date, or as soon thereafter as practicable, the Disbursing Agent shall make all Distributions required under this Plan in satisfaction of Allowed Claims against the Debtor including, but not limited to, the following: (i) the consideration described in Section 4.1(b) of this Plan to the holders of Allowed Priority Claims in full and final satisfaction of such Priority Claims; (ii) the consideration described in Section 4.2(b) of this Plan to the holders of Allowed Unsecured Priority Claims in full and final satisfaction of such Unsecured Priority Claims; (iii) the consideration described in Section 4.3(b) of this Plan to the holders of Allowed Bank One DIP Financing Claims in full and final satisfaction of such Bank One DIP Financing Claims; (iv) the consideration described in Section 4.7(c) of this Plan to the holders of Allowed Unsecured Note Claims in full and final satisfaction of such Unsecured Note Claims; (v) the consideration described in Section 4.8(c) of this Plan to the holders of Allowed Unsecured Subordinated Note Claims in full and final satisfaction of such Unsecured Subordinated Note Claims; (vi) the consideration described in Section 4.9(c) of this Plan to the holders of the Allowed General Unsecured Claims in full and final satisfaction of such General Unsecured Claims; and (vii) the consideration described in Section 4.10(b) of this Plan to the holders of the Allowed Unsecured Convenience Claims, in full and final satisfaction of such Unsecured Convenience Claims.

        Nothing in the Plan or Confirmation Order releases or nullifies any liability to a governmental entity under police and regulatory statutes and regulations that any entity would be subject to as the owner or operator of property after the Effective Date. Nothing in the Plan or Confirmation Order shall release, discharge, or preclude any Claim that arises after the Effective Date that the United States Environmental Protection Agency or any state environmental agency may have against the Debtor or any remedies of the United States Environmental Protection Agency or state environmental agencies that are not within the definition of Claim as set forth in Section 101(5) of the Bankruptcy Code.

5.8    Revesting of Railroad Permits in Reorganized Debtor's Name.

On November 15, 2002, the Debtor acquired certain utility operating assets previously held by the Montana Power Company from Northwestern Energy, LLC, including certain railroad permits.    Consistent with the terms of the underlying transaction, the Debtor obtained blanket assignments of permits for a fee of $1,000 from Union Pacific Railroad.    On the Effective Date, or as soon thereafter as practicable, the Disbursing Agent shall pay $1,000 to Burlington Northern Santa Fe Railroad Company, Montana Rail Link, Inc., Montana Western Railway Company, and Rarus Railway Company and the Reorganized Debtor shall receive blanket assignment of all permits currently held in the name of Montana Power Company or NorthWestern Energy, LLC.

5.9    General Release of Liens.    Except as otherwise provided in this Plan, or in any contract, instrument, indenture or other agreement or document created in connection with this Plan or the implementation thereof, on the Effective Date, all mortgages, deeds of trust, Liens or other security interests against property of the Estate are hereby released and extinguished, and all the right, title and interest of any holder of such mortgages, deeds of trust, Liens or other security interests will revert to Reorganized Debtor as applicable, and the successors and assigns thereof.

5.10    Full and Final Satisfaction.    All payments and all Distributions hereunder shall be in full and final satisfaction, settlement, release and discharge of all Claims and Equity Interests, except as otherwise provided in this Plan.

5.11    Waiver of Avoidance Actions.    The Debtor shall provide notice of any Avoidance Actions 30 days prior to the voting deadline and shall initiate them within 180 days of the Effective Date.    After such date, the Debtor and Reorganized Debtor, for and on behalf of themselves and their Estate, hereby waive and release any Avoidance Actions; provided, however, that the foregoing waiver and release shall not apply to any such causes of Action that are pending on such date.

5.12    Termination of Subordination Rights.    Except as otherwise provided in this Plan, the classification and manner of satisfying all Claims and Equity Interests under this Plan take into consideration all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, Sections 510(b) and (c) of the Bankruptcy Code or otherwise, that a holder of a Claim or Equity Interest may have against other Claim or Equity Interest holders with respect to any Distribution made pursuant to this Plan.    On the Effective Date, all contractual, legal or equitable subordination rights that a holder of a Claim or Equity Interest may have with respect to any Distribution to be made pursuant to this Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined and Distributions pursuant to this Plan shall not be subject to payment to a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment or other legal process by any beneficiary of such terminated subordination rights.

5.13    No Successor Liability; No Liability for Certain Released Claims.

(a)      Except as otherwise expressly provided in this Plan, with respect to the Debtor, Reorganized Debtor and the D&O Trust, the Debtor, Reorganized Debtor, the other Released Parties, and the D&O Trust do not, pursuant to this Plan, assume, agree to perform, pay, or indemnify creditors for any Claims, liabilities or obligations of the Debtor relating to or arising out of the operations of or assets of the Debtor whether arising prior to, or resulting from actions, events, or circumstances occurring or existing at any time prior to, the Confirmation Date. Neither the Released Parties, Reorganized Debtor, nor the D&O Trust is, or shall be, a successor to the Debtor by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character, except that Reorganized Debtor and the D&O Trust shall assume the obligations specified in this Plan and the Confirmation Order.

(b)      Except as otherwise expressly provided in this Plan, effective automatically on the Effective Date, the Released Parties, their respective representatives and the Additional Indemnitees shall not be released from any and all Claims and Causes of Action arising under Section 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or similar Claims or Causes of Action arising under state or any other law, including, if applicable, Claims in the nature of fraudulent transfer, successor liability, corporate veil piercing, or alter ego-type Claims, as a consequence of transactions, events, or circumstances involving or affecting the Debtor (or any of its predecessors) or any of their respective businesses or operations that occurred or existed prior to the Effective Date.

5.14    Administration Pending Effective Date.  Prior to the Effective Date, the Debtor shall continue to operate its businesses as a debtor-in-possession, subject to all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules.  After the Effective Date, Reorganized Debtor may operate its businesses, and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, but subject to the continuing jurisdiction of the Bankruptcy Court as set forth in Article XIII hereof.

5.15    Setoffs.  Nothing contained in this Plan shall constitute a waiver or release by the Debtor of any rights of setoff the Debtor may have against any Person unless otherwise agreed in writing by the Debtor prior to the Effective Date or Reorganized Debtor after the Effective Date.

5.16    Post-Confirmation Fees, Final Decree.  Reorganized Debtor shall be responsible for the payment of any post-confirmation fees due pursuant to 28 U.S.C. § 1930(a)(6) and the filing of post-confirmation reports, until a final decree is entered.  A final decree shall be entered as soon as practicable after distributions have commenced under this Plan.

5.17   Section 1145 Exemption.   The issuance of the New Common Stock, the Warrants and other securities that may be deemed to be issued pursuant to this Plan shall be exempt from registration requirements in accordance with Section 1145 of the Bankruptcy Code.

5.18   Indenture Trustees Charging Lien.   On the Effective Date, Reorganized Debtor will pay the Indenture Trustees' Fees and Expenses in full and in cash, in an amount to be agreed upon among the Debtor and each of the Indenture Trustees. In the event that the parties cannot reach an agreement on the amount thereof, any disputed amount shall be determined by the Bankruptcy Court, pursuant to Section 503 of the Bankruptcy Code, and in accordance with the terms of the applicable Indenture. Otherwise, the Indenture Trustees shall not be required to file an application with the Bankruptcy Court for payment of Indenture Trustees' Fees and Expenses. Upon receipt of payment by any Indenture Trustee of Indenture Trustees' Fees and Expenses, any Indenture Trustee Charging Lien under the applicable Indenture shall automatically be deemed released to the extent of payment on account of Indenture Trustees' Fees and Expenses; to the extent any Indenture Trustees' Fees and Expenses are not paid by the Reorganized Debtor (whether as a result of disagreement between the Indenture Trustee and the Reorganized Debtor, and/or following determination by the Bankruptcy Court) the Indenture Trustee Charging Lien of such Indenture Trustee shall not be impaired. Such payments shall be in full and final satisfaction of all pre- and post-petition Claims of the Indenture Trustees.   Subject to Reorganized Debtor's obligations under this Section, distributions to holders of Unsecured Notes, Unsecured Subordinated Notes, the South Dakota Pollution Control Bond Claims, Gas Transition Bond Claims or the Montana Pollution Control Bond Obligation Claims pursuant to this Plan will not be reduced on account of payments made to the Indenture Trustees, as applicable, on account of the Indenture Trustee Charging Liens.

Notwithstanding the above, on the Effective Date, and subject only to the review of the fee auditor appointed in this Chapter 11 Case, the Debtor shall pay to Harbert and Wilmington Trust an aggregate amount of $2.25 million on account of their legal, advisory, consulting and other professional fees and expenses, which amount shall be allocated among Harbert and Wilmington Trust by agreement between Harbert and Wilmington Trust.   Notwithstanding anything set forth herein, the fees of Goldin Associates shall not be subject to review by the fee auditor appointed in this Chapter 11 Case. Neither Wilmington Trust nor Harbert shall be required to file an application with the Bankruptcy Court for payment of such fees and expenses, provided that to the extent that the aggregate legal, advisory, consulting and other professional fees and expenses incurred by Harbert and Wilmington Trust exceed $2.25 million, Harbert and Wilmington Trust (and their professionals) may seek reimbursement of such fees and expenses by submitting an application to the Bankruptcy Court pursuant to Section 503(b) of the Bankruptcy Code, provided that the Creditor's Committee reserves the right to object to such application or applications. Notwithstanding anything set forth herein, if the fees and expenses of Wilmington Trust are not reimbursed in full by the estate, the

deficiency shall be paid out of the distributions received by Wilmington Trust on behalf of the Class 8(a) Claims. Moreover, the Debtor agrees (and this Plan shall provide) that Wilmington Trust shall have the right (but not the obligation) to sell in the public market that portion of the 6.60% of the New Common Stock distributed to Class 8(a) and received by Wilmington Trust as a distribution to the extent necessary to pay legal and advisory fees and expenses incurred by Wilmington Trust that are not otherwise reimbursed by the estate.

If the fees and expenses of the respective Indenture Trustees are not reimbursed in full by the Debtor, then any deficiency may be paid out of the distributions received by the respective Indenture Trustee on behalf of their respective class claimants. The Indenture Trustee shall have the right, but not the obligation, to sell into the public market any portion of the New Common Stock distributed to its respective class claimants and received by the Indenture Trustee as a distribution to the extent necessary to pay legal and advisory fees and expenses incurred by the Indenture Trustee that are not otherwise reimbursed by the Debtor.

5.19    Notwithstanding anything to the contrary herein, Reorganized Debtor shall pay in the ordinary course of the Reorganized Debtor's business the reasonable fees and expenses of the Indenture Trustees incurred after the Effective Date in connection with the Distributions to holders of the Unsecured Notes, the Unsecured Subordinated Notes, the South Dakota Pollution Control Bond Claims, Gas Transition Bond Claims or the Montana Pollution Control Bond Claims under this Plan. Nothing in this Section 5.17 shall be deemed to limit the obligations of the Reorganized Debtor to the trustee under the indentures with respect to any Secured Bonds which are Reinstated under the provisions of this Plan.[6]

5.20    Notwithstanding anything to the contrary herein, upon receipt of and acceptance of a Distribution from the Reorganized Debtor, any and all Claims and Cause of Action as between the Debtor and the claimant accepting the Distribution shall be fully and finally resolved.

---

[6]    The Debtor has been advised that MBIA Insurance Corporation ("MBIA") intends to seek payment of MBIA's costs and expenses incurred by its legal and financial advisors and certain alleged advisory services of MBIA by virtue of certain financial guarantee insurance policies issued by MBIA in connection with the Montana Pollution Control Bond Obligations and/or the South Dakota Pollution Control Bond Obligations. The Debtor intends to object to paying any such costs, expenses and fees, but will do so if otherwise ordered by the Court.

## ARTICLE VI

## IMPLEMENTATION OF THE D&O TRUST

6.1    Creation of the D&O Trust. On the Effective Date, the D&O Trust shall be created in accordance with this Plan and the D&O Trust Documents. The D&O Trust shall be a "qualified settlement fund" within the meaning of Section 468E of the Internal Revenue Code and the regulations issued thereunder. The purpose of the D&O Trust is to assume liability for any D&O Trust Claims that arise out of the D&O Proceedings and to use the D&O Trust Assets to pay such D&O Trust Claims and the Defense Costs in accordance with the D&O Trust Agreement and the TDP, and in such a way that all holders of D&O Trust Claims that involve similar Claims are treated in substantially the same manner. On the Effective Date, all right, title and interest in and to the D&O Trust Assets and any proceeds or Causes of Action thereunder shall be transferred to and vested in the D&O Trust, free and clear of all Claims, Equity Interests, Encumbrances and other interests of any Person without any further action of any Person.

6.2    Appointment of the Trustee. Prior to or at the Effective Date, the Debtor shall nominate the Trustee of the D&O Trust. The Bankruptcy Court, after notice and opportunity for hearing, shall appoint the initial Trustee to serve as Trustee of the D&O Trust in accordance with the D&O Trust Agreement, effective as of the Effective Date.

6.3    Appointment of Trust Advisory Committee Members. Prior to or at the hearing with respect to the confirmation of this Plan, the Debtor, the Creditors' Committee and the holders of D&O Trust Claims shall nominate three (3) members to the TAC. On the Confirmation Date, effective as of the Effective Date, the Bankruptcy Court shall appoint the initial members of the TAC (and thereupon the TAC shall be formed) to serve as members of the TAC in accordance with the D&O Trust Agreement.

6.4    Insurance Assignment. On the Effective Date, Debtor and each of the D&O Insurance Entities shall execute and deliver the Insurance Assignment Agreement and such agreement shall thereupon be the valid, binding and enforceable obligation of each party thereto in accordance with the terms thereof. Within six (6) months of the Effective Date, at the direction and request of the D&O Trust, a D&O Insurance Entity or Reorganized Debtor, as applicable, shall pursue any D&O Insurance Rights for the benefit of and to the fullest extent required by the D&O Trust, by negotiation or, if necessary, by the initiation of all appropriate and necessary legal action, to secure such D&O Insurance Rights and shall take such other action as the D&O Trust may request, including but not limited to granting to D&O Trust a security interest in the D&O Insurance Rights and commencing a declaratory judgment action to ascertain whether assignment of those D&O Insurance Rights constitutes a breach thereof. A D&O Insurance Entity or the Reorganized Debtor, as applicable, shall immediately transfer any amounts recovered under or on account of any of the D&O Insurance Rights

to the D&O Trust; provided, however, that while any such amounts are held by or under the control of a D&O Insurance Entity, such amounts shall be held in trust for the benefit of the D&O Trust.

6.5    Transfer of Claims and Demands to the D&O Trust.  On the Effective Date, all liabilities, obligations, and responsibilities relating to all D&O Trust Claims shall be transferred to the D&O Trust.

6.6    Discharge of Liabilities to Holders of D&O Trust Claims.  Except as provided in the Plan Documents and the Confirmation Order, the transfer to, vesting in, and assumption by the D&O Trust of the D&O Trust Assets and the D&O Insurance Assignment as contemplated by this Plan, the D&O Protected Parties Settlement Agreement, and the Insurance Assignment Agreement, among other things, on the Effective Date shall (a) discharge, release and extinguish all obligations and liabilities of the Debtor and Reorganized Debtor for and in respect of all D&O Trust Claims, and (b) discharge, release and extinguish all obligations and liabilities of the Released Parties for and in respect of all D&O Trust Claims.  On the Effective Date, the D&O Trust shall assume liability for any D&O Trust Claims that arise out of the D&O Proceedings and shall pay the D&O Trust Claims and Defense Costs in accordance with the TDP.

6.7    Institution and Maintenance of Legal and Other Proceedings.  As of the Effective Date, the D&O Trust shall be empowered to initiate, prosecute, defend, and resolve all Causes of Action related to any asset, liability, or responsibility of the D&O Trust.  The D&O Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all Causes of Action arising from or related to the D&O Insurance Rights.  The D&O Insurance Entities shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all Causes of Action arising from or related to their respective insurance rights to the extent permitted or required by the Insurance Assignment Agreement.

6.8    Indemnification by the D&O Trust.  As and to the extent provided in the D&O Trust Agreement, the D&O Trust will indemnify and hold harmless each of: (a) the Debtor and Reorganized Debtor and their respective Subsidiaries and their respective past, present and future representatives, in their capacities as such, and (b) the Released Parties.

6.9    D&O Insurance Entity Injunction.

(a)    Purpose and Provisions.  To protect the D&O Trust and preserve its assets, pursuant to the equitable jurisdiction and power of the Bankruptcy Court under Section 105(a) of the Bankruptcy Code, the Bankruptcy Court shall issue the D&O Insurance Entity Injunction, as described in Section 10.5(c) of this Plan; provided, however, that: (i) the D&O Trust shall have the sole and exclusive authority at any time to terminate or reduce or limit the scope of, the D&O Insurance Entity Injunction with respect to any D&O Insurance Entity upon express written notice to such D&O Insurance

Entity; and (ii) the D&O Insurance Entity Injunction is not issued for the benefit of any D&O Insurance Entity and no D&O Insurance Entity is a third-party beneficiary of the D&O Insurance Entity Injunction.

(b)    Terms.  Subject to the provisions provided in Section 6.9(c) of this Plan, all Persons (not including the D&O Trust and, to the extent permitted or required under Section 6.7 of this Plan or the Insurance Assignment Agreement, Reorganized Debtor and the D&O Insurance Entities) that have held or asserted, that hold or assert, or that may in the future hold or assert any Claim, demand or Cause of Action (including any D&O Trust Claim or any Claim or demand for or respecting any Trust Expenses), against any D&O Insurance Entity, based upon, relating to, arising out of, or in any way connected with any Claim, demand, D&O Insurance Rights, D&O Policies, or Release Parties Settlement Agreement whenever and wherever arisen or asserted (including all Claims in the nature of or sounding in tort, or under contract, warranty, or any other theory of law, equity or admiralty) shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payments, satisfaction or recovery with respect to any such Claim, demand, or Cause of Action, including:

(i)    commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any such Claim, demand, or Cause of Action against any D&O Insurance Entity or against the property of any D&O Insurance Entity, with respect to any such Claim, demand or Cause of Action;

(ii)    enforcing, levying, attaching, collecting or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree or other order against any D&O Insurance Entity, or against the property of any D&O Insurance Entity, with respect to any such Claim, demand, or Cause of Action;

(iii)    creating, perfecting, or enforcing in any manner, directly or indirectly any Lien against any D&O Insurance Entity, or the property of any D&O Insurance Entity, with respect to any such Claim, demand, or Cause of Action;

(iv)    except as otherwise specifically provided in this Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, or contribution of any kind, directly or indirectly, against any obligation due any D&O Insurance Entity or against the property of any D&O Insurance Entity, with respect to any such Claim, demand, or Cause of Action; and

(v)    taking any act in any manner in any place whatsoever that does not conform to, or comply with, the provisions of the Plan Documents relating to such Claim, demand, or Cause of Action,

provided, however, that (x) the D&O Trust shall have the sole and exclusive authority at any time to terminate, or reduce, or limit the scope of, the D&O Insurance Entity Injunction with respect to any D&O Insurance Entity upon express written notice to such D&O Insurance Entity and (y) the D&O Insurance Entity Injunction is not issued for the benefit of any D&O Insurance Entity and no D&O Insurance Entity is a third-party beneficiary of the D&O Insurance Entity Injunction.

      (c)    Reservations. Notwithstanding anything to the contrary above, this D&O Insurance Entity Injunction shall not enjoin:

      (i)    the rights of Persons to the treatment accorded them under this Plan, including the rights of Persons with D&O Trust Claims or Defense Costs to assert such D&O Trust Claims or Defense Costs against the D&O Trust in accordance with the TDP;

      (ii)    the rights of Persons to assert any Claim, debt, obligation, or liability for payment of Trust Expenses against the D&O Trust;

      (iii)    the rights of the D&O Trust to prosecute any action based on or arising from the D&O Insurance Rights;

      (iv)    the rights of Reorganized Debtor and the D&O Insurance Entities for the benefit of the D&O Trust (but only to the extent permitted or required under Section 6.7 of this Plan or the Insurance Assignment Agreement) to prosecute any action based on or arising from D&O Insurance Rights;

      (v)    the rights of the D&O Trust to assert any Claim, debt, obligation, or liability for payment against a D&O Insurance Entity based on or arising from the D&O Insurance Rights;

      (vi)    the rights of Reorganized Debtor and the D&O Insurance Entities for the benefit of the D&O Trust (but only to the extent permitted or required under Section 6.7 of this Plan or the Insurance Assignment Agreement) to assert any Claim, debt, obligation, or liability for payment against such D&O Insurance Entity based on or arising from the D&O Insurance Right;

      (vii)    the rights of Reorganized Debtor and the D&O Insurance Entities for the benefit of the D&O Trust (but only to the extent permitted or, required under Section 6.7 of this Plan or the Insurance Assignment Agreement) to assign a Cause of Action against any D&O Insurance Entity to a holder of a D&O Trust Claim or Defense Costs and for such Claimant to assert any Claim, debt, obligation, or liability for payment against such D&O Insurance Entity; and

      (viii)    any rights of the TA Debtors that may arise under any of the D&O Policies.

6.10    The D&O Trust Channeling Injunction.    Pursuant to and in connection with the Confirmation Order, the Bankruptcy Court shall enter or affirm the D&O Trust Channeling Injunction.

## ARTICLE VII

## VOTING AND DISTRIBUTIONS;
## AND TREATMENT OF DISPUTED, CONTINGENT
## AND UNLIQUIDATED CLAIMS AND EQUITY INTERESTS

7.1    Voting of Claims.    Each holder of an Allowed Claim in an impaired Class which is entitled to retain or receive property under this Plan shall be entitled to vote separately to accept or reject this Plan and indicate such vote on a duly executed and delivered Ballot as provided in such order as is entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject this Plan, or any other order or orders of the Bankruptcy Court.

7.2    Nonconsensual Confirmation.    If any impaired Class entitled to vote shall not accept this Plan by the requisite statutory majorities provided in Sections 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, or if any impaired class is deemed to have rejected this Plan, the Debtor reserves the right (a) to undertake to have the Bankruptcy Court confirm this Plan under Section 1129(b) of the Bankruptcy Code and (b) to amend this Plan in accordance with Section 13.3 of this Plan to the extent necessary to obtain entry of the Confirmation Order.

7.3    Method of Distributions Under this Plan

(a)    In General.    Subject to Bankruptcy Rule 9010, all Distributions under this Plan, other than with respect to Secured Bondholder Claims which are Reinstated pursuant to this Plan, on account of D&O Trust Claims, South Dakota Pollution Control Bond Claims, Gas Transition Bond Claims and Montana Pollution Control Bond Claims, shall be made by Reorganized Debtor (or the Disbursing Agent) to the holder of each Allowed Claim at the address of such holder as listed in the Debtor's books and records or on the Schedules as of the Confirmation Date, unless the Debtor or Reorganized Debtor have been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim or notice of transfer of claim filed by such holder that provides an address, if any, for such holder different from the address reflected in the Debtor's books and records or on the Schedules; provided that all Distributions to the DIP Lenders under Section 4.3(b) of this Plan shall be made by Reorganized Debtor (or the Disbursing Agent) to Bank One, N.A., as agent, or any successor agent thereto, for disbursement to the DIP Lenders.    With respect to D&O Trust Claims, Distributions to holders of D&O Trust Claims shall be made in accordance with the terms of the D&O Trust Documents.    With respect to South Dakota Pollution Control Bond Claims, Gas Transition Bond Claims and Montana Pollution Control Bond Claims, Distributions to holders of South Dakota Pollution Control Bond Claims, Gas

Transition Bond Claims or Montana Pollution Control Bond Claims, as the case may be, shall be made to the respective indenture trustees. Each indenture trustee shall, in turn, administer the distribution to the holders of the debt issues under the applicable indenture in accordance with the terms of such indenture. The reasonable fees and expenses of each indenture trustee incurred on or after the Effective Date in connection with the Distributions described herein, including the reasonable fees and expenses of the indenture trustee's professionals and agents, shall be paid by the Reorganized Debtor without further application to or order of the Bankruptcy Court.

(b)    <u>Distributions of Cash</u>.    Any payment of Cash made by Reorganized Debtor (or the Disbursing Agent) or the D&O Trust pursuant to this Plan shall be made by check drawn on a domestic bank or by wire transfer; provided that all Distributions of Cash to the DIP Lenders shall be made by Reorganized Debtor (or the Disbursing Agent) to Bank One, N.A., as agent, or any successor DIP Agent under the DIP Loan Agreement, by wire transfer of immediately available funds for disbursement to the DIP Lenders.

(c)    <u>Timing of Distributions</u>.  Any payment or Distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

(d)    <u>Fractional Dollars</u>.  Whenever any payment of a fraction of a dollar would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollars (rounding down in the case of $0.50 or less and rounding up in the case of more than $0.50).

(e)    <u>Fractional Shares</u>.  No fractional shares of New Common Stock shall be distributed under this Plan.  When any Distribution on account of an Allowed Claim pursuant to this Plan would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, such fractional interests shall be combined into as many whole shares as possible and shall be redistributed to holders of Allowed Claims with fractional interests, in descending order, until all such whole shares are distributed.

(f)    <u>Distributions to Holders as of the Confirmation Date</u>.  As of the close of business on the Confirmation Date, the claims register (for Claims) and the transfer ledgers (for Secured Notes and Unsecured Notes) shall be closed, and there shall be no further changes in the record holders of any Claims or Equity Interests. The Debtor and Reorganized Debtor shall have no obligation to recognize any transfer of any Claims or Equity Interests occurring after the close of business on the Confirmation Date, and shall instead be entitled to recognize and deal for all purposes under this Plan (except as to voting to accept or reject this Plan pursuant to Section 7.1 of this Plan) with only those holders of record as of the close of business on the Confirmation Date.

7.4    <u>Objections to and Resolution of Administrative Claims, Claims and Equity Interests</u>. Except as to applications for allowance of compensation and reimbursement of expenses under Sections 330 and 503 of the Bankruptcy Code (with respect to which procedures respecting objections shall be governed by Section 2.2(b) of this Plan and the Confirmation Order or other Final Order), any party in interest may file objections to the allowance of any Administrative Claims, Claims and Equity Interests subsequent to the Confirmation Date. All objections shall be litigated to Final Order; provided, however, that Reorganized Debtor shall have the exclusive authority to compromise, settle, otherwise resolve or withdraw any objections filed by Reorganized Debtor. If any joinder is made with respect to an objection, and the objection is subsequently withdrawn, the joinder shall be deemed withdrawn as well. Unless otherwise ordered by the Bankruptcy Court, all objections to the allowance of Administrative Claims, Claims or Equity Interests that are the subject of proofs of claim or requests for payment filed with the Bankruptcy Court (other than applications for allowances of compensation and reimbursement of expenses), shall be filed and served upon the holder of the Administrative Claim, Claim or Equity Interest as to which the objection is made as soon as is practicable, but in no event later than ninety (90) days after the Effective Date or such later date as may be approved by the Bankruptcy Court.

7.5    <u>Establishment and Maintenance of Reserve for Disputed Claims</u>. Reorganized Debtor shall maintain the Disputed Claims Reserve equal to the aggregate of any distributable amounts of Cash and New Common Stock equal to the relevant percentage of the Distributions to which holders of Disputed Claims would be entitled under this Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by a Final Order. For the purposes of effectuating the provisions of this Section and the Distributions to holders of Allowed Claims, the Debtor may, at any time and regardless of whether an objection to the Disputed Claim has been brought, request that the Bankruptcy Court estimate, set, fix or liquidate the amount of Disputed Claims pursuant to Section 502(c) of the Bankruptcy Code, in which event the amounts so estimated, fixed or liquidated shall be deemed the Allowed amounts of such Claims for purposes of distribution under this Plan. In lieu of estimating, fixing or liquidating the amount of any Disputed Claim, the Bankruptcy Court may determine the amount to be reserved for such Disputed Claim (singularly or in the aggregate), or such amount may be fixed by an agreement in writing by and between the Debtor and the holder of a Disputed Claim.

7.6    <u>Distributions Upon Allowance of Disputed Claims</u>. The holder of a Disputed Claim that becomes an Allowed Claim subsequent to the Effective Date shall receive Distributions from the Disputed Claims Reserve as soon as practical following the date on which such Disputed Claim becomes an Allowed Claim pursuant to a Final Order. Such Distributions shall be made in accordance with this Plan based upon the Distributions that would have been made to such holder under this Plan if the Disputed Claim had been an Allowed Claim on or prior to the Effective Date plus any interest, dividends or other Distributions earned thereon. No holder of a Disputed Claim shall

have any Claim against the Disputed Claims Reserve or Reorganized Debtor with respect to such Claim until such Disputed Claim shall become an Allowed Claim, and no holder of a Disputed Claim shall have any right to interest, dividends or other Distribution on such Disputed Claim except as provided in this Section.

7.7    Surplus Distribution. The following assets shall constitute Surplus Distributions: (i) Unclaimed Property; and (ii) to the extent that a Disputed Claim is not Allowed or becomes an Allowed Claim in an amount less than the Disputed Claim Amount, any excess of the amount of Cash or New Common Stock in the Disputed Claims Reserve attributable to such Disputed Claim over the amount of Cash or New Common Stock actually distributed on account of such Disputed Claim plus any interest, dividends or other Distributions earned thereon. On each Subsequent Distribution Date, the holders of Allowed Claims shall receive a Pro Rata Share in the Surplus Distributions attributable to such holders' Class; provided, however that Reorganized Debtor shall not be under any obligation to make Surplus Distributions on a Subsequent Distribution Date unless the aggregate market value of the Surplus Distributions (which value shall be determined based on the intrinsic value as of the Effective Date) to be distributed on such Subsequent Distribution Date exceeds $50,000 in any Class; provided, further that if the Final Distribution required under this Plan is less than $25,000 in aggregate market value in any Class such Surplus Distributions shall revest in Reorganized Debtor.

7.8    Distributions Relating to Allowed Insured Claims. Distributions under this Plan to each holder of an Allowed Insured Claim shall be in accordance with the treatment provided under this Plan for the Class in which such Allowed Insured Claim is classified, but solely to the extent that such Allowed Insured Claim is not satisfied from proceeds payable to the holder thereof under any pertinent insurance policies and applicable law. Nothing contained in this Section shall constitute or be deemed a waiver of any Cause of Action that the Debtor or any Person may hold against any other Person, including, without limitation, insurers under any policies of insurance.

7.9    Plan Committee. On or before the Effective Date, the Creditors' Committee shall appoint members of the existing Creditors' Committee to a committee (the "Plan Committee") for the purpose of overseeing the remaining Claims reconciliation and settlement process. Notwithstanding any other provision in this Plan, after the Effective Date, both the Debtor and Reorganized Debtor shall settle and compromise Claims according to the following procedures: (i) if the resulting settlement provides for an Allowed Claim in an amount less than or equal to $100,000, Reorganized Debtor may settle the claim and execute necessary documents, including a stipulation of settlement or release, in its sole discretion and without notice to any party; and (ii) if the resulting settlement provides for an Allowed Claim in an amount greater than $100,001, Reorganized Debtor may settle the Claim, in accordance with the provisions and procedures set forth in the Plan Committee By-Laws, which provides the Plan Committee with, among other things, the right to object such claims.

## ARTICLE VIII

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES;
## INDEMNIFICATION CLAIMS; AND RETIREE BENEFITS

8.1    Executory Contracts and Unexpired Leases.

(a)    Subject to Section 8.1(b) of this Plan, and excluding the Milltown Settlement and Milltown Stipulation, any unexpired lease or executory contract that has not been expressly rejected by the Debtor or treated in this Plan with the Bankruptcy Court's approval on or prior to the Confirmation Date shall, as of the Effective Date, be deemed to have been assumed by the Debtor unless there is pending before the Bankruptcy Court on the Effective Date a motion to reject such unexpired lease or executory contract (including, but not limited to any collective bargaining agreements) or such executory contract or unexpired lease is otherwise designated for rejection (including, but not limited to any collective bargaining agreements), provided, that (i) such lease or executory contract is ultimately rejected; (ii) the filing of the Confirmation Order shall be deemed to be a rejection of all then outstanding unexercised stock options, warrants and similar rights; and (iii) in accordance with Section 1123(a)(5)(G) of the Bankruptcy Code, on the Effective Date or within ninety (90) days of the Effective Date, or such other time as may be agreed to by the Reorganized Debtor and the claimant, Reorganized Debtor shall cure all defaults under any executory contract or unexpired lease assumed pursuant to this Section 8.1 by making a Cash payment in an amount agreed to between Reorganized Debtor and the claimant, or as otherwise fixed pursuant to a Final Order.

(b)    At least fifteen (15) days prior to the Voting Deadline (or such later date as the Bankruptcy Court may fix), the Debtor shall file schedules setting forth each of its executory contracts and unexpired leases to be assumed and assigned under this Plan and identifying those contracts and leases to be rejected, and the Person to which such executory contract or unexpired lease shall be assigned, together with the cure amount(s), if any, to be paid respecting such executory contracts and leases. Any party who disputes the proposed cure amount must file an objection not later than the date fixed for filing objections to confirmation of this Plan and any dispute respecting such cure amounts will be determined by the Bankruptcy Court at the Confirmation Hearing or on such later date as the Bankruptcy Court may fix. Notwithstanding the foregoing, the Debtor reserves the right, until five (5) days prior to the Confirmation Hearing, to seek to reject any executory contract or unexpired lease included on the schedule, to assume subject to the other contract party's right to (a) receive notice of the rejection, (b) object to the Debtor's rejection and (c) change its vote on the Debtor's Plan. The listing of a contract or lease on the foregoing schedules shall not constitute an admission by the Debtor that such agreement is an executory contract or an unexpired lease or that the Debtor has any liability thereunder.

8.2    Claims Deadline for Filing Proofs of Claims Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to this Plan. Claims arising out of the rejection of an executory contract or unexpired lease designated for rejection hereunder or pursuant to the Confirmation Order, must be filed with the Bankruptcy Court and served upon the Debtor or Reorganized Debtor by no later than 30 days after the notice of entry of an order approving such rejection or as otherwise may be provided in the Confirmation Order. Any Claims not filed within such time will be forever barred from assertion against the Debtor, the Estate, Reorganized Debtor and its property, and the holders thereof shall not be entitled to any Distribution under this Plan or otherwise from the Debtor or Reorganized Debtor. Unless otherwise ordered by the Bankruptcy Court, all Claims arising from the rejection of executory contracts and unexpired leases shall be treated as General Unsecured Claims under this Plan.

8.3    Insurance Policies. Each of the Debtor's insurance policies (except for the proceeds of certain D&O Policies being assigned to the D&O Trust) and any agreements, documents or instruments relating thereto, including, without limitation, any retrospective premium rating plans relating to such policies, are treated as executory contracts under this Plan. Notwithstanding the foregoing, distributions under this Plan to any holder of a Claim covered by any such insurance policies and related agreements, documents or instruments that are assumed hereunder, shall be in accordance with the treatment provided under Article IV and Article VI hereof. Each of the D&O Policies being assigned to the D&O Trust and any agreements, documents or instruments relating thereto, including, without limitation, any retrospective premium rating plans relating to such policies, are treated as assumed under this Plan. Nothing contained in this Section 8.3 shall constitute or be deemed a waiver of any Cause of Action that the Debtor may hold against any Person, including, without limitation, the insurer under any of the Debtor's policies of insurance.

8.4    Indemnification Claims. Indemnity claims not channeled to the D&O Trust shall be paid: (i) if Allowed on the Effective Date, in full in cash on the Effective Date; and (ii) if not then Allowed, such indemnity claim shall be assumed and paid in the ordinary course when such claim is Allowed.

8.5    Compensation and Benefit Programs. Except as otherwise provided in this Plan or subsequent motion prior to the Effective Date, all employment plans, practices, programs and policies maintained by the Debtor as of the Effective Date shall remain in full force and effect following the Effective Date, subject to any and all rights of the Debtor under applicable non-bankruptcy law to amend or terminate such plans, practices, programs and policies.

8.6    Retiree Benefits. Payment of any Retiree Benefits (as such benefits may have been modified during the Chapter 11 Case) shall be continued solely to the extent, and for the duration of the period, the Debtor is contractually or legally obligated to provide such benefits, subject to any and all rights of the Debtor under

applicable law (including, without limitation, the Debtor's right to amend or terminate such benefits prior to or after the Effective Date).

The Debtor has established and maintained two (2) pension plans for its employees, known as the NorthWestern Energy Pension Plan and the NorthWestern Pension Plan (collectively, the "Pension Plans"). The Pension Plans are single employer defined benefit plans covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1301 *et seq*. The Pension Plans will not be terminated during the Debtor's Chapter 11 Case and the Debtor will continue to sponsor the Pension Plans after emerging from Chapter 11, assuming the Plan is confirmed.

The Pension Benefit Guaranty Corporation ("PBGC"), a United States Government corporation which guarantees the payment of certain pension benefits upon termination of a pension plan, has asserted that the Pension Plans may be underfunded on a termination basis. The PBGC has filed contingent claims against the Debtor for unfunded benefit liabilities under 29 U.S.C. §§ 1362 and 1368; for unpaid minimum funding contributions under 29 U.S.C. § 1082 and 26 U.S.C. § 412; and for unpaid premiums under 29 U.S.C. § 1307. The PBGC has asserted that portions of these claims may be entitled to priority. PBGC's claims are contingent upon termination of the Pension Plans during the Chapter 11 Case.

8.7    QF Agreements. As of the Petition Date, the Debtor was party to approximately fourteen (14) power purchase agreements giving rise to the QF Claims as defined herein. As of the filing of the Plan, the Debtor has elected not to file a motion to reject any of the QF agreements. Unless the Debtor files a motion to reject any of the QF agreements on or before the Confirmation Date, as of the Effective Date, such QF agreements shall be deemed assumed by the Reorganized Debtor.

**ARTICLE IX**

**CORPORATE GOVERNANCE, MANAGEMENT
AND STRUCTURE OF REORGANIZED DEBTOR**

9.1    Management of Reorganized Debtor. On the Effective Date, the management, control and operation of Reorganized Debtor shall become the general responsibility of the board of directors of Reorganized Debtor (the "New Board"), which shall, thereafter, have responsibility for the management, control and operation of Reorganized Debtor in accordance with applicable law.

9.2    Directors and Officers of Reorganized Debtor.

(a)    Board of Directors of Reorganized Debtor. As of the Effective Date, the initial New Board of Reorganized Debtor shall consist of seven (7) members of which six (6) shall be designated by the Creditors' Committee and one (1) of which shall

be the Chief Executive Officer of the Reorganized Debtor. The designation of the board members for Reorganized Debtor shall be filed with the Bankruptcy Court on or prior to five (5) business days prior to the commencement date of the Confirmation Hearing, or such other date as the Bankruptcy Court may establish. On the Effective Date, the authority, power and incumbency of the persons then acting as directors of the Debtor shall be terminated and such directors shall be deemed to have been removed by unanimous vote of stockholders, and the directors of Reorganized Debtor that are selected in accordance with this Section 9.2 shall be deemed to have been elected by unanimous vote of the stockholders and shall have responsibility for the management, control and operations of Reorganized Debtor.

(b)     <u>Officers of Reorganized Debtor</u>.  On the Effective Date, the officers of the Debtor immediately prior to the Effective Date shall serve as the officers of Reorganized Debtor. After the Effective Date, the officers of Reorganized Debtor shall be determined by the New Board in accordance with Delaware law.

9.3     <u>Corporate Action, New Incentive Plan and Management Compensation</u>.

(a)     Pursuant to Section 303 of the Delaware General Corporation Law, all terms of this Plan may be put into effect and carried out without further action by the directors or stockholders of the Debtor or Reorganized Debtor, who shall be deemed to have unanimously approved this Plan and all agreements and transactions provided for or contemplated herein, including, without limitation: (i) the adoption of the Reorganized Debtor Charter and by-laws; (ii) removal of existing directors and the initial selection of directors and officers of Reorganized Debtor; and (iii) the distribution of Cash and the issuance and distribution of New Common Stock pursuant to this Plan; and (iv) implementation of the New Incentive Plan.

(b)     Notwithstanding the forgoing, 2,265,957 shares of New Common Stock representing 6% on a fully diluted basis of the shares to be issued and outstanding of Reorganized Debtor shall be reserved for any New Incentive Plan to be established by the New Board; <u>provided</u>, <u>however</u>, that 228,320 shares of the reserved New Common Stock will be allocated and delivered to those management employees set forth on Schedule 9.3 to this Plan as special recognition grants ("<u>Special Recognition Grants</u>"). The Special Recognition Grants shall vest according to the following schedule: (i) 50% on the Effective Date of the Plan; and (ii) 50% over the ensuing two to three years following the Effective Date, such vesting period to be determined by the New Board. Additionally, the Special Recognition Grants not then vested shall vest immediately upon a "change of control" as determined by the New Board. With respect to any employee of the Reorganized Debtor receiving a Special Recognition Grant, any grant not yet vested shall vest immediately upon the termination of such employee following the Effective Date; <u>provided</u>, <u>however</u>, that if such employee is terminated for cause such employee shall forfeit any remaining portion of his or her Special Recognition Grant.

(c)     Other than as provided for in sub paragraph (b) of this Section 9.3, the New Board, in its sole discretion, will decide all other issues related to the New Incentive Plan and management compensation including, but not limited to, employment agreements, base salaries, change of control provisions, short and long-term incentives, benefits and the like as is normal and customary for senior management of corporations similar to Reorganized Debtor.

9.4    <u>Reorganized Debtor Corporate Structure</u>.  Reorganized Debtor's regulated energy and utility businesses and assets will be "ring fenced" in that such assets and businesses will be owned by Reorganized Debtor as the parent company.  All of the Debtor's and Reorganized Debtor's non-regulated energy related or other businesses will be held in wholly owned subsidiaries of Reorganized Debtor.  These wholly owned subsidiaries have, and are anticipated to have, no employees of their own, but will be served by Reorganized Debtor's utility employees whose costs will be charged to the non-regulated subsidiaries through intercompany transfer pricing, which pricing mechanisms will be subject to review by the regulatory commissions having jurisdiction over Reorganized Debtor's rates.  Any debt incurred by the non-regulated subsidiaries' operations will be incurred at the subsidiary level and will be non-recourse to Reorganized Debtor.

**ARTICLE X**

**EXCULPATION, INJUNCTIONS, AND DISCHARGE**

**10.1    <u>Exculpation</u>.  None of the Debtor, Reorganized Debtor, the DIP Lenders, the Creditors' Committee, or any of their respective present or former Affiliates, Officers or Directors, or any of their respective present or former stockholders, members (in their capacity as members only), employees, advisors, attorneys, financial advisors, agents or Professionals in their capacities as such (collectively, the "<u>Exculpated Parties</u>") shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Case, the preparation or formulation of this Plan, the pursuit of confirmation of this Plan, the consummation of this Plan or the administration of this Plan or the property to be distributed under this Plan, except for willful misconduct or gross negligence, and, in all respects, the Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Plan; <u>provided, however</u>, that nothing in this Plan shall, or shall be deemed to, release the Exculpated Parties from, or exculpate the Exculpated Parties with respect to, their respective obligations or covenants arising pursuant to this Plan.**

**10.2    <u>Release of General Released Parties</u>.  As of the Effective Date, in consideration for, and as part of the treatment afforded to the holders of Claims and Equity Interests under this Plan, and for other valuable consideration, each of**

the Debtor, Reorganized Debtor, the DIP Lenders, the Creditors' Committee, and each of their respective Affiliates and their respective parents, subsidiaries, Affiliates, Officers or Directors, or any of their former or present stockholders, members (in their capacity as members only), employees, advisors, attorneys, financial advisors, accountants, auditors, agents or Professionals in their capacities as such (collectively, the "Genera1 Released Parties") shall be deemed forever released and discharged from any and all known and unknown Causes of Action of any nature that any Person (including, without limitation, any holder of Claims and Equity Interests under this Plan) may have asserted, could have asserted, or could in the future assert, directly or indirectly, against any of the General Released Parties based on any act or omission relating to the Chapter 11 Case on or prior to the Effective Date, excluding gross negligence and willful misconduct; provided, however, that the foregoing release and discharge shall not apply to Causes of Action that arise from obligations or rights created under or in connection with this Plan or any agreement provided for or contemplated in this Plan.

10.3    **Mutual Releases by General Released Parties**.    As of the Effective Date, each of the General Released Parties hereby unconditionally forever releases, waives and discharges all known and unknown Causes of Action of any nature that such General Released Party has asserted, may have asserted, could have asserted, or could in the future assert, directly or indirectly, against any of the other General Released Parties based on any act or omission relating to the Debtor or the Debtor's business operations (including, without limitation, the organization or capitalization of the Debtor or extensions of credit and other financial services and accommodations made or not made to the Debtor) or the Chapter 11 Case on or prior to the Effective Date; provided, however, that the foregoing release, waiver and discharge shall not apply to Causes of Action that arise from obligations or rights created under or in connection with this Plan or any agreement provided for or contemplated in this Plan.

10.4    **Discharge**.    Except as otherwise expressly provided in Section 1141 of the Bankruptcy Code or this Plan, the Distributions made pursuant to and in accordance with the applicable terms and conditions of this Plan are in full and final satisfaction, settlement, release and discharge as against the Debtor of any debt that arose before the Effective Date, and any debt of a kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, and all Claims and Equity Interests of any nature, including, without limitation, any interest accrued thereon from and after the Petition Date, whether or not (i) a proof of claim or proof of interest based on such Debt, obligation or Equity Interest is filed or deemed filed under Section 501 of the Bankruptcy Code, (ii) such Claim or Equity Interest is Allowed under Section 502 of the Bankruptcy Code or (iii) the holder of such Claim or Equity Interest has accepted this Plan.

10.5    <u>Injunctions</u>.

(a)    <u>Injunction Related to Discharge</u>.  As of the Effective Date and subject to its occurrence, all Persons that have held, currently hold or may have asserted, directly, indirectly, derivatively or otherwise, a Claim, a Cause of Action or an Equity Interest or other right of a holder of an Equity Interest that is discharged, released or terminated pursuant to this Plan, are hereby permanently enjoined from commencing or continuing, in any manner or in any place, any action or other proceeding, enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order, creating, perfecting or enforcing any lien or encumbrance, asserting a set-off, or right of subrogation of any kind against any Debt, liability or obligation due to any such releasing Person, and from commencing or continuing any action, in any manner or in any place where the foregoing does not comply with or is inconsistent with the provisions of this Plan, and the Confirmation Order shall provide for such injunctions.

(b)    Notwithstanding any provision of this Plan to the contrary, this Plan:

(i)    shall not enjoin or extinguish any rights or claims asserted by PPL Montana, LLC ("<u>PPL Montana</u>") in its proof of claim dated January 13, 2004 (as may be amended) or asserted in any other manner, including, without limitation, PPL Montana's counterclaims and right of setoff;

(ii)    shall not affect any setoff rights, if any, of the United States of America;

(iii)    shall not affect any setoff rights, if any, of Richard Hylland; and

(iv)    shall not preclude or otherwise prohibit the Netexit Debtors, or any creditor, trustee or the Official Committee of Unsecured Creditors appointed in the Netexit Cases, from objecting to or expunging, modifying, offsetting, recharacterizing or subordinating any claim filed in the Netexit Cases, including but not limited to claims of the Debtor or any director or officer of the Debtor.

(c)    <u>Injunction Relating to Exculpation and Release</u>.  As of the Effective Date, except as otherwise provided in this Plan, all Persons are hereby permanently enjoined from commencing or continuing, in any manner or in any place, any action or other proceeding, whether directly, derivatively or otherwise against any or all of the Exculpated Parties or General Released Parties, on account of or respecting any Claims, Debts, rights, Causes of Action or liabilities exculpated, released or discharged pursuant to this Plan, and the Confirmation Order shall provide for such injunctions.

(d)  **D&O Insurance Entity Injunction.** The purpose and terms of the D&O Insurance Entity Injunction are set forth in detail in Section 6.9 of this Plan.

(e)  **D&O Trust Channeling Injunction.** The sole recourse of the holder of a D&O Trust Claim in respect of such Claim shall be the D&O Trust pursuant to the provisions of the D&O Trust Channeling Injunction and the TDP, and such holder shall have no right whatsoever at any time to assert its D&O Trust Claim against the Debtor, Reorganized Debtor or any Released Party or any property or interest in property of the Debtor, Reorganized Debtor or any Released Party. Without limiting the foregoing, from and after the Effective Date, the D&O Trust Channeling Injunction shall apply to all holders of D&O Trust Claims including, without limitation, holders of Indemnification Claims in connection with any D&O Proceeding, and all such holders shall be permanently and forever stayed, restrained and enjoined from taking any of the following actions for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any D&O Trust Claims, other than from the D&O Trust in accordance with the D&O Trust Channeling Injunction and pursuant to the D&O Trust Documents:

(i)  commencing, conducting or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative or other proceeding) in any forum against or affecting the Debtor, Reorganized Debtor or any Released Party or any property or interests in property of the Debtor, Reorganized Debtor or any Released Party;

(ii)  enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against the Debtor, Reorganized Debtor or any Released Party or any property or interests in property of the Debtor, Reorganized Debtor or any Released Party;

(iii)  creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance or lien against the Debtor, Reorganized Debtor or any Released Party, or any property or interests in property of the Debtor, Reorganized Debtor or any Released Party;

(iv)  setting off, seeking reimbursement of, contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to the Debtor, Reorganized Debtor or any Released Party or any property or interest in property of the Debtor, Reorganized Debtor or any Released Party; and

(v)    **proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the D&O Trust, except in conformity and compliance with the D&O Trust Agreement and the TDP.**

Except as otherwise expressly provided in this Plan or the D&O Trust Documents, nothing contained in this Plan shall constitute or be deemed a waiver of any Claim, right or cause of action that the Debtor, Reorganized Debtor or the D&O Trust may have against any Person in connection with or arising out of or related to a D&O Trust Claim.

10.6    <u>No Release, Discharge, Injunction as to Richard Hylland.</u> Notwithstanding any provision to the contrary set forth in this Plan, nothing herein shall be deemed to release, discharge or otherwise affect the Debtor's or Reorganized Debtor's rights to assert Claims or Causes of Action against Richard Hylland (excluding Claims for rights of indemnification and contribution with respect to the Class Action and D&O Proceedings), or defenses to any Claims which Richard Hylland has asserted or may assert against the Debtor.

10.7    <u>No Release as to Pension Plans.</u> Notwithstanding any language to the contrary in the Debtor's Plan, nothing in the Plan shall be construed as releasing, discharging, or otherwise relieving the Debtor or any other party who may be a fiduciary with respect to the Pension Plans of any potential liability for breaches of fiduciary duties owed to the Pension Plans under ERISA.

10.8    <u>No Release as to the Securities and Exchange Commission.</u> Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan, and/or Confirmation Order, no provision shall release any non-Debtor, including any officer and/or director of the Debtor and/or any Non-Debtor included in the Released Parties, from liability to the United States Securities and Exchange Commission, in connection with any legal action brought by such governmental unit against such person(s).

10.9    <u>No Release for Non-Debtor Third Parties as to Goldman Sachs & Co.</u> Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan, and/or Confirmation Order, no provision shall release any non-Debtor third party from liability to Goldman Sachs & Co. in connection with the McGreevey Litigation.

10.10   <u>No Release for Certain Netexit Parties.</u> Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan, Confirmation Order, and/or Plan documents including, but not limited to, the D&O Trust Agreement or the D&O Protected Parties Settlement Agreement, no provision shall release the officers, directors, assignees, agents, employees, or attorneys of the Netexit Debtors from liability to the Netexit Debtors, or any creditor, trustee or the Official Committee of Unsecured Creditors appointed in the Netexit Cases, except to the extent any such claim, right or Cause of Action may be characterized as a D&O Proceeding or covered by the D&O Policies, the D&O Trust Channeling Injunction or the D&O Insurance Entity Injunction.

10.11  No Release for Magten Asset Management Corporation. Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan, Confirmation Order, and/or Plan documents, no provision shall release Magten Asset Management Corporation, or any of its respective present or former Affiliates, officers or directors, or any of their respective present or former stockholders, members (in their capacity as members only), employees, advisors, attorneys, financial advisors, agents or Professionals in their capacities as such.

10.12  Mutual Releases with Respect to Wilmington Trust and Harbert. As of the Effective Date and other than with respect to Distributions provided for in Section 4.8 on account of their respective Allowed Unsecured Subordinated Note Claims and as part of the compromise and settlement with respect to Distributions to Class 8(a) provided for in the Plan, any and all Claims and Causes of Action both known and unknown on behalf of Harbert and Wilmington Trust, individually and collectively on the one hand, and on behalf of the Debtor, the Reorganized Debtor and the Creditors' Committee, on the other hand, and each of the foregoing respective Affiliates and their parents, subsidiaries, officers, directors or any of their former or present stockholders, members (in their capacity as members only), employees, advisors, attorneys, financial advisors, accountants, auditors, agents or Professionals in their capacities as such, shall be deemed forever mutually released and discharged from any and all known and unknown Causes of Action of any nature that any Person may have asserted, could have asserted or could in the future assert, directly or indirectly, against each of Harbert, Wilmington Trust and the Debtor, the Reorganized Debtor and the Creditors' Committee respectively, specifically including but not limited to claims and issues, which have been raised by Harbert and Wilmington Trust concerning the Debtor's filings with respect to and claims of an exemption under the Public Utility Holding Company Act of 1935; provided, however, that any claims which Wilmington Trust may have in respect of an Indenture Trustees Charging Lien or pursuant to Section 5.18 herein are excluded from the forgoing releases subject to any objections that the Debtor, the Reorganized Debtor or the Creditors' Committee may assert thereto.

10.13  Limitations of Releases, Exculpation, Discharge and Injunction. Except as specifically provided for in this Plan, the releases, exculpation, discharge and injunctions (other than the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction) with respect to non-Debtor third parties shall be effective only as to those holders of Claims and Interests which vote to accept the Plan and mark their respective ballots in the place provided consenting and agreeing to the release, exculpation, discharge and injunction provisions of the Plan. The releases, exculpation, discharge and injunctions provided for in this Plan also shall not be affected with respect to those releases and settlement of claims proposed to released and settled under the Class Action Settlement Documents in the event, and only to the extent, that the Bankruptcy Court either does not approve such proposed settlement in total, or approves the settlement but limits the parties to whom the Debtor may give releases pursuant to such Class Action Settlement Documents.

## ARTICLE XI

## EFFECTIVENESS OF THIS PLAN

11.1 **Conditions to Confirmation**. It is a condition to the entry of the Confirmation Order that the following conditions have been satisfied or waived pursuant to Section 11.3 of this Plan:

(a)    The Confirmation Order shall be in form and substance reasonably satisfactory to the Debtor and the Creditors' Committee; and

(b)    The Bankruptcy Court shall have made findings and determinations, among others, substantially to the effect as follows:

(i)    The D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction are to be implemented in accordance with this Plan and the D&O Trust;

(ii)    As of the Petition Date, the Debtor has been named as a defendant in securities actions seeking damages to which the Debtor is entitled to reimbursement from the D&O Policies;

(iii)    The D&O Trust is to use its assets and income to pay D&O Trust Claims;

(iv)    The Debtor is likely to be subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the D&O Trust Claims, which are addressed by the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction;

(v)    The actual amounts, numbers, and timing of demands cannot be determined;

(vi)    Pursuit of demands outside the procedures prescribed by this Plan and the TDP is likely to threaten this Plan's purpose to deal equitably with D&O Trust Claims;

(vii)    The terms of the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction, including any provisions barring actions against third parties, are set out in this Plan and described in the Disclosure Statement;

(viii)    Pursuant to court orders, the TDP or otherwise, the D&O Trust shall operate through mechanisms such as structured, periodic, or supplemental

payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of D&O Trust Claims or other comparable mechanisms, that provide reasonable assurance that the D&O Trust shall value, and be in a financial position to pay, D&O Trust Claims that involve similar D&O Trust Claims in substantially the same manner;

(ix)    The D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction are essential to this Plan and the Debtor's reorganization efforts;

(x)    An identity of interests exists among the Debtor and the Released Parties such that a Claim asserted against any of the Released Parties gives rise to a Claim against the Debtor by the operation of the law of indemnity and contribution;

(xi)    In light of the benefits provided, or to be provided, to the D&O Trust on behalf of each Released Party, the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction are fair and equitable with respect to the persons that might subsequently assert demands that would constitute D&O Trust Claims against any Released Party; and

(xii)    This Plan and its acceptance otherwise comply with Section 105 of the Bankruptcy Code;

(c)    The D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction shall have been implemented in connection with the D&O Trust and this Plan; and

(d)    The D&O Trust shall have the sole and exclusive authority as of the Effective Date to defend all D&O Trust Claims.

11.2    Conditions Precedent to Effectiveness.    This Plan shall not become effective unless and until the following conditions shall have been satisfied or waived pursuant to Section 11.3 of this Plan:

(a)    the Confirmation Order, in form and substance reasonably acceptable to the Debtor and the Creditors' Committee, shall have been entered by the Bankruptcy Court and shall have become a Final Order;

(b)    the Bankruptcy Court shall have entered or affirmed an order or orders entering the D&O Trust Channeling Injunction and the D&O Entity Injunction;

(c)    each of the Plan Documents and the New Common Stock, in form and substance reasonably acceptable to the Debtor and the Creditors' Committee, shall have been effected or executed and delivered;

(d)     the Debtor shall have distributed on the Effective Date to each holder of an Allowed Bank One DIP Financing Claim the amount of such Allowed Claim pursuant to the DIP Financing Order and the DIP Loan Documents in full satisfaction, settlement, release, extinguishment and discharge of such Allowed Claim, unless the holder of the Allowed Bank One DIP Financing Claim and the Debtor or Reorganized Debtor, as the case may be, agree to a different treatment thereof;

(e)     all outstanding fees and expenses of Professionals retained by the Debtor and a Committee that are due and payable and have been authorized to be paid as of the Effective Date pursuant to an order of the Bankruptcy Court shall have been paid, and a reserve, sufficient to pay the reasonable estimated post-Effective Date fees and expenses of such Professionals shall have been established by the Debtor for the benefit of such Professionals. Payment of fees and expenses pursuant to this provision shall include the payment of the fees and expenses of the MPSC and the Montana Consumer Counsel pursuant to the stipulation and settlement agreement between the Debtor, the MPSC and the Montana Consumer Counsel and approved by the Bankruptcy Court on July 19, 2004;

(f)     all actions, other documents and agreements necessary to implement this Plan shall have been effected or executed and delivered;

(g)     the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction shall be in full force and effect;

(h)     the Debtor and all applicable Trustees shall have executed the D&O Trust Agreement;

(i)     the D&O Insurance Entities shall have executed and delivered counterparts of the Insurance Assignment Agreement and such agreement shall be in full force and effect;

(j)     all Trust Assets that are to be delivered to the D&O Trust on the Effective Date shall have been delivered to the D&O Trust in accordance with the requirements of all applicable Plan Documents;

(k)     the Reorganized Debtor Charter and by-laws shall be in full force and effect;

(l)     the Debtor shall have obtained either: (i) a private letter ruling establishing that the D&O Trust is a "qualified settlement fund" pursuant to Section 468B of the Internal Revenue Code and the regulations issued pursuant thereto; or (ii) other decisions, opinions, or assurances regarding the tax consequences of this Plan satisfactory to the Debtor and the Creditors' Committee; and

(m)    any other material condition the Debtor, after consultation with the Creditors' Committee, determines must be satisfied.

11.3    Waiver of Conditions.  One or more of the conditions contained in Section 11.1 and Section 11.2 of this Plan may be waived with the prior execution of a written consent by or on behalf of the Debtor and the Creditors' Committee, in their judgment reasonably exercised.

11.4    Effect of Failure of Conditions.  In the event that one or more of the conditions specified in Section 11.2 of this Plan have not occurred on or before 120 days after the Confirmation Date, upon notification submitted by the Debtor to the Bankruptcy Court, counsel for the Creditors' Committee, counsel for the DIP Lenders, and counsel for the CSFB Lenders (a) the Confirmation Order shall be vacated, (b) no Distributions under this Plan shall be made, (c) the Debtor and all holders of Claims and Equity Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred and (d) the Debtor's obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtor or any other Person or to prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Debtor.

## ARTICLE XII

## REGULATION

12.1    Regulation.  The Debtor continues to be subject to both federal and state regulation.  The Debtor shall continue to be regulated by: (i) FERC; (ii) the MPSC in accordance with the Montana Public Utilities Law, the MPSC's policies and practices, and any other laws and regulations applicable to investor-owned utilities in the State of Montana with respect to the Debtor's Montana assets and operations; (iii) the SDPUC in accordance with South Dakota Public Utilities Law, the SDPUC's policies and procedures, and any other laws, regulations and orders applicable to investor-owned utilities in the State of South Dakota with respect to the Debtor's South Dakota assets and operations; and (iv) the NPSC in accordance with the Nebraska State Gas Regulation Act and the NPSC's rules and regulations applicable to jurisdictional utilities in the State of Nebraska with respect to the Debtor's Nebraska assets and operations.

12.2    Rates and Tariffs.  Unless specifically provided for in this Plan, no provision herein is intended to impair, alter, modify, increase or decrease any prepetition or postpetition: (i) rate, tariff, regulatory order or regulatory proceeding of FERC, MPSC, SDPUC or NPSC; (ii) agreement relating to any such rate, tariff, order or proceeding; (iii) right of appeal, action or collateral challenge with respect to any of the foregoing; or (iv) the regulatory authority or jurisdiction of FERC, MPSC, SDPUC or NPSC.

## ARTICLE XIII

## RETENTION OF JURISDICTION

13.1    Retention of Jurisdiction.    Following the Effective Date, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Case and this Plan pursuant to, and for the purposes of, Sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)    to hear and determine any and all objections to the allowance of any Claims or any controversies as to the classification of any Claims;

(b)    to hear and determine any and all applications by Professionals for compensation and reimbursement of reasonable fees and expenses;

(c)    to hear and determine any and all pending applications for the rejection and disaffirmance of executory contracts (including, without limitation, any collective bargaining agreements) and unexpired leases, and fix and allow any Claims resulting therefrom;

(d)    to liquidate any Disputed Claim;

(e)    to enforce the provisions of this Plan, including the injunction, exculpation and releases provided for in this Plan;

(f)    to enable the Debtor to prosecute any and all proceedings which have been or may be brought prior to the Effective Date, or subsequent to the Effective Date, to set aside liens or encumbrances and to recover any transfers, assets, properties, or damages to which the Debtor may be entitled under applicable provisions of the Bankruptcy Code or any federal state, or local laws;

(g)    to correct any defect, cure any omission, or reconcile any inconsistency in this Plan or in the Confirmation Order as may be necessary to carry out its purpose and the intent of this Plan;

(h)    to determine any Claim or liability to a governmental unit which may be asserted as a result of the transactions contemplated herein;

(i)    to hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code;

(j)    to hear and determine any matters or disputes respecting the Debtor under Sections 1113 and 1114 of the Bankruptcy Code;

(k)    to hear and determine any matters relating to the D&O Trust;

(l)    to determine such other matters as may be provided for in the Confirmation Order or as may be authorized under the provisions of the Bankruptcy Code; and

(m)    in connection with the Milltown Settlement and Milltown Stipulation, to the extent that a final Consent Decree (as defined in the Milltown Stipulation) and a final FERC Order has not been entered, the Bankruptcy Court shall retain exclusive jurisdiction, or in the alternative, concurrent jurisdiction to hear and determine the claims related to Milltown Dam.

## ARTICLE XIV

## MISCELLANEOUS PROVISIONS

14.1    Effectuating Documents and Further Transactions.    Each of the Debtor or Reorganized Debtor, as the case may be, is authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan and any notes or securities issued pursuant to this Plan.

14.2    Exemption from Transfer Taxes.    In accordance with Section 1146(c) of the Bankruptcy Code the issuance, transfer, or exchange of a security including, without limitation the New Common Stock, or the making or delivery of an instrument of transfer pursuant to, in implementation of, or as contemplated by this Plan, may not be taxed under any law imposing a stamp or similar tax.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

14.3    Amendment or Modification of this Plan.    Alterations, amendments or modifications of this Plan may be proposed in writing by the Debtor, with the prior consent of the Creditors' Committee as to any material alterations, amendments or modifications (which consent shall not be unreasonably withheld), at any time prior to the Confirmation Date, provided that this Plan, as altered, amended or modified, satisfies the conditions of Sections 1122 and 1123 of the Bankruptcy Code, and the Debtor shall have complied with Section 1125 of the Bankruptcy Code.  This Plan may be altered, amended or modified at any time before or after the Confirmation Date and before substantial consummation, provided that this Plan, as altered, amended or modified, satisfies the requirements of Sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms this Plan, as altered, amended or

modified, under Section 1129 of the Bankruptcy Code. A holder of a Claim or Equity Interest that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such holder. The Debtor specifically reserves the right to amend or modify this Plan in the event that the Bankruptcy Court either does not approve, in total, the settlement of the Class Action pursuant to the proposed Class Action Settlement Documents, or approves the proposed settlement of the Class Action but limits the parties to whom the Debtor may give releases pursuant to such settlement. In such event, the Debtor's claims against any parties not released as proposed in the Class Action Settlement Documents shall be preserved for the benefit of the Debtor's creditors and Estate and the Plan, as may be amended, may provide a mechanism reasonably satisfactory to the Creditors' Committee to prosecute and/or preserve such claims for the benefit of the Debtor's Estate. The Debtor may, with notice to the Creditors' Committee, the DIP Lenders and the CSFB Lenders, but without notice to holders of Claims or Equity Interests insofar as it does not materially and adversely affect the interests of any such holders, correct any defect or omission in this Plan and any exhibit hereto or in any Plan Document.

14.4    Severability. In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision in this Plan is invalid, void or unenforceable, such provision shall be invalid, void or unenforceable with respect to the holder or holders of such Claims or Equity Interests as to which the provision is determined to be invalid, void or unenforceable. The invalidity, voidness or unenforceability of any such provision shall in no way limit or affect the enforceability and operative effect of any other provision hereof.

14.5    Revocation or Withdrawal of this Plan. The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date. If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then this Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Debtor or any other Person or to prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Debtor.

14.6    Plan Supplement. The plan supplement containing drafts or final versions of the Plan Documents (the "Plan Supplement") shall be filed with the Bankruptcy Court and served upon the Office of the United States Trustee, and respective counsel to the Creditors' Committee and the DIP Lenders and the CSFB Lenders as early as practicable (but in no event later than fifteen (15) days) prior to the Confirmation Hearing, or on such other date as the Bankruptcy Court may establish. Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement upon written request to the Debtor in accordance with Section 14.8 hereof. The Plan Supplement is incorporated into and a part of this Plan as if set forth in full herein.

14.7   <u>Binding Effect</u>.  This Plan shall be binding upon and inure to the benefit of the Debtor, the holders of Claims and Equity Interests, and their respective successors and assigns, including, without limitation, Reorganized Debtor.

14.8   <u>No Preclusive Effect</u>.  Any findings of fact which may be included in the Confirmation Order will not have any preclusive effect in connection with confirmation of any subsequently-filed plan of reorganization, which subsequently-filed plan of reorganization will be as a replacement and in lieu of this Plan or as this Plan may be amended.

14.9   <u>Notices</u>.  All notices, requests and demands to or upon the Debtor or the Creditors' Committee, to be effective, shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Debtor:

NorthWestern Corporation
125 South Dakota Avenue
Sioux Falls, SD 57104
Attn:   William M. Austin
        Eric R. Jacobsen, Esq.

and

Paul, Hastings, Janofsky & Walker, LLP
600 Peachtree Street
Suite 2400
Atlanta, GA 30308
Attn:   Jesse H. Austin, III, Esq.
        Karol K. Denniston, Esq.
Co-Counsel to the Debtor and Debtor-in-Possession

and

Greenberg Traurig, L.P.
The Brandywine Building, Suite 1540
1000 West Street
Wilmington, DE 19801
Attn:   Scott D. Cousins, Esq.
        Victoria Watson Counihan, Esq.
        William E. Chipman, Jr., Esq.
Co-Counsel to the Debtor and Debtor-in-Possession

If to the Creditors' Committee:

Paul Weiss Rifkind Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attn:    Alan W. Kornberg, Esq.
         Ephraim Diamond, Esq.

and

The Bayard Firm
222 Delaware Avenue
Wilmington, DE 19801
Attn:    Neil B. Glassman, Esq.
         Charlene D. Davis, Esq.

14.10   Termination of Any Committees. Except as otherwise provided in this Section 14.9, on the Effective Date, all Committees (other than the TAC and the Plan Committee) shall cease to exist and their respective members and employees or agents (including, without limitation, attorneys, investment bankers, financial advisors, accountants and other professionals) shall be released and discharged from any further authority, duties, responsibilities and obligations relating to, arising from or in connection with such Committee. All Committees shall continue to exist after such date (i) with respect to all the applications filed pursuant to Sections 330 and 503 of the Bankruptcy Code or Claims for fees and expenses by Professionals; (i) any post-confirmation modifications to this Plan or Confirmation Order; and (iii) any matters pending as of the Effective Date before the Bankruptcy Court to which such Committee is party, until such matters are resolved.

14.11   Governing Law. Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, or to the extent this Plan, provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

14.12   Withholding and Reporting Requirements. In connection with the consummation of this Plan, the Debtor or Reorganized Debtor, as the case may be, shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements.

14.13   Allocation of Plan Distributions Between Principal and Interest. To the extent that any Allowed Claim entitled to a Distribution under this Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall, for federal income tax purposes, be allocated to the principal amount of the Claim

first, and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

14.14  Headings.  Headings are used in this Plan for convenience and reference only, and shall not constitute a part of this Plan for any other purpose.

14.15  Inconsistency.  In the event of any inconsistency between this Plan and the Disclosure Statement, any exhibit to this Plan or Disclosure Statement or any other instrument or document created or executed pursuant to this Plan, this Plan shall govern.

[Concluded on next page]

Dated as of:    August _18_, 2004
               Wilmington, Delaware

NorthWestern Corporation
Debtor and Debtor-in-Possession

By: _____
        William M. Austin
        Chief Restructuring Officer


PAUL, HASTINGS, JANOFSKY & WALKER LLP

_____
Jesse H. Austin, III
Karol K. Denniston
Carolyn Chayavadhanangkur
600 Peachtree Street
Suite 2400
Atlanta, GA 30309
Telephone: (404) 815-2400

and

GREENBERG TRAURIG, LLP

_____
Scott D. Cousins (No. 3079)
Victoria Watson Counihan (No. 3488)
William E. Chipman, Jr. (No. 3818)
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801
Telephone: (302) 661-7000

*Co-Counsel for the Debtor
and Debtor-in-Possession*


PLAN OF REORGANIZATION

# EXHIBIT 10

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .    Chapter 11

NORTHWESTERN CORPORATION,           .    Case No. 03-12872(CGC)

          Debtor.                   .    Oct. 6, 2004 (9:22 a.m.)
                                    .    (Phoenix, Arizona)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHARLES G. CASE, II
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.



85

1    plan and enter an order that would allow us to do so, we

2    intend to go effective by November the 1st.  During the

3    course of since August, I can state in my place that we have

4    been working diligently to provide for the schedules that we

5    must go through for purposes of making payments on account of

6    the convenience class, the claims which we are assuming on

7    the executory contracts.  We pulled together the list that

8    will actually be getting the stock, and we've been working on

9    our financing documents so that we are going to be prepared

10   to move fairly quickly to go effective on or before November

11   the 1st.  Thank you.

12        MS. DENNISTON:  Your Honor, I want to turn now to

13   talk about the D&O trust, the funding of the D&O trust, the

14   releases, the channeling injunction, and the exculpation

15   provided for in the plan, and why is this important to the

16   debtor and why do we need to get this approved in connection

17   with this confirmation.  Two issues kind of converge here.

18   The first one is the pending motion that the debtor has

19   before this Court on the MOU.  That is a critical importance

20   to the debtor in this confirmation process is the sum --

21        THE COURT:  This is the McGreevey or the

22   securities?

23        MS. DENNISTON:  This is the big one, Your Honor,

24   with the securities class action, Mr. Etkin's client.

25        THE COURT:  The one that I've been promising for

86

1    all of this time?

2          MS. DENNISTON: That would be right, Your Honor.

3          THE COURT: Right, I understand.

4          MS. DENNISTON: That is a critical component of the

5    debtor's plan. In fact, when one looks at how do we get to

6    where we are with the D&O trust, the releases, the channeling

7    injunctions provided for in the plan is through the

8    settlement with the class action claimants. One led to the

9    other because first and foremost the debtor needed to have a

10    mechanism to address those claimants that would potentially

11    opt out of the securities class action settlement. That

12    being number one. Number two, is the use of the D&O

13    insurance policies, the Aegis and the EIM policy that are

14    being -- the proceeds of which are being transferred to the

15    trust through the insurance assignment. One had to take a

16    look and figure what was the highest and best uses of those

17    insurance policies for this estate, its creditors, and other

18    interest holders, and the highest and best use was to take

19    those insurance policies and channel the proceeds into a

20    trust so that the beneficiaries of those policies would have

21    the benefit, and the beneficiaries of those policies, as this

22    Court knows from the hearing on the MOU are the debtors,

23    directors, and officers. And the way this D&O trust has been

24    structured is pursuant to the terms of the assignment

25    agreement, those parties, including Northwestern as the

1  holder of the two policies, will be assigning to the trust

2  its interest in the policy proceeds except for the amounts

3  that have been set aside and will be segregated for the

4  purposes of settling the securities and class action

5  litigation, and that number is the $37 million that are

6  subject to the MOU.  That will be funded out of the Aegis and

7  EIM policies.

8       THE COURT:  And what's the total amount of the

9  proceeds that are available under the two policies?

10      MS. DENNISTON:  The total remaining amount of

11 what's available in the policies, Your Honor, I actually have

12 a slide that I can put up to show you.

13      THE COURT:  Remaining after the settlement of the

14 MOU or remaining before the settlement of the MOU?

15      MS. DENNISTON:  Remaining after.

16      THE COURT:  Here's the slide, it looks like.

17      MS. DENNISTON:  Thank you.  This is the proceeds

18 from the D&O coverage, Your Honor.  This slide has been

19 prepared, as I indicated earlier, with the assistance of Mr.

20 Kliewer from Northwestern.  If one looks, one sees the

21 primary carrier Aegis at 35 million, the excess carrier of

22 EIM at 25 million for a total D&O coverage of 60 million.  It

23 is these two policies the debtor proposes to channel the

24 proceeds to the D&O trust.  The contribution to the class

25 action settlement, which is subject to the MOU is 37 million,

1  is appropriate because it is no different than the access to

2  the insurance policies without the trust, and that lastly,

3  the 2.5 million that's going to be set aside for current

4  officers and directors is appropriate for the service that

5  they've rendered. And with that, Your Honor, the debtor

6  would close its case unless the Court has further questions

7  on at least the aspects of the D&O trust, the channeling

8  injunction, and the releases.

9        THE COURT: Describe for me exactly how the

10  releases work with regard to the rejecting creditors, those

11  creditors who vote no on the release.

12        MS. DENNISTON: With regard to the rejecting

13  creditors, Your Honor, it would be the debtor's position

14  because those creditors did not consent to the release they

15  would not be bound by the terms, and the debtor is working on

16  procedures in connection with the exit. As the Court

17  probably is aware identifying a beneficial holder as opposed

18  to the street name which some of the -- object may be a bit

19  of a struggle, but the debtor is working on procedures with

20  transfer agent and the various entities involved to identify

21  those so that that can be made known. At this point, I can't

22  tell the Court individual identities of who rejected

23  releases, but we will have a mechanism designed to do that.

24        THE COURT: Okay. Yeah, I notice -- I just looked

25  through the report, and they're all in street names.

# EXHIBIT 11

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                                                    Chapter 11

NORTHWESTERN CORPORATION,                      Case No. 03-12872 (CGC)

Debtor.

## ORDER CONFIRMING DEBTOR'S SECOND AMENDED AND RESTATED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

NorthWestern Corporation, a Delaware corporation (the "Debtor" or "NOR"), having filed with

this Court its voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11

U.S.C. §§ 101 et seq. (the "Bankruptcy Code") on September 14, 2003 (the "Petition Date"); and

the Debtor having filed with this Court its First Amended Plan of Reorganization Under Chapter

11 of the Bankruptcy Code dated May 24, 2004 (the "First Amended Plan") and Second

Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code dated

August 18, 2004 [Dkt. No. 2020] (as thereafter modified, the "Second Amended Plan" or

"Plan")[1]; and

(i) the Debtor having filed with this Court the First Amended Disclosure Statement Pursuant to

Section 1125 of the Bankruptcy Code for the Plan of Reorganization of the Debtor dated May

17, 2004 (the "First Amended Disclosure Statement"), Second Amended and Restated

Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the Plan of

Reorganization of the Debtor dated August 18, 2004 [Dkt. No. 2021] (the "Second Amended

Disclosure Statement" or "Disclosure Statement") and Summary Disclosure Statement Pursuant

to Section 1125 of the Bankruptcy Code dated August 18, 2004 [Dkt. No. 2023] (the "Summary

Disclosure Statement"); and

---

[1] Any capitalized term used herein but not otherwise defined shall have the meaning ascribed to such term in the Plan.

(ii) the First Amended Disclosure Statement having been approved as containing "adequate information," as such term is defined in Section 1125 of the Bankruptcy Code, by Order of this Court dated May 26, 2004 [Dkt. No. 1373] (the "Disclosure Statement Approval Order"); and

(iii) the Disclosure Statement Approval Order having, (1) authorized the Debtor to solicit acceptances or rejections of the First Amended Plan, (2) approved the form of ballots to be transmitted with the First Amended Plan and First Amended Disclosure Statement for voting purposes, (3) fixed August 2, 2004 at 5:00 p.m. (PDT) as the deadline for submitting ballots accepting or rejecting the Plan (the "Voting Deadline"), (4) fixed August 2, 2004 at 4:00 p.m. (EDT) as the deadline for objections to confirmation of the First Amended Plan to be filed and served (the "Objection Deadline"), (5) fixed August 13, 2004 at 4:00 p.m. (EDT) as the deadline for the Debtor to file and serve any response to an objection to confirmation and (6) approved the form and manner of notice of the Confirmation Hearing (as defined below) and of the Voting and Objection Deadlines; and this Court having scheduled a hearing (as such hearing may be continued, the "Confirmation Hearing") pursuant to Section 1128 of the Bankruptcy Code for

August 25, 2004 to consider confirmation of the Plan pursuant to Section 1129 of the

Bankruptcy Code; and

(iv) the Debtor having solicited votes on the First Amended Plan by transmitting copies of the First Amended Plan, First Amended Disclosure Statement, the Disclosure Statement Approval

Order, a notice of the Confirmation Hearing (the "Confirmation Hearing Notice") and an appropriate ballot to all impaired creditors entitled to vote on the First Amended Plan; and the Court having considered the Declaration of Voting Agent Regarding Tabulation of Votes in Connection with Debtor's First Amended Plan of Reorganization [Dkt. No. 1930] (the "Voting

Agent Declaration"); and

2

(v) it appearing that due notice of the Voting Deadline, the Confirmation Hearing and the

Objection Deadline has been given by the Debtor to creditors and other parties-in-interest in

accordance with the Disclosure Statement Approval Order, the Bankruptcy Code and the Federal

Rules of Bankruptcy Procedure as evidenced by the affidavits of mailing and of publication filed

with this Court; and the Disclosure Statement and Summary Disclosure Statement having been

approved as containing "adequate information," as such term is defined in Section 1125 of the

Bankruptcy Code, by Order of this Court dated September 2, 2004 [Dkt. No. 2033] (the

"Resolicitation Order"); and

(vi) the Resolicitation Order having, (1) authorized the Debtor to resolicit acceptances or

rejections of the Plan of Class 7, 8, and 9 claim holders, (2) approved the form of ballots to be

transmitted with the Summary Disclosure Statement for voting purposes, (3) fixed September

29, 2004 at 5:00 p.m. (PDT) as the deadline for submitting ballots accepting or rejecting the Plan

(the "Resolicitation Voting Deadline"), (4) fixed September 15, 2004 at 4:00 p.m. (EDT) as the

deadline for objections to confirmation of the Plan to be filed and served, (5) approved the form

and manner of notice of the continued Confirmation Hearing and of the Resolicitation Voting

Deadline; and this Court having continued the Confirmation Hearing to October 6, 2004 to

consider confirmation of the Plan pursuant to Section 1129 of the Bankruptcy Code; and

(vii) the Debtor having resolicited votes on the Plan by transmitting copies of the Summary

Disclosure Statement, the Resolicitation Order, notice of the continued Confirmation Hearing

(the "Continued Confirmation Hearing Notice") and an appropriate ballot to all impaired

creditors entitled to vote on the Plan; and the Court having considered the Declaration of Voting

Agent Regarding Tabulation of Votes in Connection with the Debtor's Second Amended Plan of

Reorganization [Dkt. No. 2170]; and

(viii) it appearing that due notice of the Resolicitation Voting Deadline and the continued Confirmation Hearing has been given by the Debtor to creditors and other parties-in-interest in accordance with the Resolicitation Order, the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure as evidenced by the affidavits of mailing and publication filed with this Court; and

(ix) the Debtor having filed with this Court a Memorandum of Law in Support of Confirmation of the Debtor's Second Amended and Restated Plan of Reorganization under Chapter 11 of the Bankruptcy Code [Dkt. No. 1928] and Memorandum of Law in Further Support of Confirmation of Debtor's Second Amended and Restated Plan of Reorganization under Chapter 11 of the Bankruptcy Code and in Response to Supplemental Objections to Confirmation [Dkt. No. 2145] (the "Supplemental Brief") filed in response to the Supplemental Objection of Magten Asset Management Corporation to Confirmation of the Debtor's Second Amended and Restated Plan of Reorganization [Dkt. No. 2105] (the "Magten Objection") and the Supplemental Objection of Law Debenture Trust Company of New York to Confirmation of the Debtor's Second Amended Plan of Reorganization [Dkt. No. 2104] (the "Law Debenture Objection"); and

(x) it appearing that the objections to confirmation filed by certain parties-in-interest have been resolved, withdrawn or overruled; and

(xi) this Court having conducted the Confirmation Hearing on August 25, 2004 and the continued Confirmation Hearing on October 6, 2004, and after due deliberation and consideration and having reviewed all pleadings, proceedings and evidence heretofore presented in this Chapter 11 case and at the respective confirmation hearings and sufficient cause appearing therefore; and

IT HAVING BEEN FOUND AND DETERMINED by this Court that:

A. Findings of Fact and Conclusions of Law. The findings of fact and conclusions of law set forth herein and on the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rule 7052 and 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. This Order incorporates the Court's oral ruling issued in the Debtor's Chapter 11 Case on October 8, 2004, which Order, among other things, confirmed the Plan in all respects and overruled all objections to confirmation not otherwise withdrawn or resolved as identified by the Debtor in Exhibit A to the Debtor's Memorandum of Law in Support of Confirmation of Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt. No. 1928], as amended, Notice of Filing of Amended Exhibit A to the Memorandum of Law in Support of Confirmation of Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt. No. 2156].

B. Judicial Notice. Pursuant to Federal Rule of Evidence 201, the Bankruptcy Court takes judicial notice of the documents included in the Debtor's Request to Take Judicial Notice of Certain Pleadings and Related Documents Filed with the Court filed on August 18, 2004 [Dkt. No. 1929] (the "Debtor's Request for Judicial Notice"). To the extent not included in the Debtor's Request for Judicial Notice, the Bankruptcy Court, pursuant to Federal Rule of Evidence 201, takes judicial notice of the docket of this Chapter 11 Case maintained by the Clerk of the Bankruptcy Court, including, without limitation, all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the various hearings held before the Bankruptcy Court during the pendency of the Debtor's Chapter 11 Case.

C. Offer of Proof. The Bankruptcy Court takes judicial notice of the Debtor's Offer of Proof and Outline of Evidence in Support of Adequacy of Debtor's Procedures and Notice in Conjunction with its Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt. No. 1932, Debtor's Exh. 15] (the "Offer of Proof"). The Bankruptcy Court enters into evidence Debtor's Exhibits 1-90, 114-121, 127-139, 142-146 and 150, identified on the Notice of Designation of Exhibits to be Used with Respect to the Confirmation Hearing filed on August 20, 2004 [Dkt. No. 1961], as such revised exhibits were introduced at the Confirmation Hearing, Exhibits 1-6 of the Creditors' Committee, identified on the Confirmation Hearing Amended Exhibit List of the Official Committee of Unsecured Creditors filed on August 23, 2004 [Dkt. No. 1970] and Exhibits 1 and 2 of the Equity Holders introduced into evidence at the Confirmation Hearing.

Pursuant to Federal Rule of Evidence 201, the Bankruptcy Court takes judicial notice of

the Supplemental Offer of Proof and Outline of Evidence in Support of the Adequacy of the

Debtor's Procedures and Notice in Conjunction with its Second Amended and Restated Plan of

ATL/1060234.9                                      5

Reorganization under Chapter 11 of the Bankruptcy Code and Request to Take Judicial Notice of

Certain Pleadings Filed with the Court [Dkt. No. 2166] (the "Supplemental Offer of Proof").

The Bankruptcy Court enters into evidence Debtor's Exhibits 151-166, 180 and 185, as such

revised exhibits were introduced at the Confirmation Hearing.

D. Jurisdiction and Venue. This Court has jurisdiction over this Chapter 11 Case and the subject matter of the Confirmation Hearing pursuant to 28 U.S.C. §§ 157 and 1334. The Confirmation Hearing is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2) and this Court has jurisdiction to enter a final order with respect thereto. Venue of this Chapter 11 Case in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

E. Background.

1. Petition. On September 14, 2003 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code [Dkt. No. 1]. The Debtor continues to operate its businesses and manage its properties as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner in the Chapter 11 Case. The Creditors' Committee was appointed by the Office of the United States Trustee on September 30, 2003.

2. Appointment of the Creditors' Committee. On October 2, 2003, the United States Trustee appointed a nine (9) member Creditors' Committee in this Chapter 11 Case pursuant to Section 1102 of the Bankruptcy Code to represent the interest of all holders of unsecured claims. The members of the Creditors' Committee were: (i) OCM Opportunities Fund IV, LP; (ii) Law Debenture Trust Company of New York, as successor Indenture Trustee to The Bank of New York; (iii) Franklin Templeton Mutual Series Fund; (iv) Wilmington Trust Co.; (v) HSBC Bank USA; (vi) Rocky Mountain Contractors, Inc.; (vii) Avenue Capital Management; (viii) AG Capital Recovery Partners III, LP; and (ix) Comanche Park, LLC [Dkt. No. 122]. By notice dated November 25, 2003, the United States Trustee added Magten Asset Management Corp. to the Creditors' Committee following Rocky Mountain Contractors, Inc. declining to serve on the Creditors' Committee [Dkt. No. 449]. By notice dated May 6, 2004, the United States Trustee removed Magten Asset Management Corp. and Law Debenture Trust Company of New York from the Creditors' Committee [Dkt. No. 1223]. By notice dated May 7, 2004, the United States Trustee removed Comanche Park, LLC from the Creditors' Committee [Dkt. No. 1238]. By notice dated July 27, 2004, the United States Trustee filed the Seventh

Amended Notice of Appointment reflecting OCM Opportunities
Fund IV, L.P.'s resignation from the Creditors' Committee
effective July 19, 2004 [Dkt. No. 1764]. By written notice to the
United States Trustee dated October 8, 2004, AG Capital Recovery
Partners III, L.P., resigned from the Creditors' Committee
effective October 8, 2004.

As of the date of this Order, the Creditors' Committee was comprised of: (i) Franklin

Templeton Mutual Series Fund; (ii) Wilmington Trust Co.; (iii) HSBC Bank USA; and (iv)

Avenue Capital Management.

    3.    Bar Date Order and Notice Thereof. The
Court entered an order establishing January 15, 2004 at 5:00 p.m.
(Pacific Standard Time) as the deadline for non-governmental
creditors, and establishing April 15, 2004 at 5:00 p.m. (Pacific
Standard Time) as the deadline for governmental creditors
(collectively, the "Bar Date"), to file proofs of claim for each claim
they assert against the Debtor that arose before the Petition Date
[Dkt. No. 197, Debtor's Exh. 21] (the "Bar Date Order"). The
notice of the Bar Date was mailed to all known creditors of the
Debtor and published in numerous regional and national newspapers
in accordance with the Bar Date Order. As described in the
Affidavit of Service of Bar Date Notice, sworn to by Angela M. Lo
on November 17, 2003 [Dkt. No. 406, Debtor's Exh. 22] (the "Lo
Affidavit"), copies of: (i) the Notice of Deadlines for Filing Proofs
of Claims and a personalized Proof of Claim were served on the
creditors listed on Exhibit A to the Lo Affidavit; (ii) copies of the
Notice of Deadlines for Filing Proofs of Claims and a blank Proof
Claim were served upon the 2002 Service List attached as Exhibit
B to the Lo Affidavit; and (iii) the Notice of Deadlines for Filing
Proofs of Claim was served on the list attached as Exhibit C to the
Lo Affidavit. The Court hereby finds that: (i) the transmittal of the
Notice of Deadlines for Filing Proofs of Claim was adequate and
sufficient under the circumstances of this Chapter 11 Case; (ii) such
notice was provided in compliance with the Bar Date Order, the
Bankruptcy Code and the Bankruptcy Rules; and (iii) no other or
further notice is required.

F. Debtor's Property Rights, Title and Interests in Executory Contracts, Leases, and Rights
of Way. On July 16, 2004, the Debtor filed its Notice of Contracts the Debtor intends to
Assume and/or Reject Pursuant to Section IV.F of the Debtor's First Amended
Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the Plan of
Reorganization [Dkt. No. 1700] and on August 9, 2004, the Debtor filed its Notice of
Amendment to Schedules of Contracts the Debtor Intends to Assume and/or Reject
Pursuant to Section IV.F of the Debtor's First Amended Disclosure Statement [Dkt. No.

1866]. Pursuant to the notices, the Debtor indicated its intent to assume certain executory contracts, leases, and rights of way. On September 22, 2004, the Debtor filed its Omnibus Motion for Court Approval to Assume Certain Executory Contracts Pursuant to Section 365 of the Bankruptcy Code and Granting Related Relief [Dkt. No. 2108].

G. Class Action Settlement. On or about April 28, 2004, the Debtor filed its Motion for Order Pursuant to Bankruptcy Rule 9019 Approving Memorandum of Understanding [Dkt. No. 1169, Debtor's Exh. 53] (the "MOU Motion"). On July 14, 2004, the Court held a hearing on the MOU Motion and on October 7, 2004 this Court entered its Memorandum Decision overruling the objection of Magten Asset Management Corporation approving the proposed settlement and finding that the proposed settlement meets the requirements of Bankruptcy Rule 9019 and applicable case law [Dkt. No. 2175].

H. The Plan.

    1.    The First Amended Plan. On May 25, 2004, the Debtor filed its proposed First Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the Plan of Reorganization of the Debtor [Dkt. No. 1352, Debtor's Exh. 1], which amended the First Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the Plan of Reorganization of the Debtor filed on May 14, 2004. Also on May 25, 2004, the Debtor filed its proposed First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt. No. 1351, Debtor's Exh. 2], which amended the First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code filed on May 14, 2004. After due notice and a hearing held on May 17, 2004, this Court entered on May 26, 2004 an Order (I) Approving First Amended Disclosure Statement, (II) Authorizing the Solicitation of Votes, (III) Scheduling a Hearing on Confirmation of the Plan of Reorganization, (IV) Establishing Notice Requirements Regarding the Confirmation Hearing and Approving the Form and Manner of Notice and (V) Granting Related Relief Respecting the Debtor's First Amended Plan of Reorganization [Dkt. No. 1373, Debtor's Exh. 3] finding that the First Amended Disclosure Statement contained "adequate information" within the meaning of Section 1125 of the Bankruptcy Code and established procedures for the Debtor's solicitation of votes on the First Amended Plan. In accordance with the Disclosure Statement Order, on or about June 4, 2004 the Debtor commenced the solicitation of votes on the First Amended Plan [Dkt. No. 1469, Debtor's Exh. 31], Affidavit of Service of Solicitation Materials.

    2.    The Second Amended Plan. On August 18, 2004, the Debtor filed its Second Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt. No. 1924, Debtor's Exh. 6], Second Amended Disclosure Statement Pursuant

to Section 1125 of the Bankruptcy Code for the Plan of
Reorganization of the Debtor [Dkt. No. 1926, Debtor's Exh. 8],
and Summary Amended Disclosure Statement Pursuant to Section
1125 of the Bankruptcy Code [Dkt. No. 1921, Debtor's Exh. 11].
On August 25, 2004, after due notice, the Court held a
confirmation hearing on the Debtor's Second Amended Plan. On
August 31, 2004, following the hearing, the Debtor filed its revised
Second Amended Plan [Dkt. No. 2020], Second Amended
Disclosure Statement [Dkt. No. 2021] and Summary Disclosure
Statement [Dkt. No. 2023]. After due notice, this Court entered on
September 2, 2004 an Order (A) Approving the Debtor's Second
Amended and Restated Disclosure Statement and Summary
Disclosure Statement, (B) Setting a Record Date for Voting
Purposes, (C) Authorizing Resolicitation of Votes, (D) Scheduling
a Continued Hearing on Confirmation of Second Amended and
Restated Plan of Reorganization, (E) Establishing Notice
Requirements Regarding the Continued Confirmation Hearing and
Approving the Form and Manner of Notice, and (F) Granting
Related Relief finding that the Second Amended Disclosure
Statement and Summary Disclosure Statement contained
"adequate information" within the meaning of Section 1125 of the
Bankruptcy Code and established procedures for the Debtor's
resolicitation of votes on the Second Amended Plan [Dkt. No.
2033]. In accordance with the Resolicitation Order, on or about
September 8, 2004 the Debtor commenced the resolicitation of
votes on the Second Amended Plan [Dkt. No. 2126].

I. Notice.

    1.    Compliance with Disclosure Statement
Approval Order. In accordance with the Disclosure Statement
Approval Order, the Bankruptcy Code and the Bankruptcy Rules,
as described in the Affidavit of Service, sworn to by Chris
Schepper on June 14, 2004 [Dkt. No. 1469, Debtor's Exh. 31] (the
"Schepper Affidavit"), the Debtor timely: (a) mailed (i) notice of
the date, time, and place of the Confirmation Hearing, (ii) notice of
the deadline and procedures for filing objections to confirmation of
the Plan, and (iii) an appropriate ballot for voting on the Plan, upon
the parties set forth in the Disclosure Statement Approval Order;
and (b) published notice of the Confirmation Hearing in each of
the following (i) Argus Leader, (ii) Billings Gazette, (iii) Great
Falls Tribune, (iv) the Missoulian, (v) New York Times, (vi) Rapid
City Journal, (vii) USA Today, and (viii) The Wall Street Journal
as required by the Disclosure Statement Approval Order [Debtor's
Exh. 23-31]. The Court hereby finds that: (i) the transmittal of the
Notice of the Confirmation Hearing and Ballots was adequate and
sufficient under the circumstances of this Chapter 11 Case; (ii) such
notice was provided in compliance with the Disclosure Statement

9

Order, the Bankruptcy Code and the Bankruptcy Rules; and (iii) no other or further notice is required.

        2.    Compliance with the Resolicitation Order. In accordance with the Resolicitation Order, the Bankruptcy Code and the Bankruptcy Rules, as described in the Affidavit of Service, sworn to by Chris Schepper on September 27, 2004 [Dkt. No. 2126, Debtor's Exh. 155] (the "Schepper Resolicitation Affidavit"), the Debtor timely (a) mailed: (i) notice of the date, time, and place of the continued Confirmation Hearing, (ii) the Summary Disclosure Statement; and (iii) an appropriate ballot for voting on the Plan, upon the parties set forth in the Resolicitation Order; and (b) caused to be published notice of the continued Confirmation Hearing in each of the following (i) Great Falls Tribune, (ii) the Missoulian, (iii) New York Times, (iv) Rapid City Journal, (v) USA Today, (vi) The Wall Street Journal, (vii) Billings Gazette; and (viii) Argus Leader as required by the Resolicitation Order [Dkt. Nos. 2128 - 2135, Debtor's Exh. 156 – 163]. The Court hereby finds that: (i) the transmittal of the Notice of the Continued Confirmation Hearing and Ballots for resolicitation was adequate and sufficient under the circumstances of this Chapter 11 Case; (ii) such notice was provided in compliance with the Resolicitation Order, the Bankruptcy Code and the Bankruptcy Rules; and (iii) no other or further notice is required.

J.  Tabulation of Votes.  As described in the Declaration of Voting Agent Regarding Tabulation of Votes in Connection with Debtor's First Amended Plan of Reorganization (the "Voting Agent Declaration") [Dkt. No. 1930, Debtor's Exh. 32], sworn to by Jonathan A. Carson on August 17, 2004, Kurtzman Carson Consultants LLC (the "Balloting Agent") distributed the solicitation packages as set forth in the Schepper Affidavit. The Balloting Agent received and tabulated the Ballots as follows: (a) each returned Ballot was opened and inspected at the Balloting Agent's office; (b) Ballots were date stamped, sorted according to Plan class, and scanned into the Bankruptcy Administration System; (c) all Ballots received by the Voting Deadline were then entered into the Bankruptcy Administration System and tabulated in accordance with the tabulation rules outlined in the Disclosure Statement Order. Voting Agent Declaration, ¶12. Classes 7, 9 and 12 accepted the First Amended Plan with respect to both numerosity and amount. Class 8 voted to reject the First Amended Plan.

K.  Tabulation of Votes in Connection with the Releases. The Voting Agent Declaration sets forth the following results in connection with the releases provided under the First Amended Plan:

| Impaired Class | Total Members Voting | Members Released | Members Not Released | Abstentions | % Released |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

| Class 7 | 261 | 215 | 46 | 264 | 82.38% |
|---------|------|------|-----|-----|--------|
| Class 8 | 2150 | 1429 | 721 | 266 | 66.47% |
| Class 9 | 24 | 18 | 6 | 7 | 75.00% |
| Class 12 | 28 | 20 | 8 | 0 | 71.43% |

See Voting Agent Declaration, ¶ 16.

L. Tabulation of Votes in Connection with Resolicitation. As described in the Declaration
   of Voting Agent Regarding Tabulation of Votes in Connection with Debtor's Second
   Amended Plan of Reorganization (the "Voting Agent Resolicitation Declaration") [Dkt.
   No. 2170, Debtor's Exh. 185], sworn to by Christopher Schepper on October 5, 2004, the
   Balloting Agent distributed the resolicitation packages as set forth in the Schepper
   Resolicitation Affidavit. The Balloting Agent, with the assistance of the Bondholder
   Communication Group ("BCG"), received and tabulated the Ballots as follows: (a) each
   returned Ballot was opened and inspected; (b) Ballots were date stamped, sorted
   according to Plan class, and scanned into the Bankruptcy Administration System; (c) all
   Ballots received by the voting deadline were then tabulated in accordance with the
   tabulation rules outlined in the Resolicitation Order. Voting Agent Resolicitation
   Declaration, ¶ 10-15. Classes 7, 8(a), 9 and 12 accepted the Second Amended Plan with
   respect to both numerosity and amount. Class 8(b) voted to reject the Second Amended
   Plan.

M. Tabulation of Class 8(b) Options. The Voting Agent Resolicitation Declaration sets forth
   the following results in connection with the holders of Class 8(b) options:

11

| Members Voted | # Members for Option 1 | # Members for Option 2 | Shares for Option 1 | Shares for Option 2 |
|---------------|------------------------|------------------------|---------------------|---------------------|
| 532 | 439 | 93 | 631,622 | 253,221 |

N. Tabulation of Votes in Connection with Releases on Resolicitation. The Voting Agent Resolicitation Declaration sets forth the following results in connection with the releases provided under the Second Amended Plan:

| Impaired Class | Total Members Voting | Members Released | Members Not Released | Abstentions | % Released |
|----------------|---------------------|------------------|----------------------|-------------|------------|
| Class 7 | 423 | 390 | 33 | N/A | 92.20% |
| Class 8(a) | 2593 | 1963 | 630 | N/A | 75.70% |
| Class 8(b) | 656 | 499 | 157 | N/A | 76.07% |
| Class 9 | 41 | 29 | 8 | 4 | 70.73% |

See Voting Agent Declaration, ¶ 19.

O. Objections

1. Objection of Stephen R. Heflin [Dkt. No.
1779]. The objection of Stephen R. Heflin failed to provide any
basis for the objection and is overruled.

2. Limited Objection of Wells Fargo, National
Association ("Wells Fargo"), in its Capacity as Indenture Trustee,
to Debtor's First Amended Plan of Reorganization Under Chapter
11 of the Bankruptcy Code re: Docket No. 1351 [Dkt. No. 1780]
and Limited Objection of U.S. Bank, National Association ("U.S.
Bank"), in its Capacity as Indenture Trustee, to Debtor's First
Amended Plan of Reorganization Under Chapter 11 of the
Bankruptcy Code re: Docket No. 1351 [Dkt. No. 1781]. Wells
Fargo sought clarifying language in connection with Section 5.17
of the First Amended Plan as well as the defined terms "Secured
Bonds" and "South Dakota Pollution Control Bonds," Sections
1.158 and 1.164 of the First Amended Plan, respectively. U.S.
Bank sought clarifying language in connection with Section 5.17
of the First Amended Plan as well as Section 5.5 of the First
Amended Plan. The Court hereby finds that both objections have
been resolved pursuant to revisions made to the Second Amended
Plan and the objections are overruled. See, Plan §§ 1.168 (Secured
Bonds), 1.174 (South Dakota Pollution Control Bonds), 1.175
(South Dakota Pollution Control Claims), 5.5(b) (Cancellation and

Surrender of Existing Securities Agreements, and 5.18 (Indenture
Trustees Charging Lien).

        3.     Limited Objection of PPL Montana LLC
("PPLM") to Confirmation of the Debtor's First Amended Plan of
Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt.
No. 1784].

            a.     The following documents
have been filed in connection with PPLM's claim: (i)
PPLM's proof of claim, Claim No. 714, as amended on
August 3, 2004 (the "PPLM Claim"); (ii) Debtor's
Objection to Claim of PPL Montana, LLC Pursuant to 11
U.S.C. § 502(b) and Fed. R. Bankr. P. 3007 [Dkt. No.
1658, Debtor's Exh. 85]; (iii) Motion of PPL Montana for
Abstention or in the Alternative for an Order Directing that
Resolution of the Objection to PPL Montana, LLC's Proof
of Claim be Determined by the United States District Court
for the District of Montana [Dkt. No. 1859]; (iv) Order
Granting Abstention [Dkt. No. 2159]; (v) Motion Pursuant
to Sections 105(a), 363(b) and 502(c) of the Bankruptcy
Code for Estimation of PPL Montana LLC's Claim and to
Establish Disputed Claim Reserve [Dkt. No. 2056]; and
(vi) Stipulation and Order Resolving Section III of the
Limited Objection of PPL Montana, LLC to Confirmation

of the Debtor's First Amended Plan of Reorganization
Under Chapter 11 of the Bankruptcy Code and the Debtor's
Motion Pursuant to Sections 105(a), 363(b) and 502(a) of
the Bankruptcy Code for Estimation of PPL Montana
LLC's Claim and Establish a Disputed Claim Reserve [Dkt.
No. 2183] (the "PPLM Stipulation").

    b.    PPLM objected to the First
Amended Plan because it asserted that the injunctions
provided for in the First Amended Plan attempted to
extinguish its setoff rights. Section 10.5(b)(i) of the
Second Amended Plan provides that "[n]otwithstanding
any provision of this Plan to the contrary, this Plan: (i) shall
not enjoin or extinguish any rights or claims asserted by
[PPLM] in its proof of claim dated January 13, 2004 (as
may be amended) or asserted in any other manner,
including, without limitation, [PPLM's] counterclaims and
right of setoff." The Court hereby finds that the language
in Section 10.5(b)(i) resolves PPLM's objection in
connection with the reservation of its counterclaims and
right of setoff; therefore, PPLM's objection to the
injunctions provided in the Plan is hereby overruled.

    c.    PPLM also objected to the
implementation of the provisions of the Plan regarding the

15

establishment of the Disputed Claims Reserve because the
Debtor made inadequate provision for the manner and
timing of establishing reserves for Disputed Claims. The
Debtor and PPLM entered into the PPLM Stipulation
whereby the Debtor will establish a segregated reserve that
will be used solely for the purpose of any distributions to
be made for the PPLM Claim. The segregated reserve will
be funded by shares of common stock equal to the value of
$50,000,000, valued as of the Effective Date, pursuant to
the terms of the PPLM Stipulation. As the Debtor and
PPLM have reached a stipulation in connection with
PPLM's objection, PPLM's objection is resolved pursuant
to the PPLM Stipulation.

4.    Objection of Indenture Trustee to
Confirmation of Debtor's First Amended Plan of Reorganization
[Dkt. No. 1789] (the "Wilmington Trust Objection") and Objection
by Harbert Management to Confirmation of the Debtor's First
Amended Plan of Reorganization Under Chapter 11 of the
Bankruptcy Code [Dkt. No. 1790] (the "Harbert Objection"). The
Wilmington Trust and Harbert Objections to confirmation have
been withdrawn pursuant to a settlement agreement reached
between the parties and incorporated into the Plan. Wilmington
Trust's and Harbert's withdrawals of their objections to

16

confirmation have been filed with the Court. See Dkt. Nos. 1994 and 1982, respectively.

        5.      Objection of Official Committee of Unsecured Creditors in Chapter 11 Case of Touch America Holdings, Inc. (the "TA Committee") to Debtor's First Amended Plan of Reorganization. The TA Committee objected to the First Amended Plan to the extent that it enjoined, limited or released any rights, claims or interests held by the TA Debtors that may arise under any of the D&O Policies and does not release any claims the TA Debtors may hold against any D&O Protected Party to the extent that such claim is against an individual in his or her capacity as a former director or officer of any of the TA Debtors or their present or former affiliates or predecessors. The Second Amended Plan provides that the D&O Insurance Entity Injunction shall not enjoin any rights of the TA Debtors that may arise under any of the D&O Policies. See Plan, § 6.9(c). The Second Amended Plan also provides that "D&O Protected Party" shall exclude any individual who previously served as an officer or director of any of the TA Debtors, or their present or former predecessors, in such individual's capacity as an officer or director of such TA Debtor. See Plan, § 1.49. The Court hereby finds that the objection has been resolved pursuant to revisions made to the Second Amended Plan and the objection is overruled.

6.    Limited Objection of Touch America

Holdings, Inc., et al., Debtors in Possession, to Debtor's First

Amended Plan of Reorganization Under Chapter 11 of the

Bankruptcy Code [Dkt. No. 1872]. The TA Debtors object to the

Plan to the extent that it limits the TA Debtors' ability to receive

distributions as a Class 9 claimant on account of the portion of its

claims classified as general unsecured claims. Section 1.95 of the

Plan provides that to the extent a creditor holds a claim that is not

an Administrative Claim, Fee Claim, Priority Tax Claim,

Unsecured Priority Claim, Bank One DIP Financing Claim, CSFB

Financing Claim, Secured Claim, Unsecured Note Claim,

Unsecured Subordinated Note Claim, Unsecured Convenience

Claim, D&O Trust Claim, Other Equity Interest, Securities Claim,

Opt-Out Securities Claim or Environmental Claim, such claim

shall be a General Unsecured Claim. The TA Debtors objection

also sought to ensure that the Disputed Claim Reserve was

adequate to pay any potential Class 9 or Class 12 claims asserted

by the TA Debtors. The Court hereby finds that pursuant to

Section 1.95 of the Plan, to the extent the TA Debtors hold an

Allowed General Unsecured Claim under the Plan such claim shall

receive distributions as a Class 9, General Unsecured Claim. The

Court also finds that Sections 7.5 and 7.6 of the Plan provides for

the Disputed Claim Reserve and procedures for distributions to

18

Disputed Claims that become Allowed Claims. Accordingly, the Court finds that the objection of the TA Debtors has been resolved or is addressed by Sections 7.5 and 7.6 of the Plan.

7.    Limited Objection of Richard R. Hylland to Confirmation of the Debtor's First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Hylland Objection").

a.    The Hylland Objection objects to Section 13.1 of the Plan which provides that the Bankruptcy Court will retain exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Case and the Plan. Excluding the arbitration proceedings initiated by Hylland and currently stayed, which proceedings will be permitted to proceed once the automatic stay is dissolved, the Court hereby finds that continuing jurisdiction, as provided for in the Plan, is appropriate, necessary and consistent with applicable law.

b.    The Hylland Objection also asserts that Section 10.5 of the First Amended Plan impermissibly impairs Hylland's setoff rights. Section 10.5(b)(iii) of the Second Amended Plan provides that "[n]otwithstanding any provision of this Plan to the contrary, this Plan: . . . (iii) shall not affect any setoff

rights, if any, of Richard Hylland." The Court hereby finds that the language in Section 10.5(b)(iii) resolves this portion of the Hylland Objection and such objection is overruled

              c.       The Hylland Objection also objects to the Plan to the extent that the Plan does not provide that claims not paid by the D&O Trust receive the treatment provided to Class 7 and Class 9. The Court finds that Section 524(e) of the Bankruptcy Code does not limit the equitable power of the Court to enjoin suits against third parties where the injunction is necessary to the plan and workable reorganization. Based upon the pleadings filed in connection with the Class Action settlement, the provisions of the Plan and the support of the Creditors' Committee and other parties-in-interest, including the MPSC, the Court finds that the Plan represents a global agreement among the parties in this case, premised on all of the mutually interdependent elements, including the formation and funding of the D&O Trust and the D&O Injunctions necessary to implement the D&O Trust. See Memorandum Decision Approving the Class Action Settlement [Dkt. No. 2175] and Order Approving the Stipulation and Settlement Agreement Among Debtor,

Montana Public Service Commission and Montana
Consumer Counsel Pursuant to Sections 105(a) and
1129(a)(4) of the Bankruptcy Code and Rule 9019 of the
Bankruptcy Rules [Dkt. No. 1706]. Upon consideration of
the provisions of the Second Amended Plan, the D&O
Trust Documents and the arguments and evidence
presented at the Confirmation Hearing, the Court overrules
Hylland's objection finding that the Debtor's transfer of its
interest in the insurance policies to the D&O Trust as
provided in Section 6.6 of the Second Amended Plan and
the Insurance Assignment Agreement provides sufficient
and adequate consideration for the channeling injunction,
that the D&O Trust is properly capitalized and that limiting
the recovery on D&O Claims to the D&O Trust provides
fair and adequate treatment to D&O Trust Claimants who
have received the benefit of the releases set forth in
Sections 6.9 and 10.5(c) of the Plan and Class Action
Settlement Documents, as consideration for the transfer of
the D&O Policies to the D&O Trust and the D&O Trust
Channeling Injunction. The Court finds the Debtor's
argument that the first in, first out ("FIFO") method of
distribution is consistent with the distribution of D&O
insurance policy proceeds being utilized to fund the D&O

Trust persuasive and hereby finds that access to the D&O Trust as the only remedy available to a Director or Officer for reimbursement of costs and related indemnification claims is appropriate, necessary and consistent with the Bankruptcy Code. Therefore, the Hylland Objection to the injunctions provided in the Plan is hereby overruled.

    d.  The Hylland Objection also objected to the Debtor's agreement to contribute up to $2.5 million to pay Defense Costs incurred by current Officers and Directors only (in the event the D&O Trust is exhausted). The Debtor has presented evidence that the agreement to contribute up to $2.5 million to pay Defense Costs incurred by current Officers and Directors is in recognition of the Debtor's statutory and contractual indemnity obligations to its current Officers and Directors, and additional consideration to the current Officers and Directors who have continued to serve the Debtor during this Chapter 11 Case. Upon consideration of the arguments and evidence, the Court declines to accept the objector's position. The Court hereby finds that Section 5.1 of the Plan is appropriate and consistent with all applicable laws, and the Hylland Objection to the allocation of the $2.5 million to pay Defense Costs incurred by current Officers

and Directors only in the event the D&O Trust is exhausted
is overruled.

          e.        The Hylland Objection urged
the Court to find that to the extent his claims are classified
as a Class 9 claim, Mr. Hylland's claims related to the
D&O Proceedings are not properly classified and are being
excluded from the D&O Trust. The evidence clearly shows
that Mr. Hylland's claims are properly classified and Mr.
Hylland received ballots for both Class 9 and Class 12
claims, but only returned the Class 9 ballot. See
Declaration of Voting Agent Regarding Ballots of Richard
R. Hylland in Connection with Debtor's First Amended
Plan of Reorganization [Dkt. No. 2037]. Moreover, the
Plan provides in Section 4.9 to the extent that Mr. Hylland
holds Class 9 Claims that are not D&O Trust Claims and
are ultimately determined to be Allowed General
Unsecured Claims, Mr. Hylland will receive the same
treatment as any other holder of an Allowed Class 9 Claim.
Based on the evidence presented, the Court declines to
accept Mr. Hylland's arguments and hereby overrules the
Hylland Objection alleging improper classification. Based
on the arguments of counsel and the evidence presented
and after due deliberation, the Court hereby finds that

Section 4.9 of the Plan provides that the portion of Mr. Hylland's Claims that may qualify as an Allowed D&O Trust Claims shall be treated as D&O Trust Claims and channeled to the D&O Trust and the portion of Mr. Hylland's Claims that may be determined to be an Allowed Class 9 Claim shall be treated as a Class 9 Claim.

8.    Objection of Goldman, Sachs & Co. ("Goldman Sachs") to Confirmation of Debtor's First Amended Plan of Reorganization [Dkt. No. 1795] and Objection of Milbank, Tweed, Hadley & McCloy LLP ("Milbank Tweed") to the Debtor's Second Amended Disclosure Statement [Dkt. No. 1986] (the "Milbank Objection"). Goldman Sachs and Milbank Tweed filed similar objections asserting that to the extent that the D&O Trust Channeling Injunction could be construed to impair their rights against non-Debtor parties such injunction was improper. Section 10.9 of the Plan provides that the Plan shall not enjoin, release or otherwise impair any claim of Goldman Sachs or Milbank Tweed against any person or entity other than the Debtor and the Reorganized Debtor or otherwise limit any defense, setoff, counterclaim or cross claim either Goldman Sachs or Milbank Tweed may have against any entity, except that any recovery by Goldman Sachs and Milbank Tweed on such counterclaim or cross claim against the Debtor or Reorganized Debtor shall be limited by

24

the Plan. Upon consideration of the evidence and the revisions to
the Plan, the Court hereby finds that the objections have been
resolved and are hereby overruled.

The Milbank Objection also asserts that the Plan cannot determine whether the MPC
Policies are part of the Debtor's estate. First, the insurance policies whose proceeds are subject
to the Insurance Assignment Agreement do not include the MPC Policies. See Insurance
Assignment Agreement, Exh. A. Second, the Debtor has acknowledged that its interests in the
MPC Policies are disputed. See Plan, Exh. C. Moreover, to the extent the McGreevey Litigation
settlement is approved, the Debtor will be transferring and assigning its rights and interest in the
MPC Policies. Neither the Plan nor this Confirmation Order seek to determine whether the MPC
Policies are part of the Debtor's estate; therefore, Milbank Tweed's objection regarding the MPC
Policies is overruled.

9.    Objection of the United States of America to
Confirmation of the Debtor's First Amended Plan of
Reorganization dated May 17, 2004 [Dkt. No. 1897]. The United
States of America (the "United States") asserts that the Debtor
owes undisputed pre-petition and post-petition fees under certain
permits with the United States Department of Agriculture, Forest
Service. The Debtor has represented that it intends to assume the
obligations related to the permits. See Notice of Contracts the
Debtor Intends to Assume and/or Reject Pursuant to Section IV.F
of the Debtor's First Amended Disclosure Statement Pursuant to
Section 1125 of the Bankruptcy Code for the Plan of

within the meaning of Section 468B of the Internal Revenue Code
and the regulations issued thereunder. On the Effective Date, all
right, title and interest in and to the D&O Trust Assets and any
proceeds or Causes of Action thereunder shall be transferred to and
vested in the D&O Trust, free and clear of all Claims, Equity
Interests, Encumbrances and other interests of any Person without
further action of any Person.

18. Transfer of Claims and Demands to the D&O Trust. On the
Effective Date, all liabilities, obligations, and responsibilities
relating to all D&O Trust Claims shall be transferred to the D&O
Trust.

19. Discharge of Liabilities to Holders of D&O Trust Claims. Except
as provided in the Plan Documents, as amended by the Debtor on
October 4, 2004 [Dkt. No. 2157], and the Confirmation Order, the
transfer to, vesting in, and assumption by the D&O Trust of the
D&O Trust Assets and the D&O Insurance Assignment, as
amended by the Debtor on October 4, 2004 [Dkt. No. 2157], as
contemplated by the Plan, the D&O Protected Parties Settlement
Agreement, as amended by the Debtor on October 4, 2004 [Dkt.
No. 2157], and the Insurance Assignment Agreement, as amended
by the Debtor on October 4, 2004 [Dkt. No. 2157], among other
things, on the Effective Date shall, and hereby does, (a) discharge,
release and extinguish all obligations and liabilities of the Debtor

74

and the Reorganized Debtor for and in respect of all D&O Trust
Claims, and (b) discharge, release and extinguish all obligations
and liabilities of the Released Parties for and in respect of all D&O
Trust Claims. On the Effective Date, the D&O Trust shall assume
liability for any D&O Trust Claims that arise out of the D&O
Proceedings and shall pay the D&O Trust Claims and Defense
Costs in accordance with the TDP.

20. D&O Trust Channeling Injunction. The sole recourse of the
holder of a D&O Trust Claim in respect of such Claim shall be the
D&O Trust pursuant to the provisions of the D&O Trust
Channeling Injunction and the TDP, and such holder shall have no
right whatsoever at any time to assert its D&O Trust Claim against
the Debtor, the Reorganized Debtor or any Released Party or any
property or interest in property of the Debtor, the Reorganized
Debtor or any Released Party; provided, however, that neither the
D&O Trust Channeling Injunction nor the D&O Insurance Entity
Injunction shall apply to the holders of the QUIPS, to the extent
that such holders did not consent to the releases.

21. Reinstatement of Unimpaired Secured Claims. Each holder of an
Allowed Bank One DIP Financing Claim, CSFB Financing Claim,
Secured Bondholder Claim, or Other Secured Claim shall receive
in full satisfaction, settlement, release, extinguishment and
discharge thereof, full Reinstatement of such Allowed Claim,

75

# EXHIBIT 12

RECEIVED NOV 18 2002

1 | Wayne Harper
NorthWestern Energy, LLC.
2 | 40 E. Broadway St.
Butte, MT 59701-9394
3 | (406)497-2257

4 | Stanley T. Kaleczyc
Kimberly A. Beatty
5 | BROWNING, KALECZYC, BERRY & HOVEN, P.C.
139 North Last Chance Gulch
6 | Helena, Montana 59601
(406) 443-6820

7 |

Attorneys for NorthWestern Energy, LLC.
8 |

MONTANA SECOND JUDICIAL DISTRICT COURT,
9 | BUTTE-SILVER BOW COUNTY

10 |

MARGARET A. MCGREEVEY;          )
11 | THOMAS G. TAYLOR; JOANNE      )
BARKELL; PATRICK BURTON;        )
12 | ROSALIE BURTON; JAMES         )
DUDLEY; JOSEPH MARTELLI;        )
13 | and LAWRENCE A. LOMBARDO,     )    Cause No. DV-01-141
                                )
14 |         Plaintiff,          )
                                )
15 |      v.                     )
                                )
16 | MONTANA POWER COMPANY, a     )    **SUBSTITUTE MOTION FOR LEAVE**
Montana Corporation;           )    **TO ADD NORTHWESTERN**
17 | MONTANA POWER, L.L.C.;       )    **CORPORATION AS AN**
TOUCH AMERICA HOLDINGS,        )    **ADDITIONAL PARTY-DEFENDANT**
18 | INC.; R.P. GANNON;           )
J.P. PEDERSON; M.J.            )
19 | MELDAHL; KAY FOSTER; CARL    )
LEHRKIND, III; DEBORAH D.      )
20 | McWHINNEY; TUCKER HART       )
ADAMS; ALAN F. CAIN; JOHN      )
21 | G. CONNORS; R.D. CORETTE;    )
JOHN R. JESTER; MICHAEL E.     )
22 | ZIMMERMAN; JOHN D. HAFFEY;   )
NOBLE E. VOSBURG; PPL          )
23 | MONTANA, LLC; GOLDMAN,       )
SACHS & CO.,a Limited          )
24 | Partnership;                 )
THE GOLDMAN SACHS GROUP,       )
25 | INC.; PANCANADIAN PETROLEUM  )
LIMITED, a Canadian            )
26 | Corporation;                 )
                                )
27 |                             )

1

109549

1  WESTMORELAND COAL COMPANY,            )
   a Delaware corporation, and          )
2  its wholly- owned                    )
   subsidiary CES ACQUISITION           )
3  CORP.; MILBANK, TWEED,               )
   HADLEY & McCLOY, LLP; and            )
4  JOHN DOES 3-5

5  Defendant.

6  _____

7       Northwestern Energy, LLC, (NWE) and NorthWestern Corporation

8  (NOR) through their counsel, hereby moves this Court for an order

9  to add NOR as an additional party-defendant in this action in full

10 compliance with this Court's Order of October 23, as reaffirmed by

11 this Court following the hearing on November 4.  In support of this

12 Motion, movants state:

13      1.  This Court, in its Order dated October 23, 2002 stated, in

14 pertinent part as follows:

15           NorthWestern Energy, L.L.C. shall not transfer
             its  utility  business  and  other  interests
16           acquired from the Montana Power Company until
             such  time  as  an  appropriate  entity  has
17           appeared to be substituted for NorthWestern
             Energy,  L.L.C.  with  the  approval  of  this
18           Court.

19 Order at page 2, paragraph 2.

20      2.  This Court in its ruling from the bench on November 4,

21 2002 reaffirmed its October 23 Order.

22      3.  At the November 4 hearing, counsel for NWE represented to

23 the Court that it was and is the intention of NOR to reorganize the

24 manner in which it holds the Remaining Utility Business acquired

25 from Touch America Holdings, Inc. (TA Holdings) and The Montana

26 Power Company (MPC) by converting substantially

27

2

1 all of those holdings from ownership by its subsidiary (NWE) to
2 NOR.

3      4.    This reorganization of the holding of the Remaining
4 Utility Business Assets was contemplated in the Final Order of the
5 Montana Public Service Commission dated January 31, 2002 as
6 explained in the affidavit of Dennis Lopach, Senior Vice President
7 Administrative Services for NWE, which is on file with this Court.
8 Lopach Affidavit at paragraphs 8-10.    Further, NWE and NOR
9 anticipate the approval of the Federal Energy Regulatory Commission
10 for the assumption of the debts of NWE by NOR on or about November
11 15, 2002.

12      5.    As Mr. Lopach also explained in his affidavit, this
13 reorganization is in the best interest of the shareholders,
14 customers and ratepayers of NOR.    Lopach Affidavit at paragraphs
15 12-15.

16      6.    NOR desires to proceed with the restructuring and
17 reorganization of the assets on or about November 15, 2002.
18 Restructuring by this date is anticipated by the financial markets,
19 the Securities and Exchange Commission and the shareholders of NOR.
20 As a result of such reorganization, substantially all of the assets
21 and liabilities of the Remaining Utility Business will be
22 transferred to NOR; however, certain of the assets and liabilities
23 will remain with NWE.

24      7.    In order to give effect to the Court's order of October
25 23, 2002, NWE requests and NOR stipulates and represents to this
26 Court that NOR may be added as an additional party-defendant to
27 these proceedings subject to the personal jurisdiction of this

3

1    Court. NOR further stipulates and represents to this Court that it
2    will be responsible for any judgment which might be entered in
3    these proceedings against NWE to the extent that NWE might not have
4    sufficient assets to satisfy such judgment and that NOR is subject
5    to the procedures for all forms of pre- and post-judgment relief
6    and execution procedures under applicable Montana Law. NWE and NOR
7    shall retain any and  all defenses or claims which NWE and NOR, or
8    either of them, may have with respect to the matters which are or
9    may be pending in these proceedings.

10       8.    NOR stipulates that it has no present plans to spin
11    off, merge or reorganize any of the utility business assets which
12    are to be transferred from NWE to NOR in the reorganization
13    contemplated herein.  NOR will include the Plaintiffs' counsel on
14    the service list for all filings with the Federal Energy Regulatory
15    Commission (FERC) and the Montana Public Service Commission (MPSC)
16    which relate to the issuance of securities, incurrence of debt, any
17    pledge, lien, security interest or other encumbrance or the
18    transfer of utility assets of  NOR.  NOR represents that it will
19    not object to Plaintiff's assertion of standing in the dockets
20    established by the filings described above.  NOR represents it can
21    not pledge, incur a security interest, lien, assume additional
22    indebtedness except such that matures one year or less after the
23    date of such issue, renewal, or assumption as provided for in 18
24    C.F.R. § 34.3C2, or transfer utility assets within the State of
25    Montana, or transfer utility assets as provided in 16 U.S.C. §
26    842b, which provides in part a public utility can not transfer all
27    or any part of a public utility's facilities with a value in excess

109549

1   of $50,000, that are subject to the jurisdiction of FERC or MPSC
2   without the prior approval of FERC and MPSC.

3        9.   NOR further stipulates and represents to the Court it
4   will not take any action intentionally designed to frustrate the
5   ability of Plaintiffs to obtain the utility business assets if
6   there is a judgment entered in this case.

7        10.  It is stipulated by NOR and NWE that Plaintiffs,
8   including the Plaintiff Class, retain all rights and remedies to
9   hereafter challenge the transfer of assets from NWE as a fraudulent
10  transfer. NOR and NWE reserve any and all defenses or claims which
11  NOR and NWE or either of them may have with respect to any claim by
12  Plaintiffs regarding fraudulent transfer.

13       11.  Based on these understandings and stipulations,
14  Plaintiffs' counsel have been contacted and state that they have no
15  objection to the addition of NOR on the basis described above and
16  that Plaintiffs' counsel agree that the transfer described
17  satisfies the requirements of the Court's October 23, 2002 and
18  November 4, 2002 Orders.

19       DATED this *15th* day of November, 2002
20                      BROWNING, KALECZYC, BERRY & HOVEN, P.C.
21
22                      By *Kimberly Beatty*
23                         Stanley T. Kaleczyc
24                         Kimberly A. Beatty
25                      Counsel for NorthWestern Energy, LLC and
26                      NorthWestern Corporation
27

5

109549

1

## CERTIFICATE OF SERVICE

2

    I hereby certify that on the _15th_ day of November, 2002, a
true copy of the foregoing was faxed and mailed by first-class

3   mail, postage prepaid, addressed as follows:

4   Dana L. Christensen                    Stephen H. Orel
    Christensen, Moore, Cockrell,          Michael Lesch
5   Cummings & Axelberg, P.C.              Leboeuf, Lamb, Greene
    P.O. Box 7370                           & MacRae, LLP
6   160 Heritage Way                       125 West 55th Street
    Kalispell, MT 59904-0370               New York, NY 10019
7
    Robert M. Murdo                        Patrick T. Fleming
8   Jackson, Murdo, Grant                  General Counsel
       & McFarland, P.C.                   130 North Main
9   203 North Ewing                        Butte, MT 59701-9332
    Helena, MT 59601
10                                         Wade J. Dahood
    R. Keith Strong                        Knight, Dahood, McLean
11  Dorsey & Whitney                         & Everett
    8 Third St. North                      113 East Third Street
12  Davidson Building                      Anaconda, MT 59711
    Great Falls, MT 59403
13                                         Frank B. Morrison, Jr.
    Steven J. Harman                       Morrison Law Offices, P.C.
14  Scott G. Gratton                       341 Central Avenue
    Brown Law Firm, P.C.                   Whitefish, MT 59937
15  315 N. 24th St.
    Billings, MT 59107-0849                Dale L. McGarvey
16                                         Roger M. Sullivan
    John L. Warden                         McGarvey, Heberling, Sullivan
17  John Hardiman                            & McGarvey, P.C.
    Sullivan & Cromwell                    745 S. Main
18  125 Broad Street                       Kalispell, MT 59901
    New York, NY 10004
19                                         Milton Datsopoulos
                                           Datsopoulos, MacDonald
20                                           & Lind, P.C.
                                           201 W. Main, Ste. 201
21                                         Missoula, MT 59802

22

23

24  _____
    BROWNING, KALECZYC, BERRY & HOVEN, P.C.
25

26

27

6

109549